UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> A. O. SMITH CORPORATION, AJITA RAJENDRA, KEVIN WHEELER, and JOHN KITA, <br><br> Defendants. | CASE NO. 2:19-CV-01198-LA <br><br> <u>CLASS ACTION</u> <br><br><br><br><br> <u>JURY TRIAL DEMANDED</u> |

**CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 2

II.     PARTIES ....................................................................................................... 7

        A.      Plaintiffs ............................................................................................ 7

        B.      Defendants ......................................................................................... 8

        C.      Relevant Nonparty ........................................................................... 10

III.    JURISDICTION ......................................................................................... 10

IV.     OVERVIEW OF THE FRAUD ................................................................. 11

        A.      A. O. Smith's Growth Was Highly Dependent On Sales In China ..................... 11

        B.      Defendants Violated SEC Regulations By Concealing That
                A. O. Smith's China Business Largely Depended On A Single,
                Undisclosed Customer Known As "UTP" ........................................ 12

        C.      Defendants Used UTP To Carry Out A Channel Stuffing Scheme ..................... 17

        D.      A. O. Smith Secretly Guaranteed Channel Stuffing Loans For
                UTP, Which Was Essentially Insolvent .......................................... 21

        E.      Defendants Promoted The Strength Of A. O. Smith's Sales And
                Distribution In China Without Disclosing UTP Or Highly Material
                Facts Regarding The Company's Relationship With UTP ................ 23

        F.      The Truth About A. O. Smith's China Business Is Revealed In A
                Series Of Disclosures ...................................................................... 25

                1.      Overstocked Chinese Customers Reduced Orders, Forcing
                        Defendants To Disclose Disastrous Financial Results ................ 25

                2.      An Extensive Investigation By J Capital Revealed The
                        Truth About A. O. Smith's Relationship with UTP, And
                        Sent A. O. Smith Shares Plummeting ...................................... 26

                3.      Defendants Have Admitted The Core Features Of The
                        Channel Stuffing Scheme ....................................................... 31

                        a)      Following The May 16 J Capital Report,
                                Defendants Were Forced To Admit That UTP Is An
                                A. O. Smith Customer ................................................... 31

Case 2:19-cv-01198-LA   Filed 11/22/19   Page 2 of 98   Document 21

b)     Defendants Admit That The Company Funded And Backstopped UTP's Channel Stuffing Loans – And That Such Information Was "Material Nonpublic Information" That Was Required To Be Disclosed ..................... 35

c)     Defendants' Post-Class Period Statements Repeatedly Validated J Capital's Reporting ................................. 36

G.     On-The-Ground Witnesses In China Confirmed J Capital's Reporting And The Company's Admissions ..................................................... 42

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 44

A.     February 2017 Form 10-K ....................................................................... 49

B.     Investor Presentations Throughout The Class Period ........................................... 50

C.     April - May 2017 Misstatements And Omissions ................................................... 51

D.     July - August 2017 Misstatements And Omissions ............................................... 52

E.     October 2017 Misstatements And Omissions ........................................................ 53

F.     November 2017 Omissions ........................................................................ 54

G.     January - February 2018 Misstatements And Omissions ...................................... 54

H.     April - May 2018 Misstatements And Omissions ................................................ 57

I.     July 2018 Misstatements And Omissions ............................................................ 58

J.     August 2018 Omissions ........................................................................... 59

K.     October 2018 Misstatements And Omissions ...................................................... 60

L.     November 2018 Omissions ........................................................................ 61

M.     January 2019 Misstatements And Omissions ...................................................... 61

N.     February 2019 Misstatements And Omissions .................................................... 62

O.     April 2019 Misstatements And Omissions ........................................................... 63

P.     May 2019 Misstatements And Omissions ........................................................... 65

VI.     ADDITIONAL SCIENTER ALLEGATIONS ................................................................. 66

VII.     LOSS CAUSATION ........................................................................................ 75

VIII.   CLASS ACTION ALLEGATIONS ................................................................. 79

IX.    UNDISCLOSED ADVERSE FACTS ............................................................ 81

X.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON
THE MARKET DOCTRINE ......................................................................... 82

XI.    NO SAFE HARBOR .................................................................................... 84

XII.   COUNTS ...................................................................................................... 85

XIII.  PRAYER FOR RELIEF ............................................................................... 88

XIV.  JURY DEMAND .......................................................................................... 89

Lead Plaintiff City of Birmingham Retirement and Relief System ("City of Birmingham" or "Lead Plaintiff") brings this action under the federal securities laws, individually, and on behalf of all persons or entities that purchased or otherwise acquired A. O. Smith Corporation ("A. O. Smith," "AOS," or the "Company") common stock during the period February 17, 2017 through May 28, 2019, inclusive (the "Class Period"), and who were damaged thereby (the "Class") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, *et seq.* (the "Exchange Act").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the independent investigation of its undersigned counsel. This investigation includes review and analysis of (i) A. O. Smith's public filings with the Securities and Exchange Commission (the "SEC"); (ii) research reports by securities analysts; (iii) transcripts of A. O. Smith's conference calls with analysts and investors; (iv) Company presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of A. O. Smith common stock; (vii) interviews with former A. O. Smith and UTP employees, as well as employees of other Chinese distributors; and (viii) other material and data concerning the Company, as identified herein. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

# I.    INTRODUCTION

1.    A. O. Smith manufactures and sells water heaters, tanks, boilers, and water treatment products.  In recent years, the Company has increasingly turned to China to generate growth.  A. O. Smith's sales in China were critical to the Company's financial performance for several years leading up to the Class Period.  Indeed, **over 90%** of the Company's revenue growth during the two-year period preceding the Class Period was derived from China.

2.    Given the critical importance of China to the Company's performance, A. O. Smith's senior executives were intensely focused on the Company's business in China and provided investors with regular, detailed updates on demand, sales, and inventories in China. Defendants promoted purported "strong demand" and "high demand" for the Company's products in China, and represented that the Company's "record" sales were "primarily due to higher sales in China."  Defendants identified specific "growth drivers" of demand for A. O. Smith products in China, and assured investors that the Company was actively managing inventory levels in China through its "extensive" distribution network that provided A. O. Smith with a "clear market advantage in China."

3.    In truth, all of these statements, and many more, were false and highly misleading.  Unbeknownst to investors at the time, the Company's China business was utterly dependent on a single customer, Jiangsu Huiyuan Supply Chain Management Co., Ltd. ("UTP"), that was essentially insolvent and that Defendants used to perpetrate a classic sales channel stuffing scheme.  As a securities research firm ultimately exposed, UTP was involved in almost every aspect of A. O. Smith's China business, was at the center of Defendants' distributor-financed channel stuffing scheme, and accounted for as much as 75% of A. O. Smith's sales in China.  The scheme vastly distorted the Company's business and reported financial results in China by forcing unwanted inventory on A. O. Smith's customers so that A. O. Smith could

2

report inflated "sales" that the Company itself financed and guaranteed. The scheme led to an immense overstocking of A. O. Smith products. While Defendants told investors that customer demand was strong and driving the Company's impressive reported sales in China, in truth, demand was declining through much of the Class Period and the channel stuffing scheme ballooned customer inventories to more than double their normal sizes. A. O. Smith's customers became so overloaded with inventory that they canceled contracts so that they could remove any contractual obligations to receive more A. O. Smith inventory.

4.     The mechanics of Defendants' channel stuffing were designed to obscure the scheme from investors. A. O. Smith secretly loaned money to UTP or had banks in China issue loans to UTP backstopped by A. O. Smith's cash collateral or commitment to "repurchase" unsold inventories. UTP, in turn, would then loan money to downstream distributors so that they could purchase products from A. O. Smith. A. O. Smith deposited cash in escrow, and – as Defendants have recently admitted – the Company assumed a massive undisclosed risk to "***repurchase***"[1] inventory that had been bought under the loans. While Defendants continually touted the strength of their business in China, they deliberately withheld material information about that business. Defendants never informed investors that A. O. Smith had agreed to repurchase the products it had "sold" to distributors if the distributors could not sell the products. Nor did Defendants inform investors that those sales were predicated on loans that A. O. Smith had effectively guaranteed. The failure to disclose such information created a materially false impression about the Company's business in China.

5.     Indeed, despite the highly material nature of Defendants' channel stuffing perpetrated through UTP, Defendants never voluntarily disclosed ***anything*** about it to investors.

---

[1] Unless otherwise noted, all emphasis herein is added.

3

In fact, Defendants **never even so much as mentioned the existence of UTP** in their securities filings and other public statements to investors during the Class Period even though (i) well-established SEC regulations clearly require public companies such as A. O. Smith to disclose their major customers to investors – the SEC explicitly considers such information to be "material information" that "allows a reader to better assess risks associated with a particular customer, as well as material concentrations of revenues related to that customer"; and (ii) UTP was not only responsible for the majority of A. O. Smith's China revenue, but was also **the Company's single largest customer worldwide**. These material omissions enabled A. O. Smith to not only disguise its dependence on a single (essentially insolvent) customer in China, but also to cover up the extent of flagging demand and declining sales in China.

6. Moreover, each and every financial statement A. O. Smith issued to investors during the Class Period was materially false and misleading for failing to disclose A. O. Smith's agreements with Chinese banks to "repurchase" unsold inventories if distributors became delinquent on their payments. These secret inventory repurchase agreements – which Defendants now admit have existed for years and backstopped hundreds of millions of dollars of Chinese loans – were highly material to investors. Under the federal securities laws' disclosure requirements, Generally Accepted Accounting Practices ("GAAP"), and established financial accounting requirements, Defendants were obligated to disclose not only the existence and nature of these material commitments and contingencies, but also the gross amount of impacted loans – loans for which A. O. Smith assumed **all credit risks** to the Chinese banks under UTP's asset-backed financing arrangements. Significantly, however, it was not until **after** securities analysts uncovered the channel stuffing scheme and anxious investors bombarded the Company with questions that Defendants began including such information in their financial statements—a

4

telling admission that such information was material and necessary to render the financial statements accurate and complete.

7. The truth finally began to emerge on April 30, 2019, when the Company was forced to release disastrous financial results, as the China sales channel stuffing had proved unsustainable. The Company continued to omit any mention of UTP, however, and provided highly unrealistic and misleading assessments of the status of the Company's business in China. Then, on May 16, 2019, securities analysts at J Capital Research ("J Capital") published a comprehensive 66-page report that exposed the scheme. As the securities analysts at J Capital explained in painstaking detail, "*despite never appearing in [A. O. Smith's] financial filings or being mentioned on conference calls*," a single customer, UTP, was "*involved in almost every aspect of A. O. Smith's China business*" and was responsible for "*as much as 75% of AOS China sales*."

8. J Capital's May 16, 2019 report was based on exhaustive research, including site visits and photographs, tax records and financial reports filed with Chinese authorities, as well as extensive interviews with UTP staff, over a dozen of A. O. Smith's key distributors in China, A. O. Smith competitors in China, and A. O. Smith's own subsidiaries in China. As one large distributor interviewed by J Capital reported, A. O. Smith "*adopted a sales strategy that would make AOS sales look like they were rising but … AOS stuffed channels, pushing UTP and, in turn, distributors, to take on more inventory than they needed, to hide the sales decline*."

9. J Capital's revelations of A. O. Smith's channel stuffing scheme sent the Company's stock price plummeting and forced Defendants to respond. The very next day, Defendants issued a press release that, for the first time, *admitted that UTP was a material customer for the Company's China operations*. Significantly, Defendants did not deny a single

specific fact stated in the J Capital report. A. O. Smith's stock price continued to decline after the press release, eventually falling over 10% and erasing nearly $700 million in shareholder market capitalization.

10. Less than two weeks later, on May 29, 2019, J Capital released a second report that provided further evidence and analysis detailing the channel stuffing scheme and the impacts on A. O. Smith's overall business and financial condition. The report explained how Defendants' May 17 admission that UTP was a customer of A. O. Smith showed that A. O. Smith had blatantly violated SEC Regulation S-K, Item 101 which (as noted) requires publicly traded companies to disclose major customers. The report also further exposed the deep business and financial entanglements between A. O. Smith and UTP, that, combined with financial reports filed in China, "*clearly show that UTP, AOS's largest customer worldwide, is essentially insolvent and could collapse*" and that "*AOS has supported UTP with loans or guarantees*." The report further documented how the previously undisclosed channel stuffing became so intense that "*many distributors cannot keep up with the contracted orders enforced by AOS*" and were "*breaking contracts, because the inventory pressure is so great*." In response to the second J Capital report, A. O. Smith's stock price declined further, falling by over 4%.

11. Once again, Defendants were forced to admit to the core of J Capital's findings. On June 3, 2019, Defendants filed a Form 8-K with the SEC admitting that A. O. Smith had for years been backstopping UTP's loans to A. O. Smith's customers. Significantly, Forms 8-K are used only when companies need to disclose material information to investors, and such disclosure cannot wait until the filing of a quarterly Form 10-Q or annual Form 10-K. A. O. Smith's Form 8-K made the critical importance of the information abundantly clear: Given

"requests for additional information" from investors and analysts after Defendants' cursory May 17, 2019 press release, Defendants' filing admitted that, consistent with J Capital's research, "***UTP … provides asset-backed financing to certain of the Company's distributors in China***" and A. O. Smith was potentially on the hook for the loans, because it had "***agreed to repurchase inventory***" from customers. Moreover, as further evidence that Defendants knew they had omitted highly material facts from their securities filings during the Class Period, the Company's post-Class Period SEC filings now regularly report the previously secret "asset-backed financing" of customers and the "repurchase arrangements" with Chinese banks.

12. As a result of Defendants' fraudulent scheme, Lead Plaintiff and other investors purchased A. O. Smith common stock at artificially inflated prices during the Class Period and have suffered substantial losses. In total, disclosures related to UTP and A. O. Smith's channel stuffing scheme have wiped out over $1.4 billion in shareholder value, as A. O. Smith's stock price plummeted from its Class Period high of $68.39 per share, to a low of $41.19 per share, representing a decline of 40%.

13. The fallout from the fraud continues to this day, as A. O. Smith has recently announced significant layoffs and store closures in China due to the continued excess inventories. As securities analysts noted following the revelation of the fraud, "[s]elling water heaters and water filters should be a simple business. If you have nothing to hide."

## II. PARTIES

### A. Plaintiffs

14. Lead Plaintiff City of Birmingham Retirement and Relief System is a public pension fund that manages retirement funds of current and retired civil service employees, elected officials, and appointed employees in the City of Birmingham, Alabama. As of the start of the second quarter of 2019, City of Birmingham oversaw approximately $1 billion in assets

for more than 7,300 members.  As set forth in the attached certification, City of Birmingham bought A. O. Smith common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

       **B.**    **Defendants**

15.     Defendant A. O. Smith is a Milwaukee-based manufacturer of gas and electric water heaters, boilers, tanks and water treatment products.  It has significant operations overseas, particularly in China.  A. O. Smith's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "AOS."

16.     Defendant Ajita Rajendra ("Rajendra") has served as the Executive Chairman of A. O. Smith since September 2018.  Previously, he served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of A. O. Smith (the "Board").  Rajendra joined the Company in January 2005 as President of the Water Products Company and was named Executive Vice President of A. O. Smith in 2006, President and Chief Operating Officer ("COO") in 2011, President and CEO in 2013, Chairman, President and CEO in 2014, and Chairman and CEO in 2017.  Rajendra has been a member of the Board since December 2011.

17.     Defendant Kevin Wheeler ("Wheeler") has served as President and CEO of A. O. Smith since September 2018, its President and COO from May 2017 to September 2018, and a member of the Board since July 2017.  He previously served as the Company's General Manager of North America, India and Europe water heating from 2013 to 2017.  Prior to that, he served as the Company's Senior Vice President and General Manager of the North America, India, and Europe water heating business from 2011 to 2012 and Senior Vice President and General Manager of the U.S. retail business for the Water Products Company from 2007 to 2011.  From 2004 to 2007, Wheeler was A. O. Smith's Vice President – International, with responsibility for all European and Asian operations.  Prior to that, Wheeler was the managing

8

director of A. O. Smith Water Products Company B.V. from 1999 to 2004. Wheeler joined A. O. Smith in 1994 as a regional sales manager.

18. Defendant John Kita ("Kita") served as Chief Financial Officer ("CFO") of A. O. Smith throughout the Class Period until his retirement in May 2019. Previously, he served as A. O. Smith's Senior Vice President, Corporate Finance and Controller from 2006 to 2011, Vice President, Treasurer and Controller from 1996 to 2006, Treasurer and Controller from 1995 to 1996, and Assistant Treasurer from 1988 to 1994. Defendant Kita is also the Chairman of A. O. Smith's largest and most profitable Chinese subsidiary, A. O. Smith (China) Water Heater Co., Ltd. According to A. O. Smith, Kita "played a crucial role" in the Company's "entrance into the Chinese market."

19. Defendants Rajendra, Wheeler, and Kita are referred to herein as the "Individual Defendants."

20. Throughout the Class Period, each of the Individual Defendants possessed the power and authority to control the contents of A. O. Smith's reports to the SEC, as well as its press releases and presentations to investors and securities analysts, money and portfolio managers, and institutional investors. Each Individual Defendant, while serving as a senior executive and/or director of A. O. Smith, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and misleading. The false statements pleaded herein were

9

each "group-published" information and were the result of the collective actions of the Individual Defendants.

**C.      Relevant Nonparty**

21.      Jiangsu Huiyuan Supply Chain Management Co., Ltd. (*i.e.*, UTP) is headquartered in Nanjing, China.  During the Class Period, UTP was involved in nearly every aspect of A. O. Smith's Chinese operations and was at all relevant times responsible for at least 50%, and up to 75%, of the Company's sales in China.

**III.      JURISDICTION**

22.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, the principal executive offices of A. O. Smith are located within this District at 11270 West Park Place, Suite 170, Milwaukee, Wisconsin 53224.

25.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone calls, and the facilities of a national securities exchange.

## IV.    OVERVIEW OF THE FRAUD

### A.    A. O. Smith's Growth Was Highly Dependent On Sales In China

26.    A. O. Smith was founded in 1874 and is the largest manufacturer and marketer of water heaters in North America.  The Company also manufactures and markets water boilers, water tanks, water treatment products, and in-home air purification products for sale in more than 60 countries.  However, the lion's share of the Company's sales and revenues are derived from just two countries, the United States and China.

27.    A. O. Smith sells its products direct to retail customers (such as the Lowe's hardware stores) and to distributors, or, as A. O. Smith referred to them in filings with the SEC during the Class Period, "distribution customers," including "distribution customers in China." In investor presentations throughout the Class Period, Defendants also repeatedly referred to the Company's "large regional distributors" as "A. O. Smith's customers."

28.    A. O. Smith has two reporting segments, North America and Rest of World ("ROW").  The North America segment consists primarily of the United States and Canada.  The ROW segment consists primarily of China, Europe, and India.  For years, A. O. Smith principally relied on its U.S. business to meet its financial targets.  Indeed, the Company did not report ROW segment performance in its financial statements until the 2011 fiscal year.

29.    As the domestic market for its products matured, A. O. Smith increasingly looked to foreign markets to drive sales and earnings growth.  In particular, A. O. Smith looked to the massive housing market in China to grow the Company's revenues and earnings.  During the two years immediately preceding the Class Period, *i.e.*, from the fourth quarter of 2014 to the fourth quarter of 2016, the Company's purported revenue growth in the ROW segment accounted for *over 90%* of the Company's total revenue gains – with over 90% of ROW revenues coming from China.  China's growing importance to A. O. Smith's overall business is further illustrated in the

11

figure below:



30.     By the start of the Class Period, A. O. Smith's sales and sales growth in China were critical to the Company's financial performance and future prospects.   Defendants recognized the heightened importance of A. O. Smith's China operations and, in the months leading up to the Class Period, promoted the Company's rapid growth in China as critical to the Company's success.

**B.      Defendants Violated SEC Regulations By Concealing
         That A. O. Smith's China Business Largely Depended
         On A Single, Undisclosed Customer Known As "UTP"**

31.     Unbeknownst to A. O. Smith's investors, since at least 2015, the Company's business in China was utterly dependent on a single customer and "logistics provider": UTP. UTP claims to have been established in 2007 in Nanjing, China, in order to provide "smart

12

business supply chain services" to companies doing business in China. UTP purports to provide an "intelligent business supply chain platform" that offers clients of the firm a variety of services, including "procurement execution" and "distribution execution," to enhance their "comprehensive competitiveness" among other things.

32.     A. O. Smith is UTP's biggest client and the companies have long shared an extensive business relationship. For example, J Capital reported that since 2015, UTP has hired and paid A. O. Smith staff, procured raw materials for A. O. Smith, managed warehousing for A. O. Smith, managed manufacturing processes at A. O. Smith, and collaborated with A. O. Smith in R&D – including the construction of new manufacturing and research plants. UTP and A. O. Smith also were joint venture partners, with UTP operating multiple online stores for A. O Smith in China. In certain locations, including Nanjing, UTP and A. O. Smith operated on adjoining parcels of land. Significantly, UTP was the exclusive distributor for Shanghai and Shenzhen, A. O. Smith's two biggest markets in China, and numerous other cities in China.

33.     Critically, UTP was at the heart of Defendants' distributor-financed channel stuffing scheme in China. A. O. Smith used UTP to report China sales volumes in line with or above the Company's targets, and to hide deteriorating sales and margins in the region amid flagging demand from customers. UTP did so by inflating inventories of A. O. Smith's downstream customers in two principal ways: (i) serving as an undisclosed middleman for loans to A. O. Smith's downstream distributors – loans which A. O. Smith guaranteed; and (ii) soaking up excess inventory, as UTP was obligated to take (and could not return) inventory if requested by A. O. Smith. One of A. O. Smith's competitors recently confirmed this relationship between A. O. Smith and UTP, describing UTP as a "tunhuoshang" (吞货商), which translates as "*stockpiler*."

34.     Given UTP's role as a loan conduit and stockpiler of inventory, UTP was by far A. O. Smith's largest customer in China during the Class Period.  On May 16, 2019, securities research firm J Capital published a thoroughly researched, 66-page report (the "May 16 J Capital Report") that revealed to investors a litany of previously undisclosed facts about A. O. Smith's China business, including that UTP was responsible for "as much as 75% of AOS China sales."

35.     The research report, titled "Hot Water," was based on the firm's well-documented investigation on the ground in China that included, among other things: (i) extensive interviews with UTP employees and nineteen different A. O. Smith distributors in China; (ii) aerial and on-the-ground photography of A. O. Smith's current and future manufacturing plants and research facilities in China, as well as warehouse space owned by UTP and dedicated to A. O. Smith; and (iii) a forensic analysis of the U.S. financial statements and securities filings of A. O. Smith and the financial statements and tax records of A. O. Smith subsidiaries, A. O. Smith competitors, and UTP filed with China's finance and tax bureau.  The report found that "[d]espite never appearing in the financial filings or being mentioned on conference calls, UTP Supply Chain is involved in almost every aspect of A. O. Smith's China business" – "most notably, 'accepting' inventory and financing AOS distributors."

36.     Indeed, based on the detail facts set forth in the May 16 J Capital Report, UTP was not only responsible for the vast majority of A. O. Smith's China business, but it was also ***A. O. Smith's single largest customer in the entire world***, accounting for between 14% and 26% of A. O. Smith's total sales throughout the Class Period.[2]

---

[2] According to A. O. Smith's Forms 10-K and 10-Q filed with the SEC during the Class Period, China was responsible for between 28.5% and 35.0% of total Company revenues each quarter during the Class Period.  As J Capital's extensive research in China uncovered, UTP, in turn, was responsible for between 50% to 75% of A. O. Smith's China revenues.  Accordingly, UTP was responsible for between 14.2% and 26.3% of A. O. Smith's total consolidated (worldwide)

14

37.     Despite the fact that A. O. Smith's most important business segment was utterly

dependent on a single customer (UTP), A. O. Smith failed to disclose even the existence of this

customer until the very end of the Class Period, when the relationship was exposed and dissected

not by the Company, but by securities analysts who conducted an extensive investigation into the

Company's business dealings in China.  Defendants' omission constituted a clear violation of the

Company's disclosure obligations under the federal securities laws and a blatant violation of the

SEC's reporting requirements for publicly traded companies, in particular, under Item 101(c) of

Regulation S-K, 17 C.F.R. § 229.101(c)(1)(vii).

38.     SEC Regulation S-K mandates that listed companies provide certain important

information to investors as part of their regular public corporate filings with the SEC.  As most

pertinent to the allegations herein, Item 101 of Regulation S-K requires that companies identify

the names and relationships of certain large customers in the first substantive section (*i.e.*, the

"Business" section) of their annual reports to investors on Form 10-K.  Specifically, Item 101

requires that reporting companies disclose, for each business segment about which financial

information is presented in the financial statements:

> ***The dependence of the segment upon a single customer***, or a few customers, the
> loss of any one or more of which would have a material adverse effect on the
> segment.  ***The name of any customer and its relationship, if any, with the
> registrant or its subsidiaries shall be disclosed if sales to the customer by one or
> more segments are made in an aggregate amount equal to 10 percent or more of
> the registrant's consolidated revenues and the loss of such customer would have
> a material adverse effect on the registrant and its subsidiaries taken as a whole.***
> ….  For purposes of this paragraph, a group of customers under common control

---

revenue throughout the Class Period.  During the Class Period, A. O. Smith did not report any
customers anywhere in the world who had such a large percentage of the Company's business,
but, tellingly, the Company did report material customers in North America that had smaller
percentages of the Company's consolidated revenues, and since J Capital's revelations
Defendants have admitted that UTP was involved in "approximately 70% of the Company's
sales in China."

15

or customers that are affiliates of each other shall be regarded as a single customer.

17 C.F.R. § 229.101(c)(1)(vii).

39. The SEC has emphasized the importance of Item 101 on multiple occasions. For example, the SEC has stated that "the identity of major customers is material information to investors. This disclosure allows a reader to better assess risks associated with a particular customer, as well as material concentrations of revenues related to that customer." In 2016, the SEC reiterated that "the identity of major customers is material information to investors."

40. A. O. Smith has also recognized the importance of disclosing major customers such as UTP to investors. In each of the Company's annual reports on Forms 10-K throughout the Class Period, Defendants stated that the Company's "concentration of sales to a relatively small number of customers makes our relationship with each of these customers important to our business." The Forms 10-K additionally stated that "[a] material loss, cancellation, reduction, or delay in purchases by one or more of our largest customers could harm our business" and that the Company "cannot assure that we will be able to retain our largest customers" as some customers "may shift their purchases to our competitors." Defendants conceded that the "loss of one or more of our largest customers [or] any material reduction or delay in sales to these customers … could have a material adverse effect on our financial position, results of operations and cash flows." Notably, for A. O. Smith's North America segment, Defendants disclosed in each of the Company's Forms 10-K during the Class Period how many customers had over 10% of the Company's consolidated revenues, and what percentages of revenues each of those customers had, for the prior three fiscal years.

41. Despite the explicit reporting requirements of Item 101 and Defendants' own statements about the critical role that A. O. Smith's largest customers played in supporting the

16

Company's business performance, Defendants never disclosed to investors the existence of UTP. UTP's very existence – and the role it played in A. O. Smith's China business – was only finally revealed by the securities analysts at J Capital, who issued extensive reports on the relationship in May 2019 (*see* ¶¶61-69, 75-79). Significantly, the May 16 J Capital Report caused an immediate, dramatic decline in the price of the stock, of more than 10%, and forced A. O. Smith to issue a press release the very next day in which it was compelled to admit the relationship with UTP. Given that UTP consistently accounted for between 14% and 26% of the Company's consolidated revenues during the Class Period and the loss of UTP would clearly have had a material adverse effect on A. O. Smith, A. O. Smith's failures to identify and describe its relationship with UTP in the Company's Forms 10-K filed during the Class Period constituted clear violations of Item 101.

**C.      Defendants Used UTP To Carry Out A Channel Stuffing Scheme**

42.      Defendants' failure to disclose the existence of UTP was no accident. To the contrary, by concealing the existence of UTP from the market, A. O. Smith hid a series of additional highly material facts from investors, including that (i) UTP was essentially insolvent and relied extensively on A. O. Smith for financial support; (ii) much of A. O. Smith's growth in China was financed by the Company itself, including through lending facilities that required the Company to "repurchase" unsold inventories; and (iii) A. O. Smith's reports of strong growth in China also depended on A. O. Smith stuffing UTP with millions of dollars of excess inventory that UTP was required to take but could not sell. As securities analysts at J Capital revealed, A. O. Smith's undisclosed relationship with UTP allowed A. O. Smith to mask a slowdown in China sales and inflate gross margins through years-long "distributor financed channel stuffing."

43.      Channel stuffing has been defined by the American Institute of Certified Public Accountants as "[a] marketing practice that suppliers sometimes use to boost sales by inducing

17

distributors to buy substantially more inventory than they can promptly resell." According to the SEC, channel stuffing involves "[t]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so." As the SEC has explained, "[m]aterial undisclosed channel stuffing may cause a company's reported results of operations to be misleading."

44.     Here, A. O. Smith's and UTP's channel stuffing scheme in China began in approximately 2015 and took off in 2016 and 2017. According to J Capital's interviews with UTP staff and nineteen A. O. Smith distributors, UTP became A. O. Smith's China supply-chain partner in 2015, right as the Chinese "real estate market cratered." Since 2015, A. O. Smith has used its extensive relationship with UTP to achieve growth in an increasingly difficult market – *i.e.*, "to inflate gross margins and mask the actual China revenue slowdown through distributor-financed channel stuffing" – in two principal ways.

45.     First, A. O. Smith carried out its channel stuffing scheme by liberally pushing out credit and incentive payments to distributors utilizing UTP as the financing vehicle. As reported by J Capital based on interviews with UTP executives and distributors, A. O. Smith loaned money to UTP at a rate of 2% interest, and UTP used those funds to extend working capital to A. O. Smith distributors at an 18% annualized interest rate (allowing UTP a 16-point spread on the loans). These distributor loans by UTP generally had six-month terms but were repaid as distributors sold inventory and then re-extended when they took on more inventory, usually on a cycle of between ten days and six weeks. As one distributor in China stated, "[t]he assistance we get is loans from UTP. We use our stock as collateral. UTP pays the loan money directly to AOS for the stock that is delivered to us." In addition to loaning funds to distributors through

18

UTP, A. O. Smith also bulked up distributors with excess inventory by guaranteeing loans that UTP made to downstream distributors under lending facilities with Chinese banks. This second, somewhat less direct loan mechanism had essentially the same effect: the Company secretly compromised its own financial position to finance customer inventory purchases in China. The following diagram, published in the May 16, 2019 J Capital Report, illustrates A. O. Smith's undisclosed backstopping of UTP's loans to downstream purchasers of A. O. Smith products in China:



46. Second, in exchange for the 16-point spread that UTP earned on loans to A. O. Smith's downstream customers, A. O. Smith obligated UTP to take any inventory requested by A. O. Smith, and A. O. Smith strictly prohibited UTP from returning these goods. According to J Capital's interviews with UTP executives and distributors, if UTP was unable to

sell the excess inventory on to downstream distributors, "it holds the inventory for the following quarter."

47.     Multiple distributors specifically confirmed the channel stuffing scheme and described how it impacted their business during the Class Period.  For example, one distributor stated that A. O. Smith was so forceful in overstocking distributors with inventory that distributors found it necessary to break their contracts with A. O. Smith in order to stop the flow of inventory from A. O. Smith: "We hear that many distributors cannot keep up with the contracted orders enforced by AOS.  They are breaking contracts, because the inventory pressure is so great."  Another distributor described how, in 2018, A. O. Smith was able to hide declining sales in China amid a deteriorating market and after channels were already bloated with excess inventory by providing higher rebates on sales volumes and directing UTP to reduce interest rates on the working-capital loans that it extended to customers.  According to this large distributor, A. O. Smith specifically implemented these strategies to "make AOS sales look like they were rising" even though the strategies "would be bad for distributors."

48.     Indeed, with so much inventory in China, A. O. Smith was forced to cut prices, putting its margins "under threat" and driving up the level of excess inventories held by UTP for the following quarter.  Distributors confirmed how, in addition to channel stuffing loans, Company product launches also elevated inventories.  For example, one distributor confirmed that it had an immense "eight months of inventory" and stated that "[t]he rate of new products coming out is too fast and it is relentlessly increasing our inventory.  Before we have sold out the old model a new model is brought out and we have to buy more inventory."  Similarly, another distributor stated that he was heavily overstocked with "six months of inventory" and confirmed that "[a]s a distributor we must purchase inventory of the new models" and the "inventory

pressure" by A. O. Smith "started to pick up in the H2 of last year," *i.e.*, the second half of 2018, just prior to the Company's announcement of disastrous financial results for the first quarter of 2019.

**D.  A. O. Smith Secretly Guaranteed Channel Stuffing Loans For UTP, Which Was Essentially Insolvent**

49.     As discussed above, part of the channel stuffing scheme involved banks in China that loaned funds to UTP, which would then loan money to other distributors so that they could purchase products from A. O. Smith.  Because of this scheme, UTP was forced to take on so much debt that it was essentially insolvent, as J Capital revealed.  Critically, financial records in China showed that UTP was severely undercapitalized, with only ¥147 million in fixed assets, and a massive ¥1.43 billion in short-term debt – or 10 times its fixed asset base.  Indeed, UTP had so much debt that its after-tax profit was insufficient to pay the interest on its debt.  As J Capital reported, "*Chinese financial statements clearly show that UTP, AOS's largest customer worldwide, is essentially insolvent and could collapse*."

50.     Because of UTP's precarious financial condition, the Chinese banks that made loans to UTP required A. O. Smith to guarantee them (as well as the loans to the downstream distributors).  A. O. Smith did so by depositing cash in escrow and by agreeing to repurchase unsold inventory from customers.   Under this arrangement, A. O. Smith shareholders were unknowingly on the hook for any number of circumstances that could cause the Company to forfeit the cash collateral held in escrow or have to "repurchase" channel-stuffed inventory that the Company had "sold" in prior quarters.  Thus, if the customers receiving the loans were unable to sell the inventory or otherwise unable or unwilling to repay the loans, or if UTP was unable or unwilling to repay the banks under the loans, and if certain additional conditions were met under the terms of the loans, A. O. Smith was required to expend funds to satisfy the loan

21

obligations in what Defendants called a "repurchase" – even though, as explained further below (*see* ¶¶83-89), there were no original "sales" under the accounting rules. As J Capital summarized, the borrowers in China were "***at risk of default – and AOS could be on the hook***."

51.     The size of the Company's undisclosed channel stuffing loans was highly material. A. O. Smith reported that, as of the end of 2018, the Company had about ***$539 million*** of its cash in China, ***or about 84% of the Company's total cash***. As J Capital revealed, A. O. Smith's use of its cash and undisclosed relationship with UTP to fund customers' purchases of A. O. Smith products in China was the "key" to solving the "mystery" of why A. O. Smith kept such a large percentage of the Company's cash in China. Significantly, A. O. Smith's cash balances in China rose even as sales growth in China flattened – further indicating that the cash was being used as collateral for channel stuffing loans. In 2013, A. O. Smith had 49% of the Company's cash in China while reporting 26% sales growth. By 2018, despite reported sales growth of just 3.5% in China, the Company had a massive 84% of its cash in China. As J Capital revealed, A. O. Smith's massive cash balances in China were being used to fund or guarantee the Company's undisclosed channel stuffing loans through UTP.

52.     Within the total amount of funds and financing that A. O. Smith dedicated to the channel stuffing scheme was the smaller amount of inventories that A. O. Smith was potentially subject to "repurchase" from customers. But even this smaller amount was still highly material. As A. O. Smith has now admitted, the "gross repurchase amounts" for loans issued under UTP's collateralized lending facilities were $67 million, $76 million, and $78 million as of December 31, 2017, December 31, 2018, and March 31, 2019, respectively. These were massive amounts of loans in the context of A. O. Smith's China operations. In Q1 2019, for example, the $78 million in A. O. Smith's "gross repurchase amounts" under the loans amounted to ***one-third of***

*the Company's quarterly Rest of World sales of $232.1 million*, and a staggering *six times the Company's quarterly Rest of World earnings of $12.3 million*.

      **E.**    **Defendants Promoted The Strength Of A. O. Smith's Sales And Distribution In China Without Disclosing UTP Or Highly Material Facts Regarding The Company's Relationship With UTP**

53.      Remarkably, the highly material facts set forth above were never disclosed to investors during the Class Period. Investors in A. O. Smith were entirely unaware that the Company's business in China – the key to its growth – depended almost entirely on one customer that was "essentially insolvent." Investors were also entirely unaware that A. O. Smith had financed hundreds of millions of dollars worth of its "sales" in China, or that the Company had posted substantial amounts of cash collateral for distributor loans and agreed to the "repurchase" obligations. Indeed, in blatant violation of SEC regulations, A. O. Smith failed to disclose even the mere existence of UTP to investors, notwithstanding the fact that it was the Company's single largest customer worldwide.

54.      Instead, Defendants repeatedly promoted the Company's sales increases in China and the purportedly strong consumer demand in China that fueled the Company's results. In numerous quarterly and annual SEC filings, investor conference calls, company presentations, and press releases issued during the Class Period, Defendants emphasized the Company's "record" sales and "double-digit" sales growth that was driven, in substantial part, by A. O. Smith's China business. Defendants cited numerous "growth drivers" for the "strong demand," and "continued high demand" that existed for A. O. Smith's consumer products in China, including "overall water heater market growth," "geographic expansion," "market share gains," "continued strong growth of water treatment products," and "air purification product growth" – all the while omitting that the distributor-financed and Company-backed channel stuffing was artificially inflating the Company's sales.

23

55.     In fact, when analysts and investors asked for more detail about the Company's China business and the sustainability of its purported growth trajectory, Defendants reassured them that there was no reason for concern, and that the Company's business in China was "fantastic."   For example, during an investor conference call in February 2017, Robert McCarthy, an analyst at Stifel Nicolaus, expressed concerns to Defendants about the Company's "outsized exposure to China sales."   In response, Defendant Rajendra stated that "you are right that we do have a lot of revenue exposure there, *which we like*," and assured investors that "*[t]he growth has been fantastic*, and we have very strong fundamentals in China with a strong brand and strong distribution, a great team."   Defendants gave no indication of the channel stuffing scheme, and again omitted the Company's reliance on its most important customer, UTP, for the vast majority of China sales.

56.     As part of addressing investor concerns about the Company's exposure to China, Defendants also repeatedly updated investors on significant trends in China sales.  Defendants emphasized that they were aware of inventory levels in China and had processes and programs to reduce inventory levels.   In 2018, for example, Defendants reported somewhat elevated inventories, but evasively attributed them to external factors such as declines in the macro-economic environment, declines in the value of Chinese currency, and a growing trade war with China.  Defendants reassured investors that there were no underlying issues with A. O. Smith's China business, and continued to omit UTP and the material channel stuffing.

57.     For example, during an investor conference call in July 2018, Defendant Wheeler stated the Company had "a systematic approach to reducing inventories over time" that involved "many programs to move our inventory," including promotional activities and product bundling. When an analyst from Longbow Research asked during the call whether recent increases in

24

inventory levels were unique to A. O. Smith, Defendants omitted key issues that were unique to A. O. Smith, *i.e.*, customer overstock and contract cancellations due to distributor-financed channel stuffing and A. O. Smith's complex financing arrangements and guarantees. Instead, Rajendra responded that "the slowdown has to be hitting everybody," and Defendant Kita added that "you have to assume everybody's kind of in the same [boat]."

      **F.    The Truth About A. O. Smith's China Business
             Is Revealed In A Series Of Disclosures**

             **1.    Overstocked Chinese Customers Reduced Orders, Forcing
                      Defendants To Disclose Disastrous Financial Results**

      58.    The scheme began to be revealed in April 2019, when, after years of slowing growth in China, A. O. Smith's Chinese customers could no longer absorb Defendants' excess inventories. On April 30, 2019, Defendants reported abysmal financial results for the first quarter of 2019, with dramatic revenue declines in China. Indeed, the Company reported just $232.1 million in revenues for the ROW segment in the first quarter of 2019 – a ***21%*** decline from the first quarter of 2018 and the lowest quarterly revenue figure for the segment ***in three years***. A. O. Smith reported an even worse result for the segment's earnings, with first quarter 2019 earnings of just $12.3 million – a ***66%*** decline versus first quarter 2018 earnings of $36.1 million and the lowest quarterly earnings figure for the segment since the Company began reporting ROW earnings ***eight years*** prior. Defendants specifically attributed the poor results to the "impact to profits from lower China sales." The ROW segment's operating margins also plummeted, falling from 12.3% in the first quarter of 2018 to just 5.3% in the first quarter of 2019 – the lowest quarterly margin figure for the segment since the Company began reporting Rest of World financials in the first quarter of 2011.

      59.    Moreover, in contrast to Defendants' statement just weeks earlier in A. O. Smith's 2018 Form 10-K that any sales decline in China would be due to "the Chinese economy

25

continu[ing] to be weak and the Chinese currency depreciat[ing]," Defendants now told investors that the precipitous fall in China sales was "a result of a channel inventory build" that occurred one year earlier, during the first quarter of 2018.  Even then, however, Defendants downplayed the "inventory build" as transitory, stating that "China performing better" would contribute to a "stronger second half in 2019 compared with the first half."  Defendants lowered their guidance for China sales performance in 2019, stating that, excluding a purported 5% impact from "inventory build," full-year 2019 China sales would "be down approximately 6% to 8% in local currency terms."  While continuing to conceal A. O. Smith's relationship with UTP, the full extent of the inventory overstocking of A. O. Smith products in China, and the Company's "repurchase" obligations under UTP's lending facilities, Defendants also maintained the midpoint of their EPS guidance for 2019.

60.    Investors reacted immediately to the Company's disclosures.  On April 30, 2019, the price of A. O. Smith common stock fell nearly 6%, or $3.24 per share, erasing over $459 million in market capitalization on the highest trading volume of the year.

### 2.    An Extensive Investigation By J Capital Revealed The Truth About A. O. Smith's Relationship with UTP, And Sent A. O. Smith Shares Plummeting

61.    The existence of UTP – and the other highly material facts alleged herein – were first revealed to investors not by the Company, but by J Capital, which published two comprehensive research reports about A. O. Smith on May 16 and 29, 2019.  The reports were supported by dozens of witness interviews, government records, site photographs, financial analysis, and additional research, which detailed that: (i) A. O. Smith's business and purported growth in China was almost completely dependent on one distributor, UTP, which constituted the vast majority – as much as 75% – of A. O. Smith's sales in China; (ii) A.O. Smith had stuffed UTP and additional customers with tens of millions of dollars worth of excess inventory that

26

they did not want or need; (iii) UTP was essentially insolvent and relied on A. O. Smith for financial support; (iv) in order to make sales in China, A. O. Smith had been forced to post cash collateral and guarantee loans made by UTP to the Company's downstream distributors (and which required A. O. Smith to incur "repurchase" obligations with the Chinese banks that loaned UTP money), thereby creating a material risk that "sales" could be reversed and the Company could be on the hook for millions of dollars in bad loans; and (v) given the true extent of the channel-stuffed inventory overhang, A. O. Smith's guidance for fiscal 2019 was false.

62.     First, the May 16 J Capital Report stunned investors by revealing A. O. Smith's extensive relationship with UTP – which "***despite never appearing in [A. O. Smith's] financial filings or being mentioned on conference calls***" was "***involved in almost every aspect of A. O. Smith's China business***." The report detailed how "UTP's involvement spans the acquisition of raw materials, the hiring of labor, potentially co-owning factories, marketing, ***and most notably 'accepting' inventory and financing AOS distributors***." Indeed, according to J Capital's research and analysis, UTP was estimated to be responsible for "***as much as 75% of AOS China sales***."

63.     Bolstered by its extensive interviews in China of UTP staff and nineteen A. O. Smith distributors,[3] J Capital also revealed how A. O. Smith's undisclosed relationship with UTP "***obscured***" the Company's business performance and financial results in China by "***allow[ing] AOS to inflate gross margins and mask the actual China revenue slowdown through distributor-financed channel stuffing***."

64.     J Capital's reporting exposed precisely how A. O. Smith "***induc[ed] UTP to take***

---

[3] J Capital interviewed 19 of A. O. Smith's approximately 30 top-tier distributors. In addition, J Capital conducted an "in-depth survey" of 12 distributors that accounted for approximately 30% of A. O. Smith's China sales.

27

*on extra inventory*" and "*used its cash for distributor loans to prop up sales*." As J Capital ultimately revealed, UTP – which was "*cash poor*" and "*essentially insolvent*" – was able to provide loans to A. O. Smith's distributors because A. O. Smith (and not UTP) underwrote and backstopped the loans. J Capital explained in remarkable detail how various aspects of the undisclosed A. O. Smith-UTP-distributor financing arrangement worked:

- "UTP purchases AOS product at a discount of 10-15% and sells to AOS distributors, including some of its own subsidiaries. UTP does not pay up front but pays AOS after the … distributors pay UTP."

- "Distributors take about 10 days of inventory at a time and usually pay UTP rather than AOS. Since UTP settles with AOS once per quarter, UTP receives a significant float from AOS apart from the financing …."

- "***UTP is obliged to take any inventory requested by AOS and cannot return goods,*** according to interviews. ***If the company is unable to sell the products on to distributors, it holds the inventory for the following quarter***."

- "UTP extends working capital to AOS distributors at 18% annualized. The loans generally have six-month terms but are repaid as distributors sell inventory then re-extended when they take on more – usually on a cycle of between 10 days and six weeks."

- "AOS lends money to UTP at 2%, allowing UTP a 16-point spread on loans."

65. J Capital also explained how, in 2018, A. O. Smith was able to hide declining sales in China amid a deteriorating market and "after packing channels with inventory" via its undisclosed relationship with UTP, while claiming sales *improvement*. Based on J Capital's extensive interviews with UTP and numerous key distributors, in addition to pumping UTP with excess inventory that could not be returned to the Company and underwriting UTP's loans to downstream distributors, A. O. Smith provided higher rebates on sales volumes and caused UTP to reduce the interest rates on the working-capital loans that UTP extended to distributors. A large A. O. Smith distributor in China illustrated UTP's role in the channel stuffing specifically in 2018 by explaining that while A. O. Smith sales fell sharply in 2018, the Company used "***a***

28

*sales strategy that would make AOS sales look like they were rising but would be bad for distributors. AOS stuffed channels, pushing UTP and, in turn, distributors, to take on more inventory than they needed, to hide the sales decline*." This, J Capital revealed, "*occurred at AOS's direction, given that UTP is not able to return unsold inventory*." Thus, AOS was "*able to report sales growth only because of help from UTP*."[4]

66.    J Capital further exposed how A. O. Smith was required to provide UTP with "*entrusted loans*" because "*no bank would lend to UTP without extra guarantees or collateral*." J Capital described in its May 16 report how it had engaged Chinese attorneys to obtain financial statements submitted to China's tax bureau by UTP and A. O. Smith's China subsidiaries. The financial statements showed that UTP had "just ¥147 mln in fixed assets, making up only 10% of the [UTP's] short-term debt"; its "current liabilities exceed current assets"; and its "after-tax profit is insufficient to pay the interest on debt—even though that rate is artificially low." As a result of UTP's precarious financial position, AOS was forced to provide UTP with an entrusted loan, "meaning that AOS would extend the loan to UTP, *or AOS may guarantee the loan by depositing cash in escrow*." As J Capital explained, these entrusted loans are "*extremely risky*" because "Chinese distributors of consumer appliances tend to be small, thinly capitalized private companies with thin margins" which "*frequently default*" during industry downturns. Consequently, "*a significant portion of AOS's cash is stuck in China and at risk of being tapped to cover defaults*." As J Capital emphasized, "*[i]f AOS is providing*

_____

[4] According to J Capital's research, A. O. Smith was able to hide a substantial decline in China sales in 2018 via its undisclosed relationship with UTP. J Capital uncovered, for example, that "A. O. Smith (China) Water Heater, by far the largest and most profitable subsidiary in China, reported a gross sales decline of 8.62% in 2018 to Chinese authorities." On a consolidated basis, J Capital calculated that, after taking into account the many intercompany transfers, A. O. Smith's income in China in fact "*declined by 5% in 2018 even after packing channels with inventory*." Indeed, the May 16 J Capital Report explained that A. O. Smith's distributors were "*now carrying double the normal level of inventory*" based on J Capital's distributor surveys.

29

*distributor financing, AOS should make such a disclosure*."

67.     The May 16 J Capital Report laid bare "*a striking anomaly: a huge proportion of the company's cash balances are kept in China*."  The Company's cash in China totaled an extraordinary $539 million – *"about 84% of the company's total cash at yearend 2018"* and an amount that "*exceed[s] the proportion of Chinese revenue and profit in the company overall*" and rose even as Chinese sales growth flattened.  For example, "[i]n 2013, when AOS reported 26% sales growth in China, the company had 49% of its cash and 27% of company sales in China.  By 2018, when reported sales growth was 4%, the cash had risen to 84% of the total but sales to just 34%."  The Company's exceptionally large cash balance in China was "puzzling," J Capital remarked, noting cynically that *"[i]f AOS really has $539 mln in unencumbered cash balances in China, then its financial managers are some of the dumbest on the planet.*"

68.     Next, the May 16 J Capital Report detailed how Defendants' April 30, 2019 statements to investors regarding the Company's China business for the remainder of 2019 were false and misleading.  During the April 30, 2019 investor conference call, Defendant Wheeler stated that full-year sales in China would "decline … 7% to 9%," or "6% - 8% in local currency terms."  As the May 16 J Capital Report explained, however, this statement vastly understated the severe decline in A. O. Smith's China business that was already occurring.  As the report revealed, "detailed distributor channel checks [that] indicate China revenue will fall by as much as *21%* in 2019 vs management's claims of a 6-8% decline."

69.     The May 16 J Capital Report noted that while Defendants had claimed during the April 30, 2019 conference call that pre-existing inventory build would negatively impact Q2 2019 sales by about $25 million, in truth, "our distributor survey in Q1 2019 shows that the company is still carrying around two months of more inventory on average than normal.  That

translates to about ***$140 [million] in excess inventory still in the system***" – or nearly ***six times*** as much inventory as the $25 million Defendants stated. The May 16 J Capital Report further revealed that Defendants were "***disingenuous***[]" when claiming during the April 30, 2019 investor conference call that "we don't know our channel inventory numbers precisely." As J Capital reported, the notion that Defendants "are not certain how much inventory is in the channel" was "disingenuous[]" because J Capital's extensive investigation revealed that "***distributors are required to report inventory levels to AOS***."

70. The market was stunned by the revelations in the May 16 J Capital report and sent the Company's stock price plummeting. Following the release of the report, A. O. Smith's share price fell $4.88 per share over the next three trading days, a decline of over 10% that erased nearly $700 million in market capitalization.

### 3. Defendants Have Admitted The Core Features Of The Channel Stuffing Scheme

#### a) Following The May 16 J Capital Report, Defendants Were Forced To Admit That UTP Is An A. O. Smith Customer

71. As a result of the May 16 J Capital Report and precipitous drop in the price of the stock, Defendants were forced to respond. On May 17, 2019, A. O. Smith issued a press release entitled "A. O. Smith Sets the Record Straight on J Capital Research Report." The short press release did not provide any significant factual rebuttal of the May 16 J Capital Report, but instead claimed that the report "makes inaccurate, unfounded and misleading allegations" and was "misinformation." In so doing, however, Defendants admitted a core revelation of the May 16 J Capital Report, *i.e.*, that A. O. Smith had a material undisclosed customer in China – UTP – through which most of A. O. Smith's China business flowed. Indeed, the press release explicitly admitted that UTP was a "supply chain partner" in China that "***purchase[s] product from us***."

72. Tellingly, Defendants refused to quantify the amount of products that UTP

31

purchased from the Company, and did not deny any of the May 16 J Capital Report's highly material facts, including that (i) UTP was the Company's biggest customer worldwide; (ii) A. O. Smith had for years used UTP as part of an extensive channel stuffing scheme; (iii) as a result of the channel stuffing, A. O. Smith's customers currently had far more inventory than Defendants had let on; (iv) the economic downturn in China was far worse than Defendants had represented; (v) UTP was a "stockpiler" that was required to accept inventory as A. O. Smith demanded; (vi) A. O. Smith guaranteed loans to its own customers so the customers would turn around and buy A. O. Smith inventory from UTP; and (vii) the Company was potentially required to forfeit cash collateral or "repurchase" substantial amounts of its customers' unsold inventories.

73.     Instead of denying any of the specific facts revealed by J Capital, the press release responded flatly that its relationship with UTP was "common for many companies who do similar business in *China.*" (Emphasis in original.)  The Company also claimed, without support, that "[a]ll revenue associated with UTP and others was appropriate[ly] recognized," but failed to address whether A. O. Smith's *expenses* – including expenses incurred in financing loans for customers to purchase A. O. Smith's products – were appropriately recognized.

74.     Securities analysts at Spruce Point Capital ("Spruce Point") responded to the press release on May 17, 2019 by noting that the Company's "***response to J Capital reads more like an admission than a defense.  So now they disclose the existence of the undisclosed material partner?  And still no clarity on what is the full extent of this relationship and how stuffed the channels still are?***"  Spruce Point also pointed to the "carefully worded language" of the press release, noting that while the Company assured investors that "revenue" associated with UTP was appropriately recognized, the Company did not mention expenses being appropriately

32

recognized, stating "what about the expenses? How are the costs to finance the loans to distributors [and] the UTP employees acting functionally like [A. O. Smith] employees accounted for?"

75. On May 29, 2019, J Capital issued a report in response to A. O. Smith's May 17 press release. The seven-page report (the "May 29 J Capital Report"), entitled "Company: 'Nothing to See Here'; AOS China Continues Its Decline," provided further facts and analysis exposing Defendants' false and misleading statements, including "half-truths and omissions" to investors. Indeed, the May 29 J Capital Report dissected in detail A. O. Smith's May 17 press release topic by topic and explained how Defendants' statements to investors were false and misleading, and omitted material facts.

76. For example, the May 29 J Capital Report explained how Defendants' May 17 admission that UTP was a customer of A. O. Smith demonstrated that A. O. Smith had violated SEC reporting Regulation S-K Item 101(c)(1)(vii). *See also* ¶¶38-41. As the report stated, Defendants' press release "*admits that Jiangsu UTP is a customer, not just a logistics services provider*." Drawing on its prior research and analysis, as well as more recent further research, J Capital described how (i) UTP was the master distributor for the two largest AOS markets and at least four additional markets; (ii) UTP is the second-largest shareholder of a distributor joint venture that manages all of AOS China's online sales, "amounting to about $350 mln per year per company reports"; and (iii) no less than 65% of the independent distributors interviewed by J Capital purchase from UTP. "Adding together these involvements," the securities analysts at J Capital underlined that UTP must be responsible for "at least half of AOS sales in China, or about $500 mln" and "at least 16%" of the Company's total gross revenues, easily triggering Item 101's disclosure requirement.

33

77.     The report also further exposed the deep business and financial entanglements between A. O. Smith and UTP.  J Capital detailed how "*AOS has supported UTP with loans or guarantees*" and "*Chinese financial statements clearly show that UTP, AOS's largest customer worldwide, is essentially insolvent and could collapse*."   The May 29 J Capital Report specifically cited statements by one of the distributors J Capital interviewed for a detailed explanation of how A. O. Smith's undisclosed loans to its customers worked.  "Distributor #7" stated that "[t]he assistance we get is loans from UTP.  We use our stock as collateral.  UTP pays the loan money directly to AOS for the stock that is delivered to us."  J Capital also highlighted that, in addition to being a master distributor for A. O. Smith, a majority owner of a distributor joint venture that manages all of AOS China's online sales, and otherwise being involved in virtually every aspect of A. O. Smith's China business, "UTP is also a supplier to AOS and employer of AOS production staff."  As J Capital emphasized, "[w]hen your largest customer is also a supplier, this provides an opportunity for fraudulent activity" making auditing of the relationship "critical."

78.     In addition, the May 29 J Capital Report further detailed how Defendants' statements about declining inventories in China were false and misleading.  The report described J Capital's most recent surveys of A. O. Smith distributors in China, including a survey conducted May 22-23, 2019, which "*indicate that channel inventories are growing, not declining*."  According to the companies surveyed by J Capital, the average inventory level had risen to 4.5 months, "up from 4 months in January and just 2 months at the end of 2017."  In other words, "*[d]istributor inventories have increased by about two weeks, not decreased, as AOS has repeatedly said*."

79.     As with its earlier report, the new information contained in the May 29 J Capital

Report caused a significant decline in A. O. Smith's stock price. On May 29, 2019, A. O. Smith's stock price fell $1.86 per share, a decline of over 4% that eliminated over $262 million in market capitalization on abnormally high trading volume of over 5.4 million shares. Media reports made clear that the Company's stock price decline was due to the May 29 J Capital Report. For example, on May 29, 2019, *Seeking Alpha* stated that A. O. Smith stock "slump[ed] to its lows of the year" after J Capital issued "its second negative report on the company this month."

        **b)**     **Defendants Admit That The Company Funded And Backstopped UTP's Channel Stuffing Loans – And That Such Information Was "Material Nonpublic Information" That Was Required To Be Disclosed**

80.      The SEC states that public companies must file Forms 8-K with the SEC "to announce major events that shareholders should know about." Following the publication of the May 29 J Capital Report, A. O. Smith was besieged by calls from analysts and investors seeking more information about the Company's relationship with UTP. As a result, on June 3, 2019, A. O. Smith filed a Form 8-K with the SEC that admitted even more of the J Capital reporting. Indeed – significantly – Defendants confirmed, for the first time, that A. O. Smith had for years been guaranteeing UTP's loans to A. O. Smith's customers. As the Form 8-K stated, due to "requests for additional information" from investors and analysts after Defendants' cursory May 17, 2019 press release, Defendants were forced to admit that, just as J Capital had reported, "*UTP … provides asset-backed financing to certain of the Company's distributors in China*" and A. O. Smith was ultimately on the hook for the loans, as the Company "*has agreed to repurchase inventory*" sold through the loans, under certain conditions, including late payments by customers.

81.      The June 3, 2019 Form 8-K also fully corroborated the timeline of the loans that

J Capital's extensive research and reporting had described. A. O. Smith admitted that the loans "were first initiated in 2015," which, as J Capital had revealed, was the same year that UTP became A. O. Smith's supply-chain partner, right as the Chinese "real estate market cratered" and A. O. Smith determined to artificially boost its China sales through the "distributor-financed channel stuffing." Notably, the June 3, 2019 Form 8-K did not even attempt to refute any of the numerous shocking revelations in either of the May 2019 J Capital reports.

82. Significantly, A. O. Smith's June 3, 2019 Form 8-K was an express admission by the Company that the information contained therein was "***material nonpublic information***" that was required to be disclosed. Defendants titled the Form 8-K "Item 7.01 Regulation FD Disclosure." Regulation FD disclosures are specifically and explicitly limited to disclosures of "***material nonpublic information*** regarding th[e] issuer or its securities." 17 C.F.R. 243.11(a). As the SEC has explained, "Regulation FD provides that when an issuer discloses material nonpublic information to certain individuals or entities—generally, securities market professionals, such as stock analysts, or holders of the issuer's securities who may well trade on the basis of the information—the issuer must make public disclosure of that information. In this way, Regulation FD aims to promote the full and fair disclosure." Accordingly, under the law, there can be no dispute that the information set forth in the June 3, 2019 Form 8-K was material information that the Company had not previously disclosed to investors.

### c) Defendants' Post-Class Period Statements Repeatedly Validated J Capital's Reporting

83. In addition to the June 3, 2019 Form 8-K, the SEC filings A. O. Smith made after the end of the Class Period are further admissions that Defendants themselves recognized that their quarterly and annual reports to investors had omitted the material information that A. O. Smith was funding and guaranteeing loans to its own customers in China. Indeed,

36

Defendants' failure to disclose A. O. Smith's guarantees behind hundreds of millions of dollars of loans issued under UTP's "financing support business" and "collateralized lending facilities" violated GAAP and applicable financial accounting requirements governing A. O. Smith's financial statements.[5]  A. O. Smith's repurchase obligations – which made much of its sales contingent according to GAAP revenue recognition criteria – were also contingent liabilities that A. O. Smith was required to disclose in amount and nature at all times during the Class Period.[6] Yet, A. O. Smith's consolidated financial statements neither identified nor described the "asset-backed financing" and "repurchase arrangements" at any point during the Class Period.

84.    A. O. Smith falsely represented that its financial statements were in conformity with GAAP.  FASB Accounting Standards Codification 450 ("ASC 450"), Contingencies, *inter alia*, states that a guarantee of the indebtedness of others is a contingent liability.  ASC 450 requires that companies disclose material loss contingencies in the financial statements, even when the possibility of loss may be remote.  SEC Staff Accounting Bulletin Topic 5.Y, Accounting and Disclosures Relating to Loss Contingencies.  GAAP specifically requires the disclosure of "guarantees of indebtedness of others" and "guarantees to repurchase receivables" or "the related property" that has been sold or otherwise assigned.  ASC 450-20-05.  GAAP states that this disclosure shall include the nature *and* amount of the guarantee.  ASC 450-20-50; *see also* 450-20-60 and ASC 460 (Guarantees).

---

[5] Generally Accepted Accounting Principles are those principles recognized by the accounting profession and the SEC as the conventions, rules and procedures necessary to define accepted accounting practice. These standards are written and defined by the Financial Accounting Standards Board ("FASB"). SEC Regulation S-X [17 C.F.R. §210.4-0 l(a)(l)] states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of the disclosures accompanying annual financial statements. 17 C.F.R. §210.10-0 l(a).

[6] FASB Accounting Standards Codification ("ASC") 605-15-25; *see also* ASC 450-20.

85.     A. O. Smith's annual reports on Forms 10-K and quarterly reports on Form 10-Q issued during the Class Period completely failed to disclose the existence, nature, or amount of the contingent sales or contingent liabilities represented by the UTP financing guarantees, as required by GAAP and applicable accounting standards. The missing disclosures were critical to A.O. Smith's investors, who were completely in the dark about the material risks inherent within the Company's China operations. A.O. Smith's China-related repurchase risks, asset-backed financing risks, and customer concentration risks were all known to management, but concealed from investors, in violation of GAAP and SEC requirements. Further, such disclosures were critical because they allowed investors to understand *how* the Company was able to make its sales in China – namely, through financing arrangements with *one* distributor that induced customers to "buy" excess inventory because the Company had agreed to repurchase it if it could not be sold.

86.     Defendants have now admitted that all of their Class Period Forms 10-Q and 10-K were false and misleading, and violated GAAP and applicable accounting standards, for omitting the highly material information about the Company's commitments and contingencies involving UTP. After the May 2019 J Capital reports were published, Defendants began disclosing, for the first time, in each of their quarterly reports filed on August 8, 2019 and November 6, 2019, essentially the same material information about the Company's asset-backed financing and "repurchase" arrangements that the J Capital reports revealed and Defendants admitted in the June 3, 2019 Form 8-K. Specifically, Defendants belatedly disclosed that the Company was engaged in "*asset-backed financing to certain of the Company's distributors in China*" and the Company "*has agreed to repurchase inventory*" sold through the loans under certain conditions "*primarily related to the aging of the distributors' notes*." These Forms 10-Q also revealed

38

gross repurchase amounts under the loans on a quarter-by-quarter basis. Despite the obvious

materiality of such information, Defendants made no such disclosures during the Class Period.

87.     Set forth below, in full, is the "Commitment and Contingencies" disclosure that

A. O. Smith belatedly included in the footnotes to its consolidated financial statements for the

third quarter of 2019.[7]

### 16. Commitments and Contingencies

The Company maintains a commercial relationship with a supply-chain service
provider [UTP] in connection with the Company's business in China. In this
capacity, [UTP] offers order-entry, warehousing and logistics support. [UTP] also
offers asset-backed financing to certain of the Company's distributors in China to
facilitate their working capital needs. To facilitate its financing support business,
[UTP] has collateralized lending facilities in place with multiple Chinese banks
under which the Company has agreed to repurchase inventory if both requested by
the banks and certain defined conditions are met, primarily related to the aging of
the distributors' notes.

[UTP] is required to indemnify the Company for any losses the Company would
incur in the event of an inventory repurchase under these arrangements. Potential
losses under the repurchase arrangements represent the difference between the
repurchase price and net proceeds from the resale of product plus costs incurred in
the process, less related distributor rebates.

Before considering any reduction of distributor rebate accruals of $17.1 and $25.1
million as of September 30, 2019 and December 31, 2018, respectively, and from
the resale of the related inventory, the gross amount the Company would be
obligated to repurchase, which would be contingent on the default of all of the
outstanding loans, was approximately $56.3 million and $75.8 million as of
September 30, 2019 and December 31, 2018, respectively. The Company's
reserves for estimated losses under repurchase arrangements were immaterial as
of September 30, 2019 and December 31, 2018.

---

[7] While providing material information to investors that should have been disclosed during the
Class Period, Defendants' belated disclosure regarding the Company's relationship with UTP
and the Company's repurchase obligations under UTP's lending facilities is *still* insufficient
under GAAP and SEC financial reporting requirements. Indeed, the disclosure raises more
questions than it answers, such as the mechanics of the financing arrangements and the entities
involved, who each party is transacting with, how the banks are involved, and who guarantees
what to whom and when, and repossession of unsold inventory. The new footnote also raises
serious revenue recognition red flags and does not address premature recognition of contingent
revenue that may materially affect the Company's consolidated revenues and net income.

39

88.     Under GAAP, footnotes to financial statements are required and provide important information to investors and other users of the financial statements as they may reveal, among other things issues with the Company's financial health.  As explained by the FASB, information disclosed in the notes to financial statements "amplifies or explains information recognized in the financial statements" and is often "essential to understanding the information recognized in financial statements and has long been viewed as an integral part of financial statements prepared in accordance with generally accepted accounting principles."  FASB, Statement of Financial Accounting Concepts No. 5, ¶7a.  The notes are required by the full disclosure principle because the amounts and line descriptions on the face of the financial statements are not sufficient information.  In fact, there may be some large potential losses that cannot be expressed as a specific amount, but they are critical information for lenders, investors, and others.  A. O. Smith was required to provide complete disclosures with respect to its repurchase agreements and asset-backed financing, including details and balances concerning UTP.  Significantly, *all* of the information that A. O. Smith now reported in its post-Class Period Forms 10-Q *was known to the Company and its senior executives throughout the Class Period*. Nor did the disclosure involve complicated accounting judgments.  To the contrary, the disclosure simply sets forth what were obviously material facts about A. O. Smith's sales in China.

89.     In sum, A. O. Smith's failure to provide this information, which included clear commitments and contingencies, rendered each of the financial statements it issued during the Class Period materially false and misleading.

90.     Defendants made additional post-Class Period statements that further corroborated the May 2019 J Capital reports.  On July 30, 2019, A. O. Smith reported the

40

Company's financial results for the second quarter of 2019. Consistent with J Capital's research, A. O. Smith's sales in China were far worse than Defendants had previously indicated. Specifically, the Company reported that its revenues in China had declined 16% compared to the second quarter of 2018, with earnings in the segment falling 35%. Defendants reduced their full-year China sales projections by "between 16 and 17 percent year-over-year in local currency terms and 19 and 20 percent after a three percentage point currency headwind."

91.     In other words, Defendants admitted in the second quarter 2019 financial results that the May 16 J Capital Report was entirely correct in reporting that J Capital's "detailed distributor channel checks indicate China revenue will fall by as much as 21% in 2019 vs management's claims of a 6-8% decline." Defendants added that A. O. Smith's disastrous financial results in China were forcing Defendants to reduce the entire Company's EPS guidance 12.5% (from a range of $2.69 to $2.75 per share announced on April 30, 2019 to a revised range of $2.35 to $2.41 per share). Halfway through 2019, Defendants knew and officially proclaimed all of 2019 as a lost year of negative earnings growth, as earnings per share would contract from the $2.61 in earnings per share that the Company recognized in 2018.

92.     The fallout from A. O. Smith's inventory overstock in China continued when A. O. Smith reported its financial results for the third quarter of 2019. On October 29, 2019, A. O. Smith reported that China sales declined 20% in local currency compared with the same period in 2018 due to "channel inventory levels." The disastrous results sent the Rest of World segment's earnings and margins plunging, and the Company reduced yet again its projection for overall Company earnings. Rest of World segment earnings were just $4.1 million in the third quarter of 2019 – *90% less* than in the same period in 2018, and the lowest quarterly earnings since A. O. Smith began reporting for the ROW segment in 2011.

93.     As J Capital had revealed, the Company's Class Period margins had been heavily inflated through channel stuffing.  Now, with the truth revealed, the Company reported segment margins of just *1.9%* – the lowest figure ever reported for the segment – compared with 13.3% margins in the same quarter of 2018.   A. O. Smith's admittedly "persistently high channel inventory levels" pushed the Company's 2019 EPS guidance to a range of $2.25 and $2.28 per share, "a 13% decline at the midpoint compared with last year."  A. O. Smith again revised down its figures for full-year sales in China "to be down approximately 19% in local currency terms," or "a decline of approximately 23%" taking currency effects into account – again corroborating J Capital's research and revelations of Defendants' false statements.

94.     Defendants further revealed in their third quarter 2019 financial reports that even after all of the purported inventory reductions in 2019, they still "expect[ed] that we will exit the year with channel inventory levels remaining above normal" and "we'll continue to work with our distribution customers on programs to reduce their inventory."   To improve margins in China, Defendants announced a "20% reduction in head count from December 2018 levels" and the closure of "over 700" stores.

## G.     On-The-Ground Witnesses In China Confirmed J Capital's Reporting And The Company's Admissions

95.     Lead Plaintiff's investigation has corroborated numerous aspects of J Capital's reporting regarding A. O. Smith's operations in China.   Through interviews with former employees of A. O. Smith, current and former employees of UTP, and A. O. Smith's customers in China, Lead Plaintiff's investigation confirmed the core allegations of J Capital's extensive research.[8]

---

[8] Former A. O. Smith and UTP employees are referred to herein as Confidential Witness "CW__" and are referenced in the feminine form to protect their confidentiality.

96. For example, CW1[9] stated that while the overall sales volume for A. O. Smith's products grew steadily from 2009 to 2016, it declined in 2017 and 2018. She stated that the decline had a "significant impact" on the sales of A. O. Smith's products. CW2[10] similarly detailed that sales volume was steadily increasing from 2014 to 2016, but that in 2017, the sales volume declined. She noted that the entire Chinese market suffered throughout 2017. CW3[11] stated that overstocking of A. O. Smith products was common among companies purchasing A. O. Smith products in China because, each year, AOS China sets up the sales goal for its distributors. The distributors purchased product to meet these goals and overstocking resulted when customers did not purchase enough A. O. Smith products.

97. CW4[12] confirmed that UTP was A. O. Smith's business partner in China and UTP loaned funds to purchasers of A. O. Smith China products. CW4 stated that UTP had a "credit-giving business" within UTP that handles these loans. CW4 further explained that UTP not only provided loans to the customers for product purchases, but also loaned money to cover a portion of warehousing, transportation and operation costs for the customers. CW4 characterized such

---

[9] CW1 was the deputy sales manager at UTP and was mainly responsible for sales and supervision of various products. She reported to the general sales manager of UTP.

[10] CW2 was employed as a sales manager for A. O. Smith China from early 2014 through June 2015. She then joined Shanghai Hongjing as a sales director, where she remained until December 2017. Shanghai Hongjing is a subsidiary of UTP. CW2 stated that Shanghai Hongjing sold only A. O. Smith products, was the general agent of AOS China in Shanghai, and was responsible for sales made in local stores and in shopping malls. CW2 stated that Chen Buhong, the CEO of Shanghai Hongjing, previously worked for AOS China. CW1 confirmed that Shanghai Hongjing is a subsidiary of UTP.

[11] CW3 is a former manager of Chongqing Runhe Trading Co., which is located in Chongqing City and purchases A. O. Smith products. She was employed at Chongqing Runhe for approximately four years between 2014 and 2018. As a manager at the company, CW3 was responsible for managing the local channel sales business.

[12] CW4 served as UTP's finance director from 2013 to 2016. She was responsible for handling finance, audit, and tax work at UTP.

loans as ***ordinary business*** under UTP's contract with A. O. Smith. CW5[13] similarly confirmed that UTP provided loans to distribution agents. CW6[14] specified that UTP provided loans to her company in China for the purchase of AOS products. She stated that the loans generally lasted 180 days, during which time her company was charged with monthly interest.

98. CW7[15] stated that UTP's home appliance department was established to serve A. O. Smith China, and that the department's managers were mostly former employees of A. O. Smith China. CW7 confirmed that UTP has a very close relationship with AOS China. CW1 similarly confirmed that Bai Yuanlong (白元龙), the chairman of UTP, has a very close relationship with Wei Ding (丁威), the general manager of AOS China.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

99. Defendants made materially false and misleading statements and omitted material facts when speaking to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

100. First, ***all*** three annual reports on Forms 10-K that Defendants filed during the Class Period were false and misleading because Defendants violated Item 101 of Regulation S-K by failing to identify UTP as the Company's most important customer. With as much as 26% of the Company's consolidated revenues during the Class Period (*see* ¶36), and upwards of 25% of consolidated revenues for each of the 2016, 2017, and 2018 calendar years, UTP was a highly

---

[13] CW5 was AOS China's sales manager from July 2014 to July 2017. In 2017, CW5 became the sales director for Wuxi Guangle, which is the general agent of A. O. Smith in Wuxi, China.

[14] CW6 is a former finance manager at Beijing Boxinda Trading, Co., which CW6 described as the general agent of AOS China in Beijing City. She was employed there for approximately nine years, and left in 2018. CW6 was responsible for budget planning and operation analysis at Beijing Boxinda.

[15] CW7 was a purchasing assistant at UPT between the summer of 2016 and the spring of 2017. She was responsible for assisting in the administration and coordination of the UTP warehouses.

material customer that the Company depended upon for its rapid growth and sales in China. Defendants were clearly required to report UTP under Item 101 as a customer that comprised over 10% of the Company's sales, and Defendants' failure to disclose UTP and the companies' deep relationship and channel stuffing scheme was highly misleading to investors.

101. Second, *all* of the Forms 10-Q and 10-K that A. O. Smith filed during the Class Period were materially false and misleading because the financial statements set forth in each of those filings failed to disclose highly material information about A. O. Smith's relationship with UTP that was required to be disclosed, including (as set forth above) that UTP provided asset-backed financing to A. O. Smith customers, and A. O. Smith guaranteed loans to customers through UTP involving many millions of dollars of inventory "repurchase" obligations. Such information was required to be disclosed by GAAP under ASC 450-20-50 and as a "Commitment and Contingency." Commitments are the obligation to the external parties of the company which arise with respect to any legal contract made by the company with those external parties whereas the contingencies are the obligations of the company whose occurrence is dependent on the outcome of a specific future events. Significantly, however, it was only after securities analysts at J Capital forced Defendants to disclose material facts about the Company's commitments and contingencies that Defendants had hidden for years, that Defendants began regular quarterly reporting of UTP-related "asset-backed financing" and "repurchase arrangements," starting with their Form 10-Q filed with the SEC on August 8, 2019.

102. Third, all of the statements specified in the SEC filings, press releases, and investor conference calls listed in chronological order below were false and misleading for the reasons specified herein, and principally because:

45

(a) Defendants heavily promoted their "extensive" distribution network in China while concealing from investors that between 50-75% of the Company's China business relied on a single distributor, UTP, with whom the Company had deep financial entanglements. Defendants stated that the "[s]trength of our … distribution… provide[d] [a] clear market advantage in China" but omitted any mention of the Company's heavy reliance on UTP, including for distributor-financed channel stuffing effectuated largely through loans financed by UTP and underwritten and guaranteed by A. O. Smith. Unbeknownst to investors, A. O. Smith used the loans to prop up sales to downstream distributors and retail customers in critical markets throughout China, masking the Company's declining business and putting shareholders on the hook for potential inventory "repurchases" by the Company and forfeiture of millions of dollars in cash collateral;

(b) Defendants represented to investors that the Company was experiencing "record" sales "driven by higher demand" and "continued strong demand" for the Company's consumer products in China, and identified specific purported "growth drivers" for the Company in China when, in reality, the Company was fraudulently manufacturing fake demand for its products through UTP. A. O. Smith used UTP to engage in channel stuffing by artificially inflating inventories "sold" to the Company's China customers that were not based on actual consumer demand, but rather distributor loans (with liberal credit standards) that were made by UTP and underwritten or guaranteed by A. O. Smith to prop up sales, thereby approximately doubling the normal level

of inventory. As J Capital explained, the Company's undisclosed "UTP partnership … allowed [A. O. Smith] to inflate gross margins and mask the actual China revenue slowdown through distributor-financed channel stuffing." Defendants admitted the Company's financing and backstopping of loans to its own customers on June 3, 2019;

(c) In 2018 and early 2019, Defendants repeatedly misled investors regarding the Company's inventory levels in China. Defendants purported to provide specific information regarding inventories, including by quantifying the purported size and the number of months or days of excess inventory. In doing so, however, Defendants understated the extent of the rising inventories and falsely attributed the rise to temporary factors that they stated were "not unusual" and "hitting everybody," such as certain "online shopping days" and "holiday sales" or "the currency … dropp[ing] … in the last month." In truth, A. O. Smith had long been engaged in channel stuffing in China, and the channel stuffing was increasing at the same time as Defendants' misrepresentations in 2018. Defendants also continued to omit the Company's relationship with UTP, including the Company's use of UTP as a vehicle for channel stuffing and associated loans to customers that were underwritten and backstopped by A. O. Smith;

(d) By 2019, as the slowdown in China sales and associated channel stuffing wore into yet another year, A. O. Smith's China customers were so overstocked that they canceled contracts with the Company. After years of channel stuffing, Defendants were finally forced to reveal shocking declines in the Company's

47

sales, earnings, and margins in China.  While doing so, they attempted to cover up the true extent of the declines, saying that full-year sales in China would "decline … 7% to 9%," or "6% to 8% in local currency terms" and the pre-existing inventory build would negatively impact Q2 2019 sales by about $25 million.  In truth, and as J Capital reported less than three weeks later based on its extensive investigation, there was nearly *six times* as much inventory as Defendants stated, and China sales would fall approximately 21% in 2019 given the massive overstock.  Defendants ultimately confirmed the J Capital reports, admitting to backstopping loans to A. O. Smith's own customers and projecting "a decline of approximately 23%" and continued excess inventory; and

(e) When Defendants finally acknowledged the existence of UTP in the Company's May 17, 2019 press release, they falsely claimed that the May 16, 2019 J Capital Report "makes inaccurate, unfounded and misleading allegations" and was "misinformation."  However, less than three weeks later, on June 3, 2019, the Company admitted many of J Capital's core findings, including that the Company had for years been backstopping UTP's loans to A. O. Smith's customers through asset-backed financing and agreements to "repurchase" unsold inventory, and corroborated the timeline of the loans uncovered by J Capital's research.  A. O. Smith disclosed massive "gross repurchase amounts" under the loans, including a staggering $78 million for the first quarter of 2019 that constituted *six times* the Company's total Rest of World quarterly earnings.

48

### A. February 2017 Form 10-K

103.    The Class Period begins on February 17, 2017, when A. O. Smith filed with the SEC its annual report on Form 10-K for fiscal year 2016.[16]   In the Form 10-K, Defendants promoted the Company's "record" sales in 2016 that were "primarily due to higher sales in China of water heaters, residential air purification products, as well as 35 percent sales growth of A. O. Smith-branded water treatment products."   The Form 10-K identified, for each of 2014, 2015, and 2016, the amount of sales of the North American segment's two largest customers. For example, Defendants stated that A. O. Smith's two largest customers in North America had 11% and 12% of A. O. Smith's total net sales in 2016.  The Form 10-K failed to provide similar information for the Rest of World segment or mention UTP at all.

104.    The statements identified above in ¶103 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶100-101, 102(b). Defendants promoted "record" sales in China as being derived from customer demand when, in truth, Defendants knew but failed to disclose that A. O. Smith was fraudulently manufacturing demand for its products in China and inflating its financial performance through an extensive and longstanding channel stuffing scheme with UTP.  Defendants' Form 10-K also wholly failed to comply with Item 101's requirement for A. O. Smith to identify UTP as a customer responsible for 10% or more of the Company's consolidated revenues.  UTP accounted for approximately 24.8% of the Company's consolidated revenues for 2016, and the loss of UTP would have had a material adverse effect on the Company, as explained above in ¶¶31-41.  The Form 10-K was also materially false and misleading for the reasons set forth in ¶¶42-52 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or

---

[16] A. O. Smith's fiscal year is the calendar year.

amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

### B.    Investor Presentations Throughout The Class Period

105.    On February 28, 2017, A. O. Smith published a PowerPoint "Analyst Presentation" that touted the purported strength of the Company's Chinese distribution network. In a slide promoting the "Investment Case" for buying A. O. Smith common stock, A. O. Smith represented to investors that the "[s]trength of our … distribution … provide[d] [a] clear market advantage in China." Another slide stated that A. O. Smith's China business was "Built [on an] Extensive Distribution and Service Network." Another slide highlighted the Company's "Broad Distribution Channel" in China. Defendants made similar or identical statements in investor presentations issued on March 16, 2017, May 1, 2017, August 3, 2017, November 9, 2017, February 12, 2018, May 12, 2018, November 5, 2018, March 1, 2019, and May 1, 2019.

106.    The statements identified above in ¶105 above were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶102(a). Indeed, rather than being "built on an extensive distribution … network" and having a "Broad Distribution Channel" that "provide[d] [a] clear market advantage in China," Defendants knew but failed to disclose that up to 75% of the Company's business in China relied on a single distributor, UTP, that carried out the Company's extensive channel stuffing scheme to manufacture fake demand and sales for the Company's products in China and artificially inflate A. O. Smith's financial performance in China. As Defendants ultimately admitted on June 3, 2019, A. O. Smith shareholders were unknowingly guaranteeing the scheme through undisclosed asset-backed financing and "repurchase" obligations.

### C.  April - May 2017 Misstatements And Omissions

107.  On April 27, 2017, A. O. Smith held its investor conference call for the first quarter of 2017.  During the call, Defendant Rajendra stated that the Company "set records for sales and earnings" in the first quarter of 2017 and noted that "[w]e continue to see strong growth in our consumer products in China."  Defendant Kita stated that A. O. Smith's China sales increased 27% in local currency during the first quarter of 2017, "driven by higher demand" and "continued strong demand" for the Company's consumer products in China. Similarly, Defendant Rajendra attributed the Company's 27% sales increase to "continued strong demand" for the Company's products in China.  Rajendra purported to identify the "growth drivers" responsible for the performance of the Company's China business, including "overall water heater market growth," "geographic expansion," "market share gain," and "continued strong growth of water treatment products and air purification product growth."

108.  On May 8, 2017, A. O. Smith filed a quarterly report with the SEC on Form 10-Q. The 10-Q reported that during the first quarter of 2017, sales in A. O. Smith's Rest of World segment grew approximately 27 percent in local currency compared to the same period in 2016, "driven by higher demand for our consumer products."

109.  The statements identified above in ¶¶107-108, were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶102(b).  In addition, contrary to Defendants' statements that A. O. Smith's sales increases in China were "driven by higher demand" and "continued strong demand" for the Company's consumer products, in truth, and as Defendants knew but hid from investors, A. O. Smith was fraudulently manufacturing demand for its products in China and inflating its financial performance in China through an extensive and longstanding channel stuffing scheme.  While purporting to identify the "growth drivers" for the Company's China business, Defendants wholly omitted the highly

51

material fact that an elaborate channel stuffing scheme was, in fact, a material "growth driver" for the business. In addition, Defendants failed to disclose the highly material fact that A. O. Smith's sales in China largely relied on asset-backed financing, and that in order to make these sales, A. O. Smith was forced to agree that it would "repurchase" the inventory from these distributors in the event they were unable to sell it. The Form 10-Q was also materially false and misleading for the reasons set forth in ¶101 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

**D.     July - August 2017 Misstatements And Omissions**

110.    On July 26, 2017, the Company held its investor conference call for the second quarter of 2017. During the call, Defendant Rajendra stated that the Company's "double-digit sales growth in the second quarter was driven by continued strong demand for our consumer products in China." Defendant Kita stated that "China sales increased 20% in local currency, driven by higher demand for our consumer products in the region led by water treatment and air purification products." Also on July 26, 2017, the Company issued a press release announcing the Company's financial results for the second quarter of 2017, which was filed with the SEC on Form 8-K. In the press release, Defendant Rajendra emphasized the strength of market demand in China, stating that "[w]e continued to see solid demand for our premium products in China with sales growth in local currency of 20 percent."

111.    On August 8, 2017, the Company filed a quarterly report with the SEC on Form 10-Q. The 10-Q reported that during the second quarter of 2017, sales in A. O. Smith's Rest of World segment grew approximately 20% in local currency compared to the same period in 2016, "driven by higher demand for our consumer products."

112.    The statements identified above in ¶¶110-111 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶102(b). Contrary to Defendants' statements that A. O. Smith's sales increases in China were "driven by higher demand" and "continued strong demand" for the Company's consumer products, and that the Company "continued to see solid demand" and "strong growth" for its products in China, in truth, and as Defendants knew but hid from investors, A. O. Smith was fraudulently manufacturing demand for its products in China and inflating its financial performance in China through an extensive and longstanding channel stuffing scheme. In addition, Defendants failed to disclose the highly material fact that A. O. Smith's sales in China largely relied on asset-backed financing, and that in order to make these sales, A. O. Smith was forced to agree that it would "repurchase" the inventory from these distributors in the event they were unable to sell it. The Form 10-Q was also materially false and misleading for the reasons set forth in ¶101 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

### E.    October 2017 Misstatements And Omissions

113.    On October 25, 2017, A. O. Smith held its investor conference call for the third quarter of 2017. During the call, Defendant Rajendra promoted the purported continued strong demand in China for the Company's products, emphasizing that "[o]ur double-digit sales growth in the third quarter was driven by continued strong demand for our consumer products in China." Defendant Kita stated that "China sales increased 13%, driven by higher demand … for our consumer products in the region …." Also on October 25, 2017, the Company issued a press release announcing the Company's financial results for the third quarter of 2017, which was filed

53

with the SEC on Form 8-K. The press release touted a nearly 13 percent increase in China sales largely driven by "[h]igher demand for the company's premium consumer products."

114. The statements identified above in ¶113, were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶102(b). Defendants promoted A. O. Smith's "double digit" sales growth as being "driven by higher demand" and "continued strong demand" for the Company's consumer products in China when, in truth, and as Defendants knew, A. O. Smith was fraudulently manufacturing demand for its products in China and inflating its financial performance in China through an extensive and longstanding channel stuffing scheme. In addition, Defendants failed to disclose the highly material fact that A. O. Smith's sales in China largely relied on asset-backed financing, and that in order to make these sales, A. O. Smith was forced to agree that it would "repurchase" the inventory from these distributors in the event they were unable to sell it.

F.     **November 2017 Omissions**

115. On November 5, 2017, Defendants filed with the SEC A. O. Smith's quarterly report on Form 10-Q for the third quarter of 2017. The Form 10-Q was materially false and misleading for the reasons set forth in ¶101 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

G.     **January - February 2018 Misstatements And Omissions**

116. On January 30, 2018, A. O. Smith held its investor conference call for the 2017 fourth quarter and full fiscal year. During the call, Defendant Rajendra touted the Company's "record" sales of $3 billion, and stated that the Company's "double-digit sales growth in 2017 was driven by continued strong demand for our consumer products in China." Defendant Kita

54

similarly repeated multiple times during the call that the increases in China sales were "due to" or "driven by higher demand for our consumer products" in China. Rajendra stated that the fourth quarter 2017 figures for China included an unspecified number of "customer orders to qualify for volume incentives as well as larger-than-expected inventory build by our e-commerce customers for the notable online shopping days in November and December."

117. Also on January 30, 2018, the Company issued a press release announcing the Company's financial results for the 2017 fourth quarter and full fiscal year, which was filed with the SEC on Form 8-K. In the Form 8-K, Defendant Rajendra promoted the Company's "double-digit sales growth in 2017," which Rajendra stated was "driven by continued strong demand for our consumer products in China." Rajendra assured investors that the Company's "growth drivers are intact" and "our replacement demand remains substantial."

118. On February 16, 2018, A. O. Smith filed an annual report with the SEC on Form 10-K. The Form 10-K highlighted A. O. Smith's "record" sales in 2017 and attributed the achievement to "higher sales in China" driven by "higher demand for our consumer products" in China. The Form 10-K identified, for each of 2015, 2016, and 2017, the amount of sales of the North American segment's two largest customers. For example, Defendants stated that A. O. Smith's two largest customers in North America had 11% and 12% of A. O. Smith's total net sales in 2017. The Form 10-K failed to provide similar information for the Rest of World segment or mention UTP at all.

119. The statements identified above in ¶¶116-118 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶100-101, 102(b). Defendants promoted A. O. Smith's "record" sales and "double digit" sales growth as being "driven by higher demand" and "continued strong demand" for the Company's consumer

products in China when, in truth, and as Defendants knew, A. O. Smith was fraudulently manufacturing demand for its products in China and inflating its financial performance in China through an extensive and longstanding channel stuffing scheme. While purporting to identify the "growth drivers" for the Company's China business, Defendants wholly omitted the highly material fact that an elaborate channel stuffing scheme was, in fact, a material "growth driver" for the business. Moreover, Defendants failed to disclose the highly material fact that A. O. Smith's sales in China largely relied on asset-backed financing, and that in order to make these sales, A. O. Smith was forced to agree that it would "repurchase" the inventory from these distributors in the event they were unable to sell it.

120. In addition, the statements made by Defendant Rajendra, identified in ¶116 above, concerning the "larger-than-expected inventory build" in China during the prior quarter were materially false and misleading, and omitted material facts when made for the reasons set forth above in 102(c). Rajendra understated the extent of the rising inventories in China and falsely attributed the increase to temporary factors, including "online shopping in November and December," while omitting that A. O. Smith had a longstanding practice of channel stuffing in China.

121. Defendants' Form 10-K also wholly failed to comply with Item 101's requirement for A. O. Smith to identify UTP as a customer responsible for 10% or more of the Company's consolidated revenues. UTP accounted for approximately 25.9% of the Company's consolidated revenues for 2017, and the loss of UTP would have had a material adverse effect on the Company, as explained above in ¶¶31-41. The Form 10-K was also materially false and misleading for the reasons set forth in ¶¶42-52 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales

or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

### H. April - May 2018 Misstatements And Omissions

122. On April 25, 2018, A. O. Smith held its investor conference call for the first quarter of 2018, in which Defendants Rajendra, Kita, and Wheeler participated. During the call, Defendant Rajendra touted the Company's "record" quarterly sales of $788 million that he largely attributed to "continued demand for our consumer products in China." Defendant Kita listed several factors purportedly driving the China sales, including "higher demand" for the Company's consumer products. Also on April 25, 2018, the Company issued a press release announcing A. O. Smith's financial results for the first quarter of 2018, which was also filed with the SEC on Form 8-K. The press release similarly promoted the Company's "double digit earnings growth on record first quarter sales" and listed several factors driving China sales, including "higher demand" for the Company's consumer products.

123. On May 7, 2018, A. O. Smith filed a quarterly report with the SEC on Form 10-Q. The Form 10-Q stated that sales in the quarter had increased 6.5% over the prior year period and attributed the increase "primarily … to continued demand for our consumer products in China."

124. The statements identified above in ¶¶122-123 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶101, 102(b). Defendants promoted A. O. Smith's "record" sales and "double digit" sales growth as being "driven by higher demand" and "continued demand" for the Company's consumer products in China when, in truth, and as Defendants knew, A. O. Smith was fraudulently manufacturing demand for its products in China and inflating its financial performance in China through an extensive and longstanding channel stuffing scheme. The Form 10-Q was also materially false and misleading for the reasons set forth in ¶101 above, as A. O. Smith failed to

57

disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

## I.     July 2018 Misstatements And Omissions

125.    On July 25, 2018, A. O. Smith held its investor conference call for the second quarter of 2018, in which Defendants Rajendra, Kita, and Wheeler participated.  During the call, Defendant Wheeler cited "high channel inventory levels" in China, which he blamed on "recent[] significant declines in the growth rate housing sales in China."  The first question from analysts on the call was from securities analyst Robert Scott Graham of BMO Capital Markets Equity Research.  Given that "the slowdown in housing in China has kind of been with us for a while," Graham questioned "why all of the sudden[] is there an inventory channel build as opposed to not having occurred earlier"?  In response, Defendant Kita maintained that a "series of things" led to the inventory build, including declining "[c]onsumer confidence," a "slowing" economy, "2 or 3 quarters" of "flat" housing growth, and that the Chinese "[c]urrency has dropped dramatically in the last month."  Graham responded by noting that Defendants had "expressed a lot of confidence in [the Company's] business model in China."

126.    Later in the investor call, Senior Analyst Matt J. Summerville from D.A. Davidson & Co. asked about whether there was a Q2 2018 prebuy that would impact future sales volumes.  Defendant Wheeler responded that a "minimal" number of units – "about a week [of inventory], maybe even a little bit less" – was "pulled forward" to inventory from future quarters.  Defendant Kita added that inventory levels were only "a little bit heavy – not bad but a little bit heavy."

127.    Securities analysts continued to press Defendants regarding inventory levels.

58

When Senior Analyst David Sutherland MacGregor from Longbow Research LLC inquired whether the Company was attempting to clear the inventory build through promotional activity, Defendant Wheeler responded that "we certainly have many programs to move our inventory, and we'll do some promotion, some bundling…. it will be again thoughtful, a systematic approach to reducing inventories over time." MacGregor followed up, asking whether A. O. Smith's channel inventory situation was "unique" to A. O. Smith or instead shared by A. O. Smith's competitors. In response, Defendant Rajendra, who stated on the call that he had been "in China last week," reassured investors that "the slowdown has to be hitting everybody," and Defendant Kita added that "you have to assume everybody's kind of in the same [boat]."

128. The statements identified above in ¶¶125-127 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶102(c). Defendants' statements minimized the extent of the inventory build and misrepresented the true reasons for the inventory increase. Defendants purported to provide specific information regarding inventories, including the "series of things" responsible for the inventory build, which were purportedly "hitting everybody" as "everybody's kind of in the same [boat]." In truth, and as Defendants knew, A. O. Smith was unique because it had long been engaged in distributor financed channel stuffing in China, which in fact was increasing at the time of the July 25, 2018 investor conference call and causing inventories to increase.

### J.    August 2018 Omissions

129. On August 6, 2018, Defendants filed with the SEC A. O. Smith's quarterly report on Form 10-Q for the second quarter of 2018. The Form 10-Q was materially false and misleading for the reasons set forth in ¶101 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales

59

or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

### K. October 2018 Misstatements And Omissions

130.    On October 30, 2018, A. O. Smith held its investor conference call for the third quarter of 2018. During the call, Defendant Wheeler cited the Company's "investments … in … broad distribution" in China as grounds for the Company's profitability in China. In response to a question from Douglas G. Clark, a securities analyst at Goldman Sachs, about current inventory levels in China, Defendant Kita stated that "inventories are up about the same percent from second to third quarter as they were last year from second quarter to third quarter," which Kita stated was "not unusual" due to seasonal fluctuations. Defendant Wheeler stated that "days [of inventory] on hand" in China declined from the second quarter to the third quarter.

131.    The statements identified above in ¶130 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶102(a), 102(c). Rather than having "broad distribution" in China, A. O. Smith's business model for China relied on a single distributor for up to 75% of its sales. And while Defendants promoted "investments" in distribution, Defendants entirely omitted that their "investments" were in an extensive and longstanding distributor-financed channel stuffing scheme that A. O. Smith's shareholders were unwittingly guaranteeing through potential "repurchases" of inventory. In addition, Defendants purported to provide specific information regarding inventories, including by quantifying the purported size of the inventory and the purported reasons for it – namely, seasonality in the sales cycle that was "not unusual." In truth, A. O. Smith's outsized inventories were highly unusual, and largely due to Defendants' undisclosed distributor-financed channel stuffing in China, which was intensifying at the time of the October 30, 2018 investor conference call.

### L.     November 2018 Omissions

132.     On November 8, 2018, Defendants filed with the SEC A. O. Smith's quarterly report on Form 10-Q for the third quarter of 2018.  The Form 10-Q was materially false and misleading for the reasons set forth in ¶101 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

### M.     January 2019 Misstatements And Omissions

133.     On January 29, 2019, A. O. Smith held its investor conference call for the 2018 fourth quarter and full fiscal year.  During the call, Defendant Wheeler stated that inventory in China grew during the first half of 2018 and "decline[d] in the fourth quarter" of 2018.  In response to a question from Scott Graham, a securities analyst at BMO Capital Markets, asking if the Company has lost market share in China, Defendant Kita told investors that any loss of market share was minimal and specified that sales were down because "the online holiday sales were not as good as what we thought."  In response to a follow-up question from Mr. Graham asking if the first quarter of 2019 presented an opportunity for A. O. Smith to flush its excess inventory, Kita assured investors that the channel inventory build in China was "not going to repeat itself."

134.     Also on January 29, 2019, A. O. Smith issued a press release announcing the Company's earnings for the 2018 fourth quarter and full fiscal year, which Defendants filed with the SEC on Form 8-K.  In the press release, Defendant Wheeler addressed the build-up of sales channel inventories in China on the Company's forecast for 2019, stating that "[a]ssuming relatively flat consumer demand in 2019 and without the impact of the previously-disclosed channel inventory build we experienced in 2018, which we estimate was at least five percent of

61

2018 China sales, we project China sales will decline by three to six percent in 2019 in local currency terms." Wheeler additionally stated that "[s]ince the inventory build primarily occurred in the first quarter of 2018, we anticipate the majority of the related China sales decline will occur in the first quarter of 2019."

135. The statements identified above in ¶¶133-134 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶102(c), 102(d). Defendants purported to provide specific information regarding inventories, including by (i) quantifying the purported size and the number of months of excess inventory; (ii) when the inventory build occurred, when it would likely clear, and whether it would repeat itself; and (iii) the projected impact of the inventory build on A. O. Smith's forecast for the current fiscal year. However, as explained above, Defendants understated the extent of the rising inventories, misrepresented when the inventory build occurred, when it would clear, and whether it would repeat itself, and issued a forecast for 2019 that they knew was materially false and misleading when made because it failed to properly take into account the Company's extensive and longstanding channel stuffing in China. Indeed, in stating that channel inventories in China grew during the first half of 2018, Defendants essentially confirmed that A. O. Smith had stuffed the China sales channel in 2018, but falsely represented to investors that impact was limited to only approximately 5% of 2018 China sales. Defendants also continued to omit A. O. Smith's relationship with UTP, including the Company's use of UTP as a vehicle for channel stuffing and associated loans to customers that were underwritten and backstopped by A. O. Smith.

### N. February 2019 Misstatements And Omissions

136. On February 15, 2019, A. O. Smith filed an annual report with the SEC on Form 10-K. The Form 10-K identified, for each of 2016, 2017, and 2018, the amount of sales of the North American segment's two largest customers. For example, Defendants stated that

A. O. Smith's two largest customers in North America had 11% and 13% of A. O. Smith's total net sales in 2018. The Form 10-K failed to provide similar information for the Rest of World segment or mention UTP at all.

137.    The statements identified above in ¶136 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶¶100-101. Defendants' Form 10-K also wholly failed to comply with Item 101's requirement for A. O. Smith to identify UTP as a customer responsible for 10% or more of the Company's consolidated revenues. UTP accounted for approximately 25.2% of the Company's consolidated revenues for 2018, and the loss of UTP would have had a material adverse effect on the Company, as explained above in ¶¶31-41. The Form 10-K was also materially false and misleading for the reasons set forth in ¶¶42-52 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

**O.    April 2019 Misstatements And Omissions**

138.    On April 30, 2019, A. O. Smith held its investor conference call for the first quarter of 2019, in which Defendant Kita, Defendant Wheeler, and the Company's new Chief Financial Officer, Charles Lauber, participated. While making partial disclosures about the Company's performance in China (*see* ¶¶58-60), Defendants made statements understating the inventory overstock and continuing to omit the Company's relationship with UTP, including the Company's distributor-financed channel stuffing through UTP. In response to a question from securities analyst Jeffrey David Hammond of KeyBanc Capital Markets about any decline in China performance in Q2 2019, Lauber responded that "we don't know our channel inventory numbers precisely," but "we're saying $50 million in Q1, so we would peg that in Q2 as roughly

63

half." Reassuring investors that the Company's China business would improve, Wheeler stated that "EPS is projected to be between $2.69 and $2.75," meaning that, as Lauber clarified, there was "no change to the midpoint" of the Company's guidance for 2019 earnings.

139. Also on April 30, 2019, Defendants published a press release announcing the Company's earnings for the first quarter of 2019, which was filed with the SEC on Form 8-K. Despite reporting sales declines in China due to inventory build, the press release affirmed the Company's guidance for 2019, stating there was "no change to the midpoint." Defendant Wheeler stated in the press release that the Company expected its business to "improve significantly in the second half of the year compared with the first half of 2019… project[ing] significantly improved second half year-over-year performance."

140. The statements identified above in ¶¶138-139 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶102(d). Defendants' statements that the inventory build would affect Q2 2019 performance by only $25 million was, as J Capital amply explained through its on-the-ground investigation in China and interviews with A. O. Smith customers, grossly understated due to the massive undisclosed overstock from Defendants' undisclosed channel stuffing. Indeed, A. O. Smith was ultimately forced to report a nearly $60 million reduction in ROW sales from Q2 2018 to Q2 2019. Defendant's statement that "we don't know our channel inventory numbers precisely" was a further attempt to disguise the true extent of the overstock, and demonstrably false due to A. O. Smith's reporting of inventories and its customers' obligation to report inventories to the Company. Defendants' projections for second-half 2019 performance were false when made given A. O. Smith's massive undisclosed overstock in China, as J Capital exposed less than three weeks later, and Defendants ultimately admitted after the Class Period.

64

### P.     May 2019 Misstatements And Omissions

141.    On May 9, 2019, Defendants filed with the SEC A. O. Smith's quarterly report on Form 10-Q for the first quarter of 2019.  The Form 10-Q was materially false and misleading for the reasons set forth in ¶101 above, as A. O. Smith failed to disclose the highly material facts discussed herein, including the existence, nature, or amount of the contingent sales or contingent liabilities arising from UTP's "financing support business," disclosure of which was required by GAAP, ASC 450-20-50, and other applicable financial accounting requirements.

142.    On May 17, 2019, A. O. Smith issued a press release in response to the May 16, 2019 J Capital Report.   In the press release, Defendants acknowledged the Company's relationship with UTP and admitted that UTP was both a customer and distributor of A. O. Smith, but attempted to minimize the significance of the relationship, stating that the Company's relationship with UTP was "common for many companies who do similar business in *China*" (emphasis in original).   The press release claimed that the J Capital report "makes inaccurate, unfounded and misleading allegations" and was "misinformation."   Defendants further represented to investors in the press release that "we do not have debt or equity interests in UTP and maintain appropriate independent commercial agreements."

143.    The statements identified above in ¶142 were materially false and misleading, and omitted material facts when made for the reasons set forth above in ¶102(e).  The May 17, 2019 press release falsely and misleadingly characterizing the May 16 J Capital Report as "misinformation."   Tellingly, while the Company claimed that the report "makes inaccurate, unfounded and misleading allegations," it pointedly failed to refute the report's statements about UTP, failed to disclose how much of the Company's business was attributable to UTP, and failed to address the report's disclosure that A. O. Smith's sales were dependent on asset-backed financing.  When the Company was ultimately forced to address the issues, Defendants finally

65

admitted on June 3, 2019 the core revelation that the Company had for years been backstopping loans to its own customers to buy A. O. Smith products, and that the Company had agreed to "repurchase" inventory from customers under certain conditions. The press release's statements about not having "debt or equity interests in UTP" intentionally obscured the truth about the Company's distributor-financed channel stuffing and A. O. Smith's potential liability under its distributor financing arrangements and bank loans, which the Company ultimately admitted in large part on June 3, 2019.

## VI.  ADDITIONAL SCIENTER ALLEGATIONS

144.    A. O. Smith and the Individual Defendants knew or were deliberately reckless in not knowing the true facts concerning A. O. Smith's China business, undisclosed relationship with UTP, and channel stuffing when making the materially false and misleading statements and omissions discussed herein.

145.    *First*, A. O. Smith's China business was a core business for the Company. Throughout the Class Period, the Company's financial performance depended heavily on, and was determined by, the performance of the Company's China business. Leading up to the Class Period, more than 90% of all A. O. Smith revenue growth was driven exclusively by ROW sales, and China accounted for over 90% of ROW sales. From the beginning of the Class Period in Q1 2017 to its peak in Q4 2017, revenue from ROW increased by another $54 million while revenue generated in the North America segment contracted by $26.5 million – further underscoring the importance of China to the Company's success. According to the Company's Form 10-Q filed on May 8, 2017, 35.1% of all revenue during the quarter was generated in the ROW segment, and more than 94% of that was attributable directly to sales in China. By Q4 2017, the ROW segment accounted for more than 40% of top-line revenue. Given the critical importance of A. O. Smith's China business as the growth driver of the entire Company, Defendants were

66

either aware of, or severely reckless in disregarding, the truth about the Company's undisclosed partner UTP and associated channel stuffing scheme.

146.    *Second*, UTP was A. O. Smith's most important customer worldwide, and by a great margin. As explained above (*see* ¶¶31-41), UTP was responsible for up to 26% of the Company's total worldwide sales during the Class Period – or approximately ***twice*** as many sales as the major North American customers that Defendants identified in each of the Company's Forms 10-K during the Class Period. In China, UTP was by far the Company's most important customer, as it was responsible for the overwhelming majority of sales – up to 75%. Defendants admit that UTP was involved in "approximately 70% of the Company's sales in China." As Defendants recognized in each of the Company's annual reports on Forms 10-K throughout the Class Period, it was critical that the Individual Defendants stay apprised of their largest customers and their business practices because "our relationship with each of [the Company's major] customers is important to our business" and "[a] material loss, cancellation, reduction, or delay in purchases by one or more of our largest customers could harm our business." Indeed, for A. O. Smith's North America segment, Defendants disclosed in each of the Company's Forms 10-K during the Class Period how many customers had over 10% of the Company's consolidated revenues, and what percentages of revenues each of those customers had. Given the size of UTP's purchases from A. O. Smith and the critical importance of UTP to A. O. Smith's entire business, the Individual Defendants clearly knew that they were violating Item 101 by not reporting UTP, violating GAAP and financial accounting requirements by not disclosing the UTP-related loan guarantees, and engaged in the longstanding UTP channel stuffing scheme.

147.   *Third*, the Individual Defendants have not disputed, and cannot dispute, that they knew throughout the Class Period all of the material facts that the Company disclosed in the June 3, 2019 Regulation FD Form 10-K.   Particularly given the importance of the Company's business in China and of UTP in particular, Defendants obviously were aware for years that UTP was "***financing … the Company's distributors in China***" and the Company had "***agreed to repurchase inventory***" sold through the loans, under certain conditions, including late payments by customers.   Indeed, such material arrangements could only have been entered into by senior officers of the Company, and represented material commitments and contingencies of the Company.

148.   *Fourth*, Defendants repeatedly emphasized their focus on A. O. Smith's operations in China.   Defendants regularly updated investors on significant trends in China sales and inventory, including in earnings calls each quarter, as well as additional investor conferences, press releases, and in quarterly and annual SEC filings.   In so doing, the Individual Defendants made repeated, detailed and unequivocal statements to investors about the Company's sales channel inventory in China.   As set forth above, A. O. Smith and the Individual Defendants purported to provide the market with updated information on inventory levels in China as well as the purported reasons for the inventory build and in which categories of customers it was occurring.   Defendants spoke to the number of months or days of excess inventory and when they purportedly expected the inventory clear, detailed the Company's purported approach to reducing inventories, and projected specific financial impacts on sales in the current quarter and future quarters.

149.   The Individual Defendants also told investors that the Company's senior management was focused on China and had engaged and consulted with outside experts for

68

advice on what was happening on the ground, including from a risk perspective. For example, on October 21, 2015, in response to a question from securities analyst David Rose from Wedbush Securities, asking if the Company monitors "the financial strength of the distributors in China," Defendant Rajendra specifically confirmed to investors that "[w]e do monitor that." Rajendra assured investors that "we work with the [Chinese distributors]. And if we find that there are concerns about [their financial health], we have a plan to switch them out." Similarly, on February 2, 2017, Defendant Rajendra assured investors that he, along with Defendant Kita and their "team," closely follow the Company's Chinese business because "we do have a lot of revenue exposure there." Rajendra further stated "we hire outside experts to give us advice" on China, that the Company has a "Eurasia group on retainer, and we work with them in terms of understanding the risk out there," and that "we have consulted with them, and we are very comfortable in terms of where we are from a risk perspective." On July 25, 2018, Defendant Rajendra again assured investors that Defendants were involved in a "day-to-day management" of inventories in China. Given Defendants' admitted constant focus on the Company's China business and sales channel, including the Company's distribution customers, Defendants knew, or at minimum were severely reckless in not knowing, that as much as 75% of the Company's actual business in China depended on a single distributor and a related channel stuffing scheme.

150. *Fifth*, Defendants professed detailed knowledge of the Company's inventory levels throughout the Class Period. In A. O. Smith's SEC filings and in conference calls throughout the Class Period, Defendants' statements to investors showed that they possessed an intimate knowledge of the Company's inventory status in China. Defendants also represented that they knew specifically which customers, sales channels, and seasons influenced changes in inventory. For example, on October 30, 2018, Defendant Wheeler told investors the Company

69

utilized "a variety of inventory measures, by customer, by product category, by percentage increase, off-line to online." The Company's Form 10-Q issued on November 8, 2017 noted "[h]igher inventory levels related to residential water heater demand, boiler and air purifier sales seasonality, and water treatment safety stock." Similarly, on January 30, 2018, Defendant Rajendra told investors how inventory levels purportedly changed specifically due to "notable online shopping days in November and December."

151. The Individual Defendants stated that their knowledge of the Company's inventory was so comprehensive that they were able to quantify A. O. Smith's inventory levels at precise points during the Class Period using several metrics. For example, on July 25, 2018, Defendant Wheeler noted that inventory levels "from the year-end to the first quarter grew **exactly** the same amount in units as the prior year December to first quarter," showing the specificity with which the Company tracked its levels and provided this information to the Individual Defendants. During the same investor conference call, Wheeler displayed knowledge of the Company's seasonal inventory levels, telling investors "[h]istorically, first quarter to second quarter [inventory levels] would have been flat or down." Similarly, on October 30, 2018, Defendant Kita represented that "[i]nventories are up about the same percent from second to third quarter as they were last year from second quarter to third quarter. That's not unusual because we're entering our highest selling season." Defendants were also at all times readily able to quantify inventory levels in financial terms. For example, on January 29, 2019, Defendant Kita compared current inventory levels to historical levels, telling investors that the first quarter of 2018 had "$40 million to $50 million of inventory build in it."

152. The Individual Defendants also reassured investors that the Company was actively managing China sales inventory and had processes in place to reduce inventory levels in

70

specific time frames. For example, when analyst David Sutherland MacGregor from Longbow Research expressed concern during the Company's July 25, 2018 investor conference call about how A. O. Smith planned to address its "high channel inventories" in China amid a "slowing macro," Defendant Wheeler quieted MacGregor's concerns by describing the specific processes and steps the Company would take to address the high inventory levels. Wheeler described the "many programs" the Company had "to move our inventory," including promotional activities and product bundling, and assured investors that such activities would be a part of the Company's "systematic" process of reducing inventories by the end of the calendar year. "We'll do it in a systematic way," Wheeler told investors during the July 2018 call. "We'll also do it looking at where inventories are at, what categories do we have higher inventories, and we'll continue to move that forward." Wheeler assured investors that the Company would be implementing a "thoughtful, a systematic approach to reducing inventories over time," with the specific objective of reducing inventories "in the neighborhood of about 30 days by the end of the year."

153. Given the Individual Defendants' focus on China inventories, their constant omissions of UTP and the UTP channel stuffing scheme as it related to the key inventory metrics were clearly knowing, or at a bare minimum severely reckless.

154. *Sixth*, the Individual Defendants were not only aware of the intricacies of the Company's China operations from internal reporting, but also through their personal exposure to China operations. For example, from 2004 to 2007, Defendant Wheeler was responsible for the Company's Asian operations in his capacity as A. O. Smith's Vice President – International. In a May 2017 press release, Rajendra highlighted Wheeler's "extensive international experience," and explained how Wheeler was "instrumental in growing [the international] part of our

business" and "leading our China business." In addition, Defendant Kita is the Chairman for two of A. O. Smith's Chinese subsidiaries, including A. O. Smith (China) Investment Co., Ltd., and the Company's largest and most profitable Chinese subsidiary, A. O. Smith (China) Water Heater Co., Ltd. According to A. O. Smith, Kita "played a crucial role" in the Company's "entrance into the Chinese market," which was one "of the most transformative events in company history."

155. As President and COO from 2011 to 2012, Rajendra was responsible for A. O. Smith's water heater operations in China and the Company's water purification business in China. According to news reports, Defendant Rajendra visited China four to five times per year during the Class Period. Rajendra confirmed his frequent visits to investors during a January 2016 earnings call, proclaiming that "I go there very often." Moreover, on November 5, 2018, during the Company's Analyst Day conference call, Wei Ding, Sr. VP of A. O. Smith and President of A. O. Smith China, stated that A. O. Smith's entire Board of Directors had visited China "a couple of weeks ago," *i.e.*, at the same time Defendants Rajendra and Wheeler served on the Board. According to media reports, Defendant Wheeler made at least three additional trips to China throughout the Class Period, including in October 2017, May 2018, and February 2019, and Defendant Rajendra made at least two additional trips to China throughout the Class Period, including in June 2017 and November 2017.

156. The direct and substantial involvement of Wheeler, Kita, and Rajendra, in the Company's China operations was emblematic of the substantial involvement of A. O. Smith executives generally in the Company's China operations. In addition to Kita, several A. O. Smith executives have held key positions in the Company's Chinese subsidiaries. For example, James Stern, A. O. Smith's Executive Vice President, General Counsel, and Secretary

72

since 2007, serves as a director of A. O. Smith (China) Water Heater Co., Ltd. and A. O. Smith (China) Investment Co., Ltd.; Aninda DasGupta, A. O. Smith's Sr. VP – International since June 2018, serves as a director of A. O. Smith (China) Investment Co., Ltd.; Wilfridus Brouwer, Sr. VP of A. O. Smith from 2013 to 2014, Sr. VP – Asia Corporate Development from 2015 to 2017, and Sr. VP – International from 2017 to 2018, served as the President and General Manager of A. O. Smith (China) Investment Co., Ltd. from 2009 to 2012; and Wei Ding, Sr. VP of A. O. Smith since 2013, served as the President of A. O. Smith (China) Investment Co., Ltd. from 2013 to 2017, the General Manager of A. O. Smith (China) Water Heater Co., Ltd. from 1999 to 2017, President of A. O. Smith (China) Water Heater Co., Ltd. in 2013, and the President of A. O. Smith China from 2017 to the present.

157. *Seventh*, the Individual Defendants' insider trading further demonstrates their scienter. Defendants Rajendra and Kita each sold unusually large amounts of their A. O. Smith stock at elevated prices during the Class Period, and the sales were far out of line with Defendants' prior trading. For example, Defendant Rajendra sold nearly $5.5 million of A. O. Smith stock during the Class Period – selling over *twice* as many shares during the 27-month Class Period as he did in the 27 months immediately preceding the Class Period (the "Control Period"). All of the sales were made at artificially inflated prices as high as $66.55 per share – just shy of the Class Period peak price for A. O. Smith stock of $68.39 per share, and far above the stock's $41.19 closing price at the end of the Class Period. Similarly, Defendant Kita's Class Period stock sales were nearly *double* his Control Period sales. Defendant Kita sold nearly $5.2 million in stock at artificially inflated prices of as much as $66.10 per share – again, almost exactly at the top of the Class Period stock price peak of $68.39 per share. Defendant Wheeler, who sold zero shares of A. O. Smith stock during the Control Period, sold over $1.5

million worth of the stock during the Class Period. Notably, none of Defendants' Class Period sales were pursuant to any pre-existing 10b5-1 trading plan.[17]

158. *Eighth*, The Individual Defendants' scienter is further underscored by their signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications").[18] The SOX Certifications assured investors that A. O. Smith's quarterly and annual reports filed with the SEC did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." The SOX certifications further asserted that "[t]he information contained in the [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of the Company." By signing the SOX Certifications, the Individual Defendants acknowledged their duty to investors for establishing and maintaining

---

[17] Additional A. O. Smith insiders also sold suspiciously high amounts of stock during the Class Period. Wilfridus Brouwer, Sr. VP of A. O. Smith from 2013 to 2014, Sr. VP – Asia Corporate Development from 2015 to 2017, Sr. VP – International from 2017 to 2018, and President and General Manager of A. O. Smith (China) Investment Co., Ltd. from 2009 to 2012, sold 37,644 shares of A. O. Smith common stock (valued at $2.36 million) during the Class Period, compared with sales of just 22,133 shares in the Control Period. Notably, Brouwer's March 2018 sales of $1.89 million of stock constituted 79.7% of his stock holdings at the time. Charles Lauber, the Company's CFO since May 1, 2019, more than **doubled** his sales of A. O. Smith stock during the Class Period, as compared to the Control Period, selling $1.19 million worth of stock at prices as high as $62.76 per share in June 2018. Wei Ding, Sr. VP of A. O. Smith since 2013, General Manager of A. O. Smith (China) Water Heater Co., Ltd. from 1999 to 2017, President of A. O. Smith (China) Water Heater Co., Ltd. in 2013, and President of A. O. Smith China from 2017 to the present, sold over twice as many shares during the Class Period as compared to the Control Period, including sales in February 2018 that constituted 66.7% of his total stock holdings.

[18] During the Class Period, Defendant Rajendra signed SOX Certifications in A. O. Smith's Forms 10-K issued on February 16, 2017 and February 16, 2018, and the Company's Forms 10-Q issued on May 8, 2017, August 7, 2017, November 6, 2017, May 6, 2018, and August 6, 2018. Defendant Wheeler signed SOX Certifications in A. O. Smith's Form 10-K issued on February 15, 2019, and A. O. Smith's Forms 10-Q issued on November 8, 2018 and May 9, 2019. Defendant Kita signed SOX Certifications in A. O. Smith's Forms 10-K issued on February 16, 2017, February 16, 2018, and February 15, 2019, and the Company's Forms 10-Q issued on May 8, 2017, August 7, 2017, November 6, 2017, May 6, 2018, August 6, 2018, and November 8, 2018.

74

controls to ensure that material information about A. O. Smith was made known to them and that the Company's disclosure related controls were operating effectively. The fact that Defendants consistently assured the market and certified that they had undertaken an assessment and evaluation of the Company's financial reporting leads to the conclusion that they knowingly misled investors or were severely reckless in executing such certifications.

## VII.    LOSS CAUSATION

159.    During the Class Period, Defendants' materially false and misleading statements and omissions artificially inflated the price of A. O. Smith common stock and maintained existing inflation in the stock price. A series of partial disclosures revealed the relevant truth and removed the artificial inflation. As a result of their purchases of A. O. Smith stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss.

160.    A. O. Smith's common stock reached a Class Period peak price of $68.39 on January 29, 2018, then lost approximately 40% of its value to close at $41.19 per share at the end of the Class Period.

### Disclosures on April 30, 2019

161.    On April 30, 2019, A. O. Smith reported abysmal financial results for its Rest of World segment. The partial disclosures (*see* ¶¶58-60) caused the Company's stock price to decline. On April 30, 2019, the price of A. O. Smith common stock fell nearly 6%, or $3.24 per share (from a closing price of $55.81 on April 29, 2019 to a closing price of $52.57 per share on April 30, 2019), erasing over $459 million in market capitalization on the highest trading volume of the year.

162.    Securities analysts were shocked by the disclosures and openly questioned Defendants' credibility. Analysts at BMO Capital Markets published a report on April 30, 2019

that was unequivocal in summarizing the Company's China results: ***"Rest of World: Thud."*** The analysts explained that the Company's "poor sales and margins" in the Rest of World segment caused "worse than … expected" earnings. Given the extraordinary deterioration in A. O. Smith's China business, the analysts concluded that there was little to corroborate Defendants' guidance for the remainder of 2019, as "visibility on guidance is lacking." The analysts summed up how Defendants had lost credibility, stating that while "Management said it is seeing some stabilization in the market[, w]e don't agree…."

163.    Securities analysts at Boenning & Scattergood also seized on the dire China results, concluding in a May 1, 2019 report that the Company's China business was "***in free fall as sales, margins plummet***." The analysts underscored that Defendants' disclosure of the Rest of World segment results "***understate[d] the China headwinds***, with India sales increasing 30% in the first quarter." The analysts noted that "management's assertion that [the poor results] is driven in part by a challenging comp (due to 1Q18 channel stocking) and is in-line with its own expectations does little to take the sting off of the accelerating pace of decline." The analysts attributed the stock price drop on April 30 to Defendants' disclosures and stated that the stock price decline was not as severe as it otherwise would have been due to "management affirming the midpoint of 2019 guidance" for the Company overall. The analysts at Boenning & Scattergood doubted the veracity of Defendants' guidance for 2019, pointing out that earnings in the second half of 2019 would have to rebound significantly to meet their guidance.

**Disclosures on May 16, 2019**

164.    On May 16, 2019, J Capital published a comprehensive 66-page report exposing A. O. Smith's undisclosed relationship with UTP and the Company's longstanding participation in inventory overstocking to artificially boost the Company's financial results in China,

including through secret loans to A. O. Smith customers financed and guaranteed by A. O. Smith. The partial disclosures (*see* ¶¶61-70) caused the Company's stock price to decline immediately. On May 16, 2019, the stock price declined over 6%, or $3.24 per share, on abnormally high trading volume. In total, during the three trading days between May 16, 2019 and May 20, 2020, A. O. Smith's stock price fell over 10%, or $4.88 per share (from a closing price of $48.14 on May 15, 2019 to a closing price of $43.26 per share on May 20, 2019), erasing nearly $700 million in market capitalization on abnormally high trading volume.

165.    Media outlets and securities analysts reported on the significant decline in A. O. Smith shares caused by the publication of the May 16 J Capital Report. For example, on May 16, 2019, the financial news website *Benzinga* published an article noting that A. O. Smith stock had declined significantly following the revelation that "[w]ater heater and boiler manufacturer A. O. Smith Corp (NYSE: AOS) has a material undisclosed partner, UTP Supply Chain, that acts like the company and allows it to 'stuff' distributors and inflate gross margins." The article noted the "dozens of interviews in China" that supported the May 16 J Capital Report. A May 16, 2019 article on *Seeking Alpha* similarly reported that A. O. Smith stock was "zap[ped]" by "as much as 7.8%" following the publication of the May 16 J Capital Report. Analysts at Schaeffer's Investment Research noted that while "U.S. markets are moving higher today," the May 16 J Capital Report "Sen[t] A. O. Smith To [its] Worst Day In Nearly 4 Years" and "sent investors running from AOS" as the stock "tank[ed]."

166.    Also on May 16, 2019, securities analyst Spruce Point Capital wrote an article and issued a series of statements supporting the May 16 J Capital Report's allegations and conclusions. Spruce Point noted that J Capital was a "firm known for high quality investigative research in China" and cited the May 16 J Capital Report's "[g]reat on the ground China

investigative due diligence…. What they dug up on this undisclosed material partner is quite shocking." Spruce Point noted that J Capital had exposed A. O. Smith's "trapped cash" in China, which was "all tied up in loans to shaky Chinese distributors, and certainly cannot be repatriated" and should have been listed as "'restricted' cash" in A. O. Smith's SEC filings. Spruce Point noted its concerns with A. O. Smith's reported gross margins, "which dwarf competitors margins by 10% for seemingly commodity-like products [and] are either being inflated by management with aggressive accounting or could not be sustained… Based on J Capital's investigative research showing a material undisclosed partner that functionally acts like AOS… this appears to be the case."

**Disclosures on May 29, 2019**

167.    On May 29, 2019, J Capital issued a report in response to A. O. Smith's May 17, 2019 press release. The seven-page report entitled "Company: 'Nothing to See Here'; AOS China Continues Its Decline" provided further facts and analysis exposing Defendants' false and misleading statements, including "half-truths and omissions" to investors. The partial disclosures (*see* ¶¶75-79) caused the Company's stock price to fall. On May 29, 2019, A. O. Smith's stock price declined 4.32%, or $1.86 per share (from a closing price of $43.05 on May 28, 2019 to a closing price of $41.19 per share on May 29, 2019), eliminating over $262 million in market capitalization on abnormally high trading volume of over 5.4 million shares.

168.    The significant and repeated declines in A. O. Smith's stock price were a direct result of the nature and extent of Defendants' misrepresentations finally being revealed to investors and the market. The timing and magnitude of the declines in the Company's share price negate any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-

specific facts unrelated to Defendants' violations of the federal securities laws. The following

graphic shows the performance of a $100 investment in A. O. Smith's stock price prior to the



Class Period as compared to two major market indexes:

## VIII. CLASS ACTION ALLEGATIONS

169. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or

otherwise acquired A. O. Smith common stock between February 17, 2017 and May 28, 2019,

inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers

and directors of A. O. Smith, members of their immediate families and their legal

representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance

carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

170. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, A. O. Smith shares were actively traded on the NYSE. As of May 28, 2019, there were over 141 million shares of A. O. Smith common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, A. O. Smith common stock was actively traded on the NYSE, an open and efficient market, under the symbol "AOS." Millions of A. O. Smith shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by A. O. Smith and/or its transfer agents and may be notified of the pendency of this action by mail, using a form notice similar to that customarily used in securities class actions.

171. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

172. Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    (a)    Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    (b)    Whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)     Whether documents, press releases, and other statements disseminated to the investing public and the Company's stockholders during the Class Period misrepresented material facts about the business, finances, and prospects of A. O. Smith;

(d)     Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose facts about the business, finance, value, and performance of A. O. Smith;

(e)     Whether the market price of A. O. Smith common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     The extent to which the members of the Class have been damaged and the proper measure of damages.

173.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Furthermore, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## IX.     UNDISCLOSED ADVERSE FACTS

174.    The market for A. O. Smith common stock was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and omissions described herein, A. O. Smith common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the other members of the Class purchased or otherwise acquired A. O. Smith shares relying upon the integrity of the market price of the Company's stock and market information relating to A. O. Smith, and have been damaged thereby.

175.    During the Class Period, Defendants materially misled the investing public,

81

thereby inflating the price of A. O. Smith common stock and maintaining inflation in the stock price, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

176. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about A. O. Smith's business performance and operations, including its operations in China.

177. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiff and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

178. At all relevant times, the market for A. O. Smith common stock was an efficient market for the following reasons, among others:

      (a)     A. O. Smith's stock met the requirements for listing, and was listed and

actively traded, on the NYSE, a highly efficient and automated market;

(b)     As a public company, A. O. Smith filed periodic reports with the SEC and the NYSE;

(c)     A. O. Smith was followed by numerous securities analysts employed by major firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(d)     A. O. Smith regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

179.    As a result of the foregoing, the market for A. O. Smith's common stock reasonably promptly digested current information regarding A. O. Smith from all publicly available sources and reflected such information in the price of A. O. Smith's common stock.  All purchasers of A. O. Smith common stock during the Class Period suffered similar injury through their purchases of A. O. Smith common stock at artificially inflated prices, and a presumption of reliance applies.

180.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.   As this action involves

83

Defendants' failure to disclose material adverse information regarding A. O. Smith's business practices, operations and financial performance – information that Defendants were obligated to disclose during the Class Period but did not – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## XI.    NO SAFE HARBOR

181.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

182.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of A. O. Smith who knew that the statement was false when made.

## XII.    COUNTS

### COUNT I
### For Violations Of Section 10(b) Of The Exchange Act
### And SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

183.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

184.    This Count is asserted on behalf of all members of the Class against Defendants A. O. Smith, Rajendra, Wheeler, and Kita for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

185.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

186.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of A. O. Smith common stock during the Class Period.

187.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the

85

other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of A. O. Smith common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, A. O. Smith's business and operations; (b) artificially inflate and maintain the market price of A. O. Smith common stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

188.    Defendants A. O. Smith, Rajendra, Wheeler, and Kita are liable for all materially false and misleading statements made during the Class Period, as alleged above.

189.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of A. O. Smith stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

190.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for A. O. Smith common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the Class would not have purchased A. O. Smith common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these

86

Defendants' misleading statements.

191. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of A. O. Smith common stock during the Class Period.

## COUNT II
### For Violations Of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants)

192. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

193. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

194. During their tenures as officers and/or directors of A. O. Smith, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of A. O. Smith, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by A. O. Smith during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

195. In their capacities as senior corporate officers and/or directors of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal

compliance, and in its accounting and reporting functions. The Individual Defendants signed the Company's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by A. O. Smith during the Class Period. As a result of the foregoing, Defendants Rajendra, Wheeler, and Kita, as a group, and individually, were controlling persons of A. O. Smith within the meaning of Section 20(a) of the Exchange Act.

196. As set forth above, A. O. Smith violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Amended Complaint.

197. By virtue of their positions as controlling persons of A. O. Smith and as a result of their own aforementioned conduct, Defendants Rajendra, Wheeler, and Kita are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired A. O. Smith securities. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of A. O. Smith, each of these Defendants culpably participated in the material misstatements and omissions made by A. O. Smith.

198. As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of A. O. Smith common stock.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

88

(b)     Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' and experts' witness fees and other costs; and

(d)     Awarding such other relief as this Court deems appropriate.

## XIV.   <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 22, 2019                    Respectfully submitted,

**SAXENA WHITE P.A.**

By: <u>*/s/ David R. Kaplan*</u>

David R. Kaplan
Brandon Marsh
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
bmarsh@saxenawhite.com

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com

Maya Saxena
Joseph E. White, III
150 East Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
jwhite@saxenawhite.com

89

*Attorneys for Plaintiff*

**CROSS LAW FIRM, S.C.**
MARY C. FLANNER
SBN: 1013095
Nola J. Hitchcock Cross
SBN: 1015817
The Lawyers' Building
845 N. 11th Street
Milwaukee, WI 53233
(414) 224-0000 (phone)
(414) 273-7055 (facsimile)
mflanner@crosslawfirm.com
njhcross@crosslawfirm.com

*Local Counsel for Plaintiff*

90

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 22, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

/s/ *David Kaplan*

# CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, James D. Love, on behalf of the City of Birmingham Retirement and Relief System ("Birmingham"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the consolidated class action complaint against A.O. Smith Corporation and certain of its executives and I am authorized in my capacity as Assistant City Attorney of Birmingham to initiate litigation and to execute this Certification on behalf of Birmingham.

2.  Birmingham did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Birmingham is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Birmingham's transactions in A.O. Smith Corporation common stock during the class period as specified in the complaint are set forth in the attached "Schedule A."

5.  Birmingham has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *City of Birmingham Ret. and Relief Sys. v. Credit Suisse Group AG*, No. 1:17-cv-10014 (S.D.N.Y.)

    *In re BRF S.A. Sec. Litig.*, No. 1:18-cv-02213 (S.D.N.Y.)

    *City of Birmingham Firemen's and Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 1:18-cv-10330 (S.D.N.Y.)

    *Keippel v. Health Ins. Innovations, Inc.*, No. 8:19-cv-0421 (M.D. Fla.)

    *City of Sterling Heights Gen. Employees' Ret. And Relief Sys. v. Anheuser-Busch InBev SA/NV*, No. 1:19-cv-05854 (S.D.N.Y.)

    *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. plc.*, No. 2:19-cv-15382 (D.N.J.)

6.  Birmingham has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff motion is still pending:

*Ollila v. Babcock & Wilcox Enterprises, Inc.*, No, 3:17-cv-00109 (W.D.N.C.)

*Grodko v. Teva Pharmaceutical Indus. Ltd.*, No. 2:17-cv-03743 (E.D. Pa.)

*Koch v. Healthcare Services Group, Inc.*, No. 2:19-cv-01227 (E.D. Pa.)

*Scheller v. Nutanix, Inc.*, No. 3:19-cv-01651 (N.D. Cal.)

*Batter et al. v. Hecla Mining Company*, No. 1:19-cv-04883 (S.D.N.Y.)

*City of Birmingham Firemen's and Policemen's Supplemental Pension Sys. v. Pluralsight, Inc.*, No. 1:19-cv-00128 (D. Utah)

7. Birmingham will not accept any payment for serving as a representative party on behalf of the Class beyond Birmingham's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21ˢᵗ day of November, 2019.

City of Birmingham Retirement
and Relief System

James D. Love, Assistant City Attorney

**Transactions in A.O. Smith Corporation Common Stock**
**Period: February 17, 2017 through May 28, 2019**

| Common Stock Purchases | | | | Common Stock Sales | | |
|---|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | | **Date** | **Shares** | **Price** |
| 05/09/17 | 13,844 | $54.91 | | 08/21/18 | 6,448 | $59.07 |
| 06/23/17 | 100 | $56.36 | | 08/22/18 | 400 | $58.44 |
| 12/12/17 | 81 | $61.23 | | | | |
| 03/20/18 | 6,097 | $65.73 | | | | |
| 06/22/18 | 50 | $60.27 | | | | |
| 02/05/19 | 7,053 | $49.46 | | | | |
| 02/20/19 | 1,904 | $52.22 | | | | |
| 03/05/19 | 4,872 | $52.44 | | | | |
| 03/26/19 | 3,913 | $51.58 | | | | |