UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br>     v.<br><br>A. O. SMITH CORPORATION, AJITA RAJENDRA, KEVIN WHEELER, and JOHN KITA,<br><br>        Defendants. | Case No. 2:19-cv-01198-LA<br><br>CLASS ACTION<br><br>Jury Trial Demanded |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   SUMMARY OF THE COMPLAINT ................................................................. 4

      A.   China Was Critical To AOS's Financial Performance ............................... 4

      B.   Defendants Concealed From Investors That AOS's Results In China
           Were Due To An Unsustainable Channel Stuffing Scheme ...................... 5

      C.   Securities Analysts Revealed The Channel-Stuffing Scheme And
           Forced Defendants To Admit The Truth .................................................... 6

      D.   Defendants' Post Class Period Admissions Further Confirmed The
           Fraud ........................................................................................................ 8

III.  ARGUMENT .................................................................................................... 9

      A.   Defendants Made False And Misleading Statements And Omissions ..................... 10

           1.   Defendants Failed To Disclose The Existence Of UTP ............................. 10

           2.   Defendants Concealed AOS's Channel Stuffing Scheme ........................ 12

           3.   Defendants Violated GAAP ......................................................... 17

      B.   Defendants' Various "Falsity" Contentions Fail ....................................... 18

           1.   Defendants Did Not "Contradict" Their False And
                Misleading Statements ................................................................... 18

           2.   Defendants' Statements Were Highly Material, Not
                "Optimistic" "Puffery" .................................................................... 19

           3.   Defendants' Statements Are Not Entitled To Safe Harbor
                Protection ................................................................................... 21

           4.   Defendants' Statements Were Not Mere Opinions .................................... 22

      C.   The Complaint Pleads A Strong Inference Of Scienter ......................................... 23

      D.   The Complaint Adequately Pleads Loss Causation ............................................. 29

IV.   CONCLUSION ................................................................................................. 30

Case 2:19-cv-01198-LA    Filed 04/03/20    Page 2 of 40    Document 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) .......................................................................... 15, 17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ........................................................................................... 12

*AnchorBank, FSB v. Hofer*,
  649 F.3d 610 (7th Cir. 2011) ............................................................................. 10

*Asher v. Baxter Int'l. Inc.*,
  377 F.3d 727 (7th Cir. 2004) ........................................................... 12, 21, 22, 30

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) ............................................................. 20

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ........................................ 22, 27, 28, 29

*Central States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ......................................................................... 30

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
  2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ...................................................... 18

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) ............................................................ 19

*City of Omaha Police & Fire Ret. Sys., v. Evoqua Water Techs.*,
  2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020) .................................................. 13

*Costello v. Grundon*,
  651 F.3d 614 (7th Cir. 2011) ............................................................................. 22

*Cunha v. Hansen Nat. Corp.*,
  2011 WL 8993148 (C.D. Cal. May 12, 2011) .................................................... 13

*Curran v. Freshpet, Inc.*,
  2018 WL 394878 (D.N.J. Jan. 12, 2018) .......................................................... 21

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) ............................................................... 18

Case 2:19-cv-01198-LA    Filed 04/03/20    Page 3 of 40    Document 30

*Direct Benefits, LLC v. TAC Fin. Inc*.,
2014 WL 671616 (D. Md. Feb. 20, 2014)..................................................................... 15

*Friedman v. Rayovac Corp*.,
295 F. Supp. 2d 957 (W.D. Wis. 2003)....................................................................... 15

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007)....................................................................................... 12

*Hughes v. Huron Consulting Grp., Inc*.,
733 F. Supp. 2d 943 (N.D. Ill. 2010) ......................................................................... 26

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ......................................................................... 26

*In re Bofi Holding, Inc. Sec. Litig*.,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ........................................................... 19

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008)....................................................................... 27

*In re Harley-Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009) ................................................................. 16, 18

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ............................................................................... 16, 17

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
236 F. Supp. 3d 824 (S.D.N.Y. 2017)......................................................................... 26

*In re Interlink Elecs., Inc., Sec. Litig.*,
2008 WL 4531967 (C.D. Cal. Oct. 6, 2008) .................................................... 24, 25, 26

*In re Lihua Int'l, Inc. Sec. Litig.*,
2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) ........................................................... 16

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006) ......................................................................... 14

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000)........................................................................... 26

*In re NeoPharm, Inc. Sec. Litig*.,
705 F. Supp. 2d 946 (N.D. Ill. 2010) ......................................................................... 29

*In re Next Level Sys., Inc.*,
   1999 WL 387446 (N.D. Ill. Mar. 31, 1999) ........................................................................ 11, 26

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)........................................................................................ 27

*In re Qwest Commc'ns. Int'l, Inc. Sec. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004) ............................................................................ 27

*In re Sci. Atlanta, Inc. Sec. Litig.*,
   239 F. Supp. 2d 1351 (N.D. Ga. 2002),
   *aff'd*, 374 F.3d 1015 (11th Cir. 2004) ............................................................................ 13

*In re Spectrum Brands, Inc. Sec. Litig.*,
   461 F. Supp. 2d 1297 (N.D. Ga. 2006) ............................................................................ 16

*In re Spiegel, Inc. Sec. Litig.*,
   382 F. Supp. 2d 989 (N.D. Ill. 2004) ............................................................................ 26

*In re St. Jude Med. Inc. Sec. Litig.*,
   836 F. Supp. 2d 878 (D. Minn. 2011) ........................................................... 13, 17, 21

*In re Symbol Techs., Inc. Sec. Litig.*,
   2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ............................................................... 28

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y. 2000)........................................................................... 13

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
   2017 WL 1658822 (D.N.J. Apr. 28, 2017) ................................................................... 16

*In re XM Satellite Radio Holdings Sec. Litig.*,
   479 F. Supp. 2d 165 (D.D.C. 2007) ............................................................................ 16

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
   140 S. Ct. 768 (2020) ............................................................................................... 22

*Jones v. Corus Bankshares, Inc.*,
   701 F. Supp. 2d 1014 (N.D. Ill. 2010) ................................................................*passim*

*Keippel v. Health Ins. Innovations, Inc.*,
   2019 WL 5698329 (M.D. Fla. Nov. 4, 2019)................................................................. 20

*Kelsey v. Allin*,
   2016 WL 825236 (N.D. Ill. Mar. 2, 2016)..................................................................... 16

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) ........................................................................... 25

*Lindelow v. Hill*,
  2001 WL 830956 (N.D. Ill. July 20, 2001) ............................................................ 21, 29

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................................... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ........................................................... 13, 19, 20, 29

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ........................................................................................... 10, 19

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) ........................................................... 16, 30

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ........................................................................... 30

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................... 28

*Mun. Emps.' Ret. Sys. v. Pier 1 Imps., Inc.*,
  935 F.3d 424 (5th Cir. 2019) ............................................................................... 12

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ............................................................................... 14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S.Ct. 1318 (2015) ....................................................................................... 23

*Ong v. Sears, Roebuck & Co.*,
  459 F. Supp.2d 729 (N.D. Ill. 2006) ................................................................. 29

*Ross v. Career Educ. Corp.*,
  2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ................................................. 19, 25

*Sapssov v. Health Mgmt. Assocs., Inc.*,
  22 F. Supp. 3d 1210 (M.D. Fla. 2014) ............................................................. 14

*Schleicher v. Wendt*,
  529 F. Supp. 2d 959 (S.D. Ind. 2007) ........................................................... 23, 24

*Scis. Corp. Sec. Litig.*,
  890 F. Supp. 2d 650 (E.D. Va. 2012) ............................................................................. 29

*SEC v. Pirate Inv'r LLC*,
  580 F.3d 233 (4th Cir. 2009) ......................................................................................... 22

*SEC v. Stifel, Nicolaus & Co., Inc.*,
  2012 WL 4069346 (E.D. Wis. Sept. 14, 2012) .......................................................... 19

*Selbst v. McDonald's Corp.*,
  2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ........................................... 17, 21, 22, 24

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) .......................................................................... 19

*Shah v. Zimmer Biomet Holdings, Inc.*,
  2019 WL 762510 (N.D. Ind. Feb. 20, 2019) .......................................................... 10, 16

*Sherleigh Assocs. v. Windmere-Durable Holdings Inc.*,
  178 F. Supp. 2d 1255 (S.D. Fla. 2000) ......................................................................... 13

*Silverman v. Motorola, Inc.*,
  2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ......................................................... 24, 30

*Snellink v. Gulf Res., Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ........................................................................... 12

*St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
  2011 WL 814932 (N.D. Ill. Feb. 28, 2011) .................................................................. 21

*Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
  2013 WL 566805 (N.D. Ill. Feb. 3, 2013) .................................................................... 27

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) ......................................................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................. 9, 23, 27, 29

*United Union Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Great Lakes
  Dredge & Dock Corp.*,
  2014 WL 12780549 (N.D. Ill. Oct. 21, 2014) ......................................................... 27, 30

*Van Noppen v. InnerWorkings, Inc.*,
  136 F. Supp. 3d 922 (N.D. Ill. 2015) ............................................................................ 27

Case 2:19-cv-01198-LA    Filed 04/03/20    Page 7 of 40    Document 30

*Veal v. LendingClub Corp.*,
2019 WL 5698072 (N.D. Cal. Nov. 4, 2019) ............................................................................. 16

*W. Pa. Elec. Emp. Pension Tr. v. Plexus Corp.*,
2009 WL 604276 (E.D. Wis. Mar. 6, 2009) .............................................................................. 21

*Walker v. S.W.I.F.T. SCRL*,
517 F. Supp. 2d 801 (E.D. Va. 2007) ....................................................................................... 16

*Waterford Twp. Police v. Mattell, Inc.*,
321 F. Supp. 3d 1133 (C.D. Cal. 2018) .................................................................................... 15

## Regulations

17 C.F.R. §229.101(c)(1)(vii) ............................................................................................................ 25

## I. INTRODUCTION

Throughout the Class Period, A.O. Smith Corp. ("AOS" or the "Company") maintained an illusion of strong financial performance and growth based primarily on a high level of demand for its products in China. Accounting for approximately one-third of AOS's total revenues and nearly all of its revenue growth, the Company's China business was critical to its financial health. AOS's senior executives were intensely focused on China and provided investors with regular, detailed updates on demand, sales, and inventory levels in China. Defendants promoted purported "strong demand" for the Company's products in China, identified specific "growth drivers" of that demand, and assured investors that AOS was actively managing inventory levels in China through its "extensive" distribution network that gave AOS a "clear market advantage in China." As Defendants continued to report high demand and strong growth, AOS's stock price reached all-time highs.

In truth, AOS's purported growth in China was a mirage. As ultimately revealed by securities analysts – and belatedly admitted by the Company – AOS's China business was utterly dependent on just one customer, an "essentially insolvent" distributor named UTP that AOS propped up with financial support. Indeed, as these analysts revealed, AOS falsified "demand" in China through secret loans of hundreds of millions of dollars to and through UTP so UTP and other distributors could then turn around and "buy" AOS's products. Moreover, to guarantee that UTP and the other distributors would take whatever products AOS shipped, AOS explicitly agreed to repurchase those products in the event they could not be sold – meaning that by definition the "sales" were ***contingent*** sales. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs III*") (impermissible channel stuffing includes "book[ing] revenues on the basis of goods shipped but not really sold because the buyer can return them").

The scope of this channel stuffing scheme was enormous: During the Class Period, UTP became AOS's largest customer in the world, accounting for a staggering 75% of AOS's business in

1

China and as much as 26% of the Company's total worldwide sales. The contingent sales alone amounted to as much as *six times* AOS's non-U.S. earnings and progressively grew as the overstock mounted. Yet remarkably, even though (i) UTP was critically important to AOS's financial success; (ii) longstanding SEC rules specifically required AOS to disclose its largest customers (like UTP) precisely because such information was material to investors; and (iii) Generally Accepted Accounting Principles ("GAAP") clearly and unequivocally required AOS to disclose in its financial statements contingent sales exactly like the ones it made in China, ***Defendants never so much as breathed a word about UTP's existence, the loans, or the repurchase agreements until securities analysts exposed the relationship and the truth about AOS's purported "success" in China***.

The truth began to emerge on April 30, 2019, when, after years of unsustainable channel stuffing, the Company was forced to report reduced sales. Then, on May 16 and May 29, 2019, securities analysts at J Capital revealed that AOS's business depended on UTP; AOS had violated SEC rules by failing to disclose UTP; and AOS artificially inflated its China sales by secretly agreeing to repurchase inventory under certain conditions. J Capital's comprehensive research reports – based on dozens of witness interviews, including of UTP employees and 19 different AOS distributors in China, on-site and aerial photography, and forensic analyses of financial statements and other documents located in China – detailed how AOS used UTP "to inflate gross margins and mask the actual China revenue slowdown through distributor-financed channel stuffing." Indeed, the reports laid bare how AOS "induc[ed] UTP to take on extra inventory," guaranteed and financed UTP's loans "to prop up sales," and backstopped UTP's loans with Chinese banks because UTP was "essentially insolvent and could collapse." The revelations stunned investors and caused immediate, massive declines in AOS's share price, including AOS's largest single-day decline in nearly four years.

With the fraud exposed, Defendants had no choice but to admit to the core aspects of the

channel-stuffing scheme, including that (i) for years, AOS sold products to its distribution customer UTP without disclosure, thus violating a clear SEC disclosure requirement; and (ii) AOS's China sales used "repurchase" and "asset-backed financing" agreements that left AOS financially responsible for much of its own "sales" in China. As securities analysts noted, AOS's response to the J Capital channel-stuffing reports read "more like an admission than a defense." With the channel stuffing exposed, AOS's sales have now collapsed to unprecedented levels and AOS has been forced to substantially scale back operations in China, announcing massive layoffs and store closures.

In response to such powerful and well-pleaded facts, Defendants move to dismiss the Complaint for failure to plead a false or misleading statement or omission, scienter, and loss causation. The motion is meritless and should be denied.

First, contrary to Defendants' assertions, the Complaint details with great particularity how and why Defendants' statements about AOS's Chinese business and inventory levels were false and misleading when made.[1] While purporting to provide "continual" updates regarding inventory levels in China, Defendants concealed the highly material fact that AOS was only able to manufacture demand for its products by secretly agreeing to loan millions of dollars to and through UTP so UTP and other distributors could purchase those products, and by agreeing to repurchase those products in the event they could not be sold. Moreover, AOS failed to disclose its largest customer in direct violation of affirmative disclosure obligations under the securities laws – even though, as Defendants later admitted, AOS's relationship with UTP was highly material. Finally, Defendants violated GAAP by omitting that AOS was potentially on the hook for hundreds of millions of dollars of channel-stuffed "repurchases." These well-pled facts amply allege material misstatements and omissions.

---

[1] *See* ¶¶99-143 (statements and omissions, and reasons why false), ¶¶26-98 (further factual support). All "¶__" references are to the Consolidated Class Action Complaint (ECF No. 21) ("Complaint"). All "Br." references are to Defendants' Rule 12(b)(6) memorandum (ECF No. 23). Unless otherwise noted, in this brief all emphasis is added, and all internal citations and punctuation are omitted.

Second, the Complaint pleads a strong inference of scienter. *See, e.g.*, ¶¶144-58. Defendants told investors that they were focused on AOS's China business, and explicitly assured investors they closely monitored channel inventory levels, trends in sales, and distributor solvency. At the same time, however, Defendants concealed from investors UTP's very existence and the material risks posed to the Company by the channel stuffing scheme. By Defendants' own admissions, they were well aware throughout the Class Period of all the material facts alleged herein, including that UTP was by far the Company's most significant customer in China; AOS was loaning UTP (or guaranteeing loans to UTP) millions of dollars each year so that UTP could purchase AOS's products; and, to bolster sales, AOS was forced to agree to repurchase hundreds of millions of dollars in products if such products could not be resold. Nothing more is required to plead scienter.

Finally, the Complaint adequately pleads loss causation under Rule 8. *See* ¶¶159-68. Defendants' fraud was revealed through three corrective disclosures on April 30, May 16, and May 29, 2019. Each revealed new and highly material facts, and caused steep investor losses.

## II. SUMMARY OF THE COMPLAINT

In their "Factual Background" section, Defendants omit the Complaint's actual allegations and instead attempt to create their own set of contradictory "facts" for a transparent reason: setting forth the actual allegations establishes that the Complaint states claims for securities fraud. Defendants' incomplete narrative omits whole categories of facts showing that their public statements were false, misleading, and made with scienter.

### A. China Was Critical To AOS's Financial Performance

AOS manufactures and sells water heaters, boilers, tanks, and other related products. ¶26. The Company is divided into two reporting segments, North America and Rest of World ("ROW"), with over 90% of ROW revenues coming from China. ¶¶26-29. As the U.S. market for its products matured, AOS turned to China for growth. ¶29. This strategy was successful at first. In the two years

4

before the Class Period, ROW revenue growth accounted for over 90% of AOS's revenue gains. *Id.*

Throughout the Class Period, Defendants repeatedly touted AOS's "record" sales, "high demand," and "double-digit" sales growth in China. ¶¶30, 53-57, 102(b), 103-43. They specifically highlighted China as a growth driver for AOS, citing AOS's "geographic expansion," "overall water heater market growth," and "extensive distribution" in China. ¶¶54, 102(a), 105-07. When AOS reported "inventory build," analysts pressed Defendants on the size and reasons for inventory levels. Defendants falsely represented that inventory was only "a little bit heavy" as such "minimal" issues were due to transitory external factors such as currency fluctuations. ¶¶56-57, 59, 102(c), 125-28.

### B. Defendants Concealed From Investors That AOS's Results In China Were Due To An Unsustainable Channel Stuffing Scheme

Unbeknownst to investors, since at least 2015 AOS's Chinese business was utterly dependent on a single customer: UTP. Indeed, UTP was AOS's largest customer in the entire world, accounted for as much as 26% of the Company's total sales, and was involved in approximately 75% of the Company's sales in China. ¶¶31-36 & n.2. While Defendants reported the identities of AOS's other large customers (all of whom were less important than UTP) and stressed the importance of disclosing such large customers, they failed to disclose UTP. ¶¶36 n.2, 40-41. This highly material omission clearly violated SEC Item 101, which mandates disclosure of "major customers." ¶¶37-41, 76, 100.

The reason for Defendants' intentional omission of UTP is now clear: UTP lay at the heart of a massive years-long channel stuffing scheme that Defendants used to artificially prop up sales and project rising demand where there was none. The mechanics of the unsustainable channel-stuffing scheme are established. ¶¶32-33, 42-52, 61-78. In brief, AOS would extend loans to UTP and work with Chinese banks to extend loans to UTP. ¶¶33-34, 45-52, 64-67. UTP would in turn use these funds to extend loans to other downstream distributors to purchase excess amounts of AOS products. *Id.* But because UTP was essentially insolvent, Chinese banks required AOS to serve as the loan

5

guarantor by depositing its cash in escrow and agreeing to potentially repurchase products. *Id.* AOS also used UTP as a standalone "stockpiler" of excess channel-stuffed inventory. ¶¶33, 46, 64.

AOS thus took on massive credit and collateral risk for "sales" of its own products, and was on the hook to potentially repurchase enormous amounts of unsold inventories. ¶¶33-34, 45-52, 64-67. If UTP or the customers receiving the loans were unable to sell the inventory or otherwise unable or unwilling to repay the loans, AOS was required to satisfy the loan obligations in what Defendants called a "repurchase," even though there were no original "sales" under GAAP.[2] Indeed, the amount of inventory subject to repurchase was $67 million, $76 million, and $78 million as of December 31, 2017, December 31, 2018, and March 31, 2019 – striking figures in context. ¶52. Defendants failed to disclose these contingent liabilities, in clear violation of GAAP. ¶¶83-89, 101.

These rising values highlight the clear timeline of Defendants' escalating and unsustainable channel stuffing. The scheme began in approximately 2015, when AOS and UTP began working together, and took off in 2016 and 2017 to compensate for undisclosed sales declines starting in 2017. ¶¶44, 81, 96. By 2018, with ever-rising inventories to cover up flagging demand, "the pressure" by AOS "started to pick up" and AOS continued "stuff[ing] channels … to hide the sales decline." ¶¶48, 65. Distributors had immense overstock, including "eight months of inventory" amid a "relentless[] increase[]"from AOS. ¶48; *see* ¶52 (rising repurchase agreements alongside rising overstock). The channel stuffing was so intense that "many distributors [could not] keep up with the contracted orders enforced by AOS" and were "breaking contracts, because the inventory pressure [was] so great." ¶47.

**C.      Securities Analysts Revealed The Channel-Stuffing Scheme And Forced Defendants To Admit The Truth**

The truth began to be revealed in April 2019. After years of flagging demand in China, and

---

[2] ¶¶50-52, 80-89. AOS also loaned money to UTP at 2%, which UTP in turn loaned to distributors as working capital at 18%. ¶45. In return for the spread, AOS required UTP to take unlimited inventory. ¶46.

with distributors fighting back by breaking contracts and refusing further inventories, on April 30, 2019, Defendants reported awful financial results for AOS's China business, including a ***66%*** decline in earnings to all-time lows, and all-time lows in profit margins.  ¶¶58-59, 161-63.  Defendants attributed the poor results to "lower China sales" and "channel inventory build."  *Id.*  Defendants, however, continued to omit the channel stuffing scheme and sought to cover up the true extent of inventory overstock.  For example, Defendants claimed that the financial results were transitory, as "China performing better" would contribute to a "stronger second half in 2019."  *Id.*

Just weeks later, investment research firm J Capital published two comprehensive reports about AOS.  ¶¶61-70, 75-79.  The detailed reports were based on dozens of witness interviews, including with UTP employees and 19 AOS distributors in China, on-site and aerial photography, forensic analysis of financial statements and government filings in China, and additional research.  *Id.*; *see* ¶35.  They revealed that, despite never being disclosed by AOS, UTP was "involved in almost every aspect of [AOS]'s China business," and explained how AOS "obscured" AOS's actual financial results in China by using UTP "to prop up sales" and cram customers full of excess inventory to "inflate gross margins and mask the actual China revenue slowdown through distributor-financed channel stuffing."  ¶¶61-65.  As J Capital revealed, UTP – which was "essentially insolvent" – was able to provide loans to AOS's distributors only because AOS not only underwrote and backstopped the loans, but also committed itself to repurchasing "sold" inventory under certain circumstances.  ¶¶45-52, 64-67.  The May 16 report revealed that "detailed distributor channel checks" showed how Defendants had made multiple false statements on April 30, 2019 in an effort to continue covering up the true, undisclosed extent of AOS's overstocking in China.  ¶¶68-69.  For example, on April 30, 2019 Defendants severely understated the extent of inventory in China and the massive declines it would cause in sales for the rest of 2019.  *Id.*  Investors reacted immediately to the publication of the

7

May 16 report, selling AOS shares *en masse* and dropping the price more than 10%.[3]

AOS responded with a press release the next day that did not deny, or provide any factual rebuttal to, ***any*** of J Capital's revelations, including that (i) AOS used UTP as part of an extensive channel stuffing scheme to falsely represent high levels of demand for AOS's products that did not exist; (ii) as a result of the channel stuffing, AOS's customers had far more inventory than Defendants stated; (iii) the economic downturn in China was far worse than Defendants had represented; and (iv) AOS risked forfeiting cash collateral or "repurchasing" substantial amounts of its customers' unsold goods. ¶¶71-76. Indeed, AOS admitted for the first time that UTP was AOS's customer. *Id.* As securities analysts noted, the press release "***reads more like an admission than a defense***." ¶74.

On May 29, J Capital issued a report in response to AOS's May 17 press release. ¶¶75-79. This report explained how AOS had violated Item 101 by not disclosing UTP's role as a material customer of AOS, and further detailed the UTP financing scheme. As J Capital revealed, "AOS has supported UTP with loans or guarantees" and "Chinese financial statements clearly show that UTP, AOS's largest customer worldwide, is essentially insolvent and could collapse." ¶¶76-77. Similar to the May 16 report, the May 29 report again detailed how Defendants had made false and misleading statements downplaying the overstock in China and resulting financial impact to AOS. ¶¶75, 78.

**D. Defendants' Post Class Period Admissions Further Confirmed The Fraud**

Following the publication of the May 29 J Capital Report, AOS was besieged by calls from analysts and investors seeking more information about AOS's relationship with UTP. ¶80. As a result, on June 3, 2019, AOS filed a Form 8-K admitting that, just as J Capital had reported, AOS had for

---

[3] ¶¶70, 164-66. Defendants' assertions that J Capital "offered no evidence that AOS engaged in any wrongdoing" and "said nothing about AOS's revenue-recognition practices" (Br. at 1, 6) are simply false. J Capital exposed AOS's "masking" of true revenues and "inflat[ing of] gross margins" through "high levels of inventory"—the same channel stuffing that is well-recognized as deceptive and improper. ¶¶61-69, 75-78; *see* Section III.A.2 below (discussing improper channel stuffing).

years been backstopping UTP's loans to AOS's customers through "asset-backed financing" *and* AOS "ha[d] agreed to repurchase inventory" sold through the loans under certain conditions. *Id.* The filing of the Form 8-K was an express admission that the previously undisclosed information was material, yet withheld from investors. ¶82. As with Defendants' May 17, 2019 press release, the Form 8-K did not even attempt to refute any of the many shocking revelations in either of the J Capital reports. ¶81.

In addition, Defendants have now admitted that all of their Class Period Forms 10-Q and 10-K were false and misleading, and violated GAAP and applicable accounting standards, for omitting the highly material information about the Company's "repurchase" commitments and contingencies involving UTP. ¶¶83-89. Indeed, AOS's post-Class Period SEC filings now regularly identify UTP and describe AOS's "asset-backed financing" and "repurchase arrangements" through UTP and Chinese banks, as well as the amounts of AOS's material commitments pursuant to them. *Id.*

With Defendants' channel-stuffing scheme exposed, AOS reported multiple quarters of disastrous financial results for its China business. ¶¶90-94. On October 29, 2019, AOS reported a 20% sales decline in China for 3Q 2019 due to "persistently high channel inventory levels" – precisely as J Capital had documented. ¶¶68-69, 92-94. Earnings declined **90%** to the lowest figure ever recorded; margins fell to the lowest percentage ever; and AOS announced a 20% workforce reduction and the need to close "over 700" stores in China. *Id.* After this action was filed, AOS reported another disastrous quarter including a 23% decline in China sales for fiscal 2019—again corroborating J Capital's reporting of a 21% decline for 2019 due to the inventory overhang. ¶¶68-69.

## III.    ARGUMENT

On motions to dismiss in PSLRA cases, "courts must consider the complaint in its entirety," "constantly assum[e] the plaintiff's allegations to be true," and "draw all reasonable inferences in favor of the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 326-27 (2007) ("*Tellabs II*"); *Tellabs III*, 513 F.3d at 705. "The issue is not whether a plaintiff

will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."
*AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

### A. Defendants Made False And Misleading Statements And Omissions

"Rule 10b-5 forbids a company or an individual to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Tellabs III*, 513 F.3d at 704; *see Shah v. Zimmer Biomet Holdings, Inc.*, 2019 WL 762510, at *4 (N.D. Ind. Feb. 20, 2019) (there is an "ever-present duty not to mislead"). To plead this claim element, a plaintiff "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1021 (N.D. Ill. 2010) ("[A] plaintiff is not required to prove the truth of his allegations.").

### 1. Defendants Failed To Disclose The Existence Of UTP

UTP was AOS's largest customer worldwide and the lynchpin of its critical China business. Indeed, throughout the Class Period, UTP was responsible for as much as 75% of AOS's China sales and 26% of AOS's consolidated revenues. ¶¶34, 36 n.2, 62. UTP was also essentially insolvent, which led AOS to assume massive risks in backstopping channel-stuffing loans to and through UTP. ¶¶33-34, 45-52, 64-67. Despite these highly material facts, Defendants never disclosed UTP, let alone any aspect of the channel stuffing scheme AOS used UTP to perpetrate. These omissions clearly violated AOS's disclosure obligations under the federal securities laws and were blatant violations of the SEC's Item 101 reporting requirements for publicly traded companies. ¶¶37-41, 76, 100.

Given UTP's admitted critical importance to AOS, there can be no question that Defendants violated Item 101 by omitting UTP. AOS's sales to UTP were more than 10% of AOS's consolidated revenues and "the loss of [UTP] would have [had] a material adverse effect on [AOS] and its subsidiaries taken as a whole." ¶¶34, 36 n.2, 38, 62. Indeed, throughout the Class Period UTP was

10

responsible for as much as 26.3% of AOS's consolidated revenues (¶¶36 n.2, 104, 121, 137, 146) and the loss of UTP would have not only immediately cratered the vast majority of AOS's sales in China, but also would have upended Defendants' undisclosed channel-stuffing scheme that was artificially propping up the Company's reported financial figures.[4]  Defendants' Item 101 violation was clearly intentional, as Defendants disclosed *other* customers that represented *smaller* percentages of AOS's consolidated revenues than UTP; and omitting UTP assisted Defendants in obscuring the channel stuffing.  ¶¶40, 146; *see In re Next Level Sys., Inc.*, 1999 WL 387446, at *8-9 (N.D. Ill. Mar. 31, 1999) (Item 101 omission "hid[] the significant difficulties" the company was facing).

Defendants have no real response to the allegations that they omitted material information and violated Item 101 by not disclosing UTP.  Br. at 12-15.  While Defendants appear to assert that they did not have to disclose UTP, and that it was not material, their words are directly belied by their own actions.  Indeed, after the Class Period ended, and only after the analyst community had revealed UTP, AOS's SEC filings for the first time contained a lengthy, detailed discussion of UTP and the fact that AOS was both guaranteeing sales and bound by product repurchase agreements.  ¶¶80-89.

Defendants also appear to contend that UTP was not "an actual AOS customer" because it was also a "distributor" for AOS.  Br. at 13.  This is nonsense.  Defendants expressly admitted that UTP "***purchase[s] products from us***"—a plain admission that UTP was AOS's customer.  ¶71.  As J Capital correctly concluded, Defendants "***admit[ted] that Jiangsu UTP is a customer, not just a logistics services provider***."  ¶¶71, 76.  Moreover, during the Class Period, AOS: (i) expressly recognized in its SEC filings that its "distributors" (aka, "supply-chain partners") are its "customers;" (ii) repeatedly referred to its "distribution customers" and "distribution customers in China"; and

---

[4] ¶¶42-52, 61-79.  Contrary to Defendants' assertions (Br. 13-14), the Complaint also details how AOS stuffed UTP full of inventory to generate false revenues.  ¶46.  After UTP was disclosed, AOS was forced to report a series of disastrous financial results and sweeping measures to downsize the Company's contracting China operations, including plummeting revenues.  ¶¶90-94.

(iii) published many investor presentations classifying AOS's "large regional distributors" as "AOS's customers." ¶27. Defendants' brief conveniently ignores all of these facts.

Defendants assert that although AOS never mentioned UTP before the J Capital reports, and J Capital's disclosure of UTP caused huge declines in AOS's stock price (¶¶61-70, 75-79, 164-68), the information was "in the public domain" in China (Br. at 14) so Defendants never omitted anything. Br. at 14, 30. This "truth on the market" defense is premature and incorrect.[5] Simply put, Defendants can point to no information, news or disclosure in this country that revealed anything about UTP until the J Capital reports, and that dooms their argument.[6]

### 2. Defendants Concealed AOS's Channel Stuffing Scheme

Throughout the Class Period, Defendants falsely claimed that AOS's rising sales in China were due to customer demand, and misleadingly claimed that inventory build was due to external forces. *E.g.*, ¶¶103-120, 122, 124. The truth was precisely the opposite. AOS's "sales" in China were not due to rising demand, but instead to a massive, years-long channel-stuffing scheme that ultimately collapsed under its own weight and the investigative reporting of analysts at J Capital.

---

[5] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013) (the Court has "emphasized" that "news [that] the truth credibly entered the market … is a matter for trial"); *Asher v. Baxter Int'l. Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("truth-on-the-market" defense "is available in principle, but not at the pleading stage"). Defendants cite UTP's website in support of their assertion, but it is in Chinese. ECF No. 25-33, at 8-9; *see Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) (public filings in China "are not readily accessible for U.S. investors"). Defendants also cite *Higginbotham* (Br. at 14), but the case supports the Complaint. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) (individuals "are not charged with knowing the truth of whatever any public official anywhere in the world may assert," let alone what is on a Chinese website). Defendants cite *Pier 1*, but that case regarded the risk of markdowns, not, as here, a years-long *executed* strategy of overstuffing customers with inventory to artificially inflate results. *Mun. Emps.' Ret. Sys. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 435-37 (5th Cir. 2019).

[6] Contrary to Defendants' assertion (Br. at 14), the Complaint does not allege that "all" of Defendants' misstatements were misleading because they omitted UTP. As alleged, the Forms 10-K violated Item 101 (¶100), and Defendants' statements concerning distributors were misleading for omitting UTP (¶¶105-06, 130-31). Defendants' other statements are actionable for a host of additional reasons specified in the Complaint. *See* ¶¶99-143.

¶¶58-82. AOS's inventory build was due to the channel stuffing – not temporary external forces – and Defendants grossly understated the extent of the inventory build. ¶¶61-69, 75-78. When the truth finally came out, AOS was forced to admit a complete collapse in its China business. ¶¶90-94.

Controlling law is clear that such allegations state claims for securities fraud. As the Seventh Circuit held in *Tellabs I*, "[w]hile there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, ***providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them***." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598 (7th Cir. 2006) ("*Tellabs I*"). That is precisely the case here. And, as further explained by the *Tellabs* court on remand from the Supreme Court, channel-stuffing like Defendants' here is also actionable due to AOS's repurchase agreements, *i.e.*, its use of channel stuffing "***to book revenues on the basis of goods shipped but not really sold because the buyer can return them***." *Tellabs III*, 513 F.3d at 709. Such "sales" are "***in effect sales on consignment, and such sales cannot be booked as revenue***." *Id.* Like the Seventh Circuit in *Tellabs*, courts throughout the country have upheld "channel stuffing" claims similar to those alleged here where a company borrowed future period sales in order to artificially inflate current period results.[7]

---

[7] *See, e.g.*, *City of Omaha Police & Fire Ret. Sys., v. Evoqua Water Techs.*, 2020 WL 1529371, at *19-20 (S.D.N.Y. Mar. 30, 2020) (sustaining allegations of "channel stuffing with unreported right of return"); *In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 891 (D. Minn. 2011) ("STJ misle[d] investors by stating that its earnings and growth rate would be maintained even though STJ was engaging in an unsustainable pattern of channel stuffing…."); *Cunha v. Hansen Nat. Corp.*, 2011 WL 8993148, at *2 (C.D. Cal. May 12, 2011) ("[T]he channel-stuffing could at the very least cause … results to be misleading where it resulted in an overloaded supply chain that could not sustain impressive early results."); *In re Sci. Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1361 (N.D. Ga. 2002) ("[i]f investors knew about [the] channel stuffing practice, they could surmise that revenues in later quarters would decrease as customers used the stockpiled inventory rather than purchasing more product"), *aff'd*, 374 F.3d 1015 (11th Cir. 2004); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 202 (E.D.N.Y. 2000) (channel stuffing "is undoubtedly a fact that a reasonable investor would have considered important"); *Sherleigh Assocs. v. Windmere-Durable Holdings Inc.*, 178 F. Supp. 2d 1255, 1262, 1272 (S.D. Fla. 2000) (defendants did not adequately warn of significant gap in sales volume caused by channel stuffing through extensive discounting);

By obscuring the true reasons for AOS's reported revenues, Defendants also flouted their basic duty to truthfully explain the basis for AOS's reported performance.  As courts routinely reaffirm, once a company "put[s] the source of [its] revenues at issue" it has a duty to "disclos[e] information necessary to explain the true nature of the business practices employed to enhance those revenues." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 474 (S.D.N.Y. 2006); *accord Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014) (same).

The Complaint details the mechanics, size, and duration of Defendants' deceptive channel stuffing, including by identifying (i) the AOS subsidiary and "supply chain partner" through which AOS carried out the scheme; (ii) the precise mechanisms by which AOS funneled and parked funds to enable purchase of its own products; (iii) details as to the scheme's start date and development during the Class Period; (iv) specific statements by distributors in China concerning their breaking of contracts due to "relentless" "pressure" by AOS; and (v) specific quantifications of the size of inventory overstock due to channel stuffing.  For example, as the J Capital reports explained and Lead Plaintiff's investigation confirmed, Defendants' statements quantifying China inventory levels were false when made because distributors had much more inventory—indeed, as much as eight months of excess inventory, or nearly ***six times*** as much as Defendants falsely stated.  ¶¶48, 62, 68-69, 78.

Despite such facts, Defendants assert that the Complaint should have identified specific channel-stuffing transactions.  Br. at 10-11.  There is no such requirement, particularly in a case such as this that features channel stuffing that has been largely admitted and was so massive that its revelation decimated the Company's financial results.  As the *Rayovac* court put it, "[e]ven without an itemized list of transactions, it is reasonable to infer from plaintiffs' allegations that defendants' channel stuffing was pervasive.  Plaintiffs do not have to plead the dates of transactions or the exact

---

*see also Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000) (false statements made "despite knowledge of the true reasons for rising inventory levels").

dollar amounts involved." *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 987 (W.D. Wis. 2003); *see Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 80 (1st Cir. 2002) (reversing dismissal due to "absence of specific identifying information as to the amount and nature of contingent sales transactions"); *Jones*, 701 F. Supp. 2d at 1021 (rejecting argument that plaintiff "does not point to a single concrete example of a loan that Corus supposedly should have treated differently"). Indeed, "neither Rule 9(b) nor the PSLRA requires plaintiffs to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants." *Direct Benefits, LLC v. TAC Fin. Inc.*, 2014 WL 671616, at *8 (D. Md. Feb. 20, 2014). The fact that AOS admitted to backstopping hundreds of millions of dollars of UTP-financed loans with guarantees and repurchase commitments (¶¶80-82) further underscores the lack of any need to identify individual channel-stuffing transactions at this early stage.

Defendants' assertion that there was nothing "improper" about their channel stuffing (Br. at 11-12) flies in the face of the ample precedent and well-pleaded facts. Defendants' related assertion that J Capital "conceded it had no actual proof of improper channel stuffing" (*id.* at 11 n.3) is also wrong: The J Capital reports provided detailed evidence showing the improper channel stuffing, and specifically identified material misstatements by Defendants covering it up. ¶¶61-69, 75-78. Significantly, Defendants themselves have validated the reports, ***admitting*** to the core features of the scheme, *i.e.*, that AOS was engaged in "asset-backed financing" to the distributors and AOS "***has agreed to repurchase inventory***" sold through the loans. ¶¶71-74, 80-89. Defendants' cases are inapt. Indeed, ***none*** involved stuffing channels by concealing substantial financial guarantees, large repurchase obligations for a company's own sales, and parking the vast majority of its cash abroad.[8]

---

[8] Defendants' attempted reliance on *Greebel* is misplaced. *See Aldridge*, 284 F.3d at 81 ("*Greebel* did not hold that a plaintiff, before discovery, must in every case allege the amount of overstatement of revenues and earnings …."). Both of the out-of-Circuit *Spectrum* and *Mattel* cases are inapposite, as the complaints there contained no specific allegations that there was anything improper about the channel stuffing. *See In Waterford Twp. Police v. Mattell, Inc.*, 321 F. Supp. 3d 1133, 1147-48 (C.D.

Defendants also contend that the J Capital reports must be "discounted" because they are "hearsay." Br. at 11. Courts in this Circuit and across the country have "repeatedly rejected" this contention, holding that analyst reports properly substantiate securities fraud claims, particularly before discovery. *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (collecting cases); *see Shah*, 2019 WL 762510, at *8 (citing the "clear weight of authority"); *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *1 (D.N.J. Apr. 28, 2017) (short seller report revealed undisclosed ways in which company artificially propped up sales); *In re Lihua Int'l, Inc. Sec. Litig.*, 2016 WL 1312104, at *12 (S.D.N.Y. Mar. 31, 2016) (rejecting Defendants' "critici[sm]" of article exposing misconduct as "relying on an anonymous source"); *Kelsey v. Allin*, 2016 WL 825236, at *3-4 (N.D. Ill. Mar. 2, 2016) (short seller reports revealed material omissions).[9]

Finally, Defendants attempt to dispute the well-pleaded facts, which must be taken as true. Defendants assert that they "did not conceal facts about Chinese channel inventory," so there was nothing "surreptitious" or "nefarious." Br. at 12. In truth, Defendants' statements about inventory levels intentionally understated the extent of the rising inventories in China and falsely attributed the increase to a series of temporary, external factors, while omitting that the inventories were due to AOS's longstanding channel stuffing through UTP. *E.g.*, ¶¶68-69, 120, 128, 131, 135; *see In re*

---

Cal. 2018) (case regarded unsurprising end-of-year sales); *In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1309 (N.D. Ga. 2006) ("Plaintiffs' channel-stuffing allegations consist only of generalized assertions regarding … corporate culture and business practices."). In *XM*, unlike here, the alleged false statements were "simply reports of certain financial results" even though "Plaintiffs do not contest the accuracy of any of these reports." *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 178 (D.D.C. 2007). In *Harley-Davidson*, unlike here, the channel stuffing was disclosed; overstock was founded on "independent dealerships' requests for more" products; and "nothing indicates that dealers had the ability to return products." *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 985-87 (E.D. Wis. 2009) ("Channel stuffing [is] deceptive … when a defendant's public statements … fail[] to disclose the practice.").

[9] Defendants' cases are inapt. For example, in *Veal*, the third-party facts provided "no corroboration whatsoever for any … other allegations." *Veal v. LendingClub Corp.*, 2019 WL 5698072, at *16-17 (N.D. Cal. Nov. 4, 2019); *see also Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806-07 (E.D. Va. 2007) ("contradictory" facts from a newspaper article could not "fill gaps in the[] factual allegations").

16

*Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 105 (D.C. Cir. 2015) (statements about drawing down inventories "to normal levels," misleading due to undisclosed company-specific facts).

### 3. Defendants Violated GAAP

Defendants were required under GAAP to disclose the existence, nature and amounts of AOS's repurchase obligations, but AOS's annual and quarterly reports failed to do so. ¶¶83-89, 101. The omissions were critical to A.O. Smith's investors, who were thus completely in the dark about the material risks of the Company's China operations. *Id.* Once J Capital exposed AOS's repurchase obligations undergirding the channel stuffing, Defendants filed a Form 8-K recognizing the materiality of the information (¶¶80-82), and, in a clear admission of AOS's prior GAAP violations, finally began disclosing the repurchase obligations in each subsequent Form 10-Q. ¶¶86-87, 101.

Courts regularly hold that whether defendants violated GAAP is generally inappropriate for resolution as a matter of law at this stage. *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *11 (N.D. Ill. Sept. 21, 2005) ("on a motion to dismiss … courts should be careful not to make a factual determination as to whether the company violated a specific accounting rule") (collecting cases). Defendants nonetheless contend that the Court should rule as a matter of law at the pleading stage that here there were no GAAP violations because Defendants unilaterally chose not to restate their financials. Br. at 2, 15. The argument completely misses the mark. The allegation is not that AOS was required to reverse sales; it is that the financial statements were misleading because they omitted highly material information that was required under GAAP. Such information would have allowed readers to understand the nature of AOS's sales, including the highly material fact that they were contingent, and the risk that AOS could be required to repurchase material amounts of product that it had already recorded as a final sale. There is no dispute about this; indeed, AOS now discloses the information. It is also well established that "the lack of any … restatement does not preclude a claim for securities fraud." *St. Jude*, 836 F. Supp. 2d at 889; *see Aldridge*, 284 F.3d at 83.

Moreover, the violations here were not miscalculations of line items or complex determinations of accounting judgment that a restatement corrects; instead, AOS violated core GAAP disclosure requirements.[10] Defendants' assertion that the Complaint does not "identify a single statement in AOS's filings that was rendered misleading" by the GAAP violations (Br. at 16) fails for similar reasons. Defendants' cases are inapt.[11]

**B.  Defendants' Various "Falsity" Contentions Fail**

**1.  Defendants Did Not "Contradict" Their False And Misleading Statements**

On both July 25, 2018 and October 30, 2018, securities analysts asked questions that provided Defendants golden opportunities to tell the truth about AOS's inventory levels; instead, Defendants deflected and continued to conceal channel stuffing. ¶¶125-28, 130-31. Defendants assert that they made additional statements on those dates, and that the additional statements "contradict" the statements alleged to be false and misleading. Br. at 17-18. Defendants are wrong. The additional statements do not change the meaning of Defendants' false and misleading statements, nor do they contain any disclosure of the true cause of AOS's inventory build: years of intentional channel stuffing to distort the Company's financial results. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth."). In any event, Defendants' invitation to adjudicate falsity in their favor is premature. *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *2 (N.D. Ill. Jan. 23, 2012) ("It is not the function of th[e] Court at the

---

[10] ¶¶85, 87 89, 101. Defendants' note that "probable" and "reasonably estima[ble]" liabilities are accrued (Br. at 16) misses the point. It is not merely that Defendants improperly quantified the contingent sales and liabilities; instead, Defendants wholly failed to disclose them, their nature, and any quantification of them. Similarly, Defendants' assertion that Lead Plaintiff was required to plead "the amount of the overstatement" (Br. at 15-16) is also incorrect. As alleged, Defendants' GAAP violations were disclosure failures, not mere miscalculations. *E.g.*, ¶¶84-89, 101.

[11] For example, *Harley-Davidson* did not concern the disclosure obligations here, but instead particular quantification rules. 660 F. Supp. 2d at 989 (allegations of "***comput[ations] in violation of GAAP***"). *Davis* is similarly inapposite. *See Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 710 (N.D. Ill. 2005) (allegations regarded "improper recognition of revenue").

pleading stage to determine whether the statements were in fact false or misleading.").

### 2. Defendants' Statements Were Highly Material, Not "Optimistic" "Puffery"

Defendants contend that nearly all of their misrepresentations were merely "assertions of corporate optimism" and inactionable as a matter of law.[12] The shotgun assertion is clearly incorrect.

First, Defendants' puffery argument is premature. Materiality is an "inherently fact-specific" inquiry that "is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Matrixx*, 563 U.S. at 30, 39 (materiality "cannot be reduced to a bright-line rule"); *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 840 (N.D. Ind. 2018).

Second, while Defendants' puffery contention attempts to isolate phrases and assess materiality out of context (Br. at 19), "[t]he crux of materiality is whether, ***in context***, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Tellabs I*, 437 F.3d at 596; *see SEC v. Stifel, Nicolaus & Co., Inc.*, 2012 WL 4069346, at *6 (E.D. Wis. Sept. 14, 2012) (rejecting puffery assertions because "defendants pull th[e] words out of the sentences that give them context"); *In re Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *9 (S.D. Cal. Sept. 27, 2016) (same). In context, Defendants' misstatements concerned a subject of critical importance to investors and AOS – namely China, which constituted some 35% of AOS's business. ¶145. Defendants concealed hundreds of millions of dollars in channel stuffing and highly material risks associated with UTP. When the fraud was revealed, AOS's China business collapsed and its stock price plunged, including the largest one-day decline in years, further showing materiality. ¶¶159-68; *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) ("The

---

[12] Br. at 18-20. Defendants' "optimism" argument cites nearly every row in Defendants' "appendix." The appendix incorrectly summarizes the Complaint by, *inter alia*, omitting many of Defendants' false statements and all of their omissions. *See* ¶¶99-143 (the actual allegations). In addition, should the Court find an actionable misstatement or omission, it need not rule on Defendants' "optimism," safe harbor, and "opinion" arguments (Br. at 18-22). *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1041 n.7 (N.D. Cal. 2018).

19

market's negative reaction further tends to show" materiality.).  Moreover, the failure to disclose UTP and the contingent sales cannot be immaterial, as the disclosures were *required* by SEC rules and GAAP.  ¶¶37-41, 83-89.  Defendants' corrective Forms 8-K and 10-Q, filed after the Class Period, *admit* that they withheld "material nonpublic information" from investors.  ¶¶80-89.

Third, Defendants constantly reiterated their misstatements to emphasize critical issues for AOS: the Company's China results and the "investment case" for buying AOS stock.  *See, e.g.*, ¶105; *Tellabs I*, 437 F.3d at 596 (misstatements "reflect[ing]... consequential fact[s] about the company" are not "unspecific puffery"); *Keippel v. Health Ins. Innovations, Inc.*, 2019 WL 5698329, at *7-8 (M.D. Fla. Nov. 4, 2019) (statements not puffery "when key executives continually stress [their subject matter] as a key to company success").  "[T]he significance [of demand for AOS's products] is illustrated by the frequency with which Defendants emphasized [it]."  *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008).

Fourth, the vast majority of Defendants' statements were quantifiable misstatements of present fact, not "optimism" as Defendants now contend.  For instance, Defendants claimed that their increasing sales figures were "primarily due to" various factors, yet materially omitted that the increases were in fact largely due to channel-stuffed overstock in China.  ¶¶103-04.  Defendants' assurances that AOS had "higher demand" and "solid demand" were quantifiable misstatements, as demand was in fact decreasing.  *See Jones*, 701 F. Supp. 2d at 1027-28 (collecting cases).

Fifth, certain of Defendants' statements were in direct response to analyst questions, and thus material.  *Tellabs I*, 437 F.3d at 597 ("[A] direct response to an analyst's inquiry" is not puffery.).

Finally, even if the Court were to find that any of the false statements are puffery, they remain actionable because Defendants were aware that the statements were deceptive and omitted material facts that made the statements misleading.  *Jones*, 701 F. Supp. 2d at 1027-28 ("statements that would

20

otherwise amount to puffery can be actionable if the speaker is aware that the statement is deceptive").

### 3. Defendants' Statements Are Not Entitled To Safe Harbor Protection

Defendants assert that a handful of their statements are protected by the PSLRA's safe harbor for forward-looking statements. Br. at 20-21. Many of the statements Defendants challenge are not forward-looking. For example, Defendants contend that their statements on April 27, 2017, that the Company's historical results were "driven by continued strong demand" and there were several purported "growth drivers underpinning our China business" were about the future. But they were plainly about the past and present, and thus fall outside the safe harbor. *See Tellabs I*, 513 F.3d at 705.

In addition, Defendants' purported cautionary language is not "meaningful" under the safe harbor. *Selbst*, 2005 WL 2319936, at *9 ("When making a forward-looking statement, … the speaker must speak the whole truth … [and] is liable if [it omits] a known material fact which makes the affirmative statement misleading or false."); *see Lindelow v. Hill*, 2001 WL 830956, at *5 (N.D. Ill. July 20, 2001). Defendants' "warnings," including regarding Chinese inventory levels, falsely attributed AOS's inventory levels to external economic conditions rather than a channel stuffing scheme. *E.g.*, ¶125; *Asher*, 377 F.3d at 734 (cautionary language that "omitted important variables" is not meaningful); *St. Jude*, 836 F. Supp. 2d at 894 (cautionary language insufficient because "[w]hile such exogenous variables might have had a negative impact on STJ's results, the Court understands Plaintiffs' claim to [regard] STJ's undisclosed sales and accounting practices"); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018) (statements about expected demand and sales growth were not protected by safe harbor where defendants omitted "existing facts").[13] For this

---

[13] Defendants attempt to rely on *W. Pa. Elec. Emp. Pension Tr. v. Plexus Corp.*, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009), and *St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932 (N.D. Ill. Feb. 28, 2011). Br. at 20-21. The cases are inapt, featuring warnings specifically discussing the "loss of a major customer" and "risks related to certain key suppliers." 2009 WL 604276, at *9; 2011 WL 814932, at *10. Here, by contrast, AOS never disclosed UTP or the risks of the undisclosed channel stuffing scheme, financial guarantees, or repurchase agreements.

reason, courts frequently conclude that "[e]xactly what constitutes 'meaningful cautionary language' is 'difficult if not impossible' to decipher, particularly 'at the pleading stage, before plaintiffs have access to discovery.'" *Selbst*, 2005 WL 2319936 at \*16 (quoting *Asher*, 377 F.3d at 729, 734).

Moreover, the Complaint pleads in detail how Defendants made their misrepresentations with actual knowledge of their falsity, eliminating any chance of safe harbor protection. ¶¶144-58; Section III.C below. As the Supreme Court has held, there are many "usual ways to prove actual knowledge at any stage in the litigation," including "inference from circumstantial evidence" and indications of "willful blindness." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 771, 775 (2020).

### 4. Defendants' Statements Were Not Mere Opinions

Defendants incorrectly contend that certain misstatements were "non-actionable opinions."

Several of the statements that Defendants label uncertain "opinions" (Br. at 21-22) are not opinions. For example, the assertion that "I was in China last week" and "the slowdown has to be hitting everybody," and "you have to assume everybody's kind of in the same" boat with regards to elevated inventories were – far from uncertain projections or guesses – factual statements denying that there was anything unique about AOS's inventory levels. ¶127; *see SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 240 n.11 (4th Cir. 2009) ("The statements cannot be dismissed as unverifiable opinion; they set forth or were grounded in actual past or present facts …."). The statements concealed then-existing material facts regarding AOS's business, regardless of whether some started with "We believe" or "We think." *Costello v. Grundon*, 651 F.3d 614, 639 (7th Cir. 2011) ("it is not the form of the statement which is important or controlling" because "whether a statement is one of fact or opinion depends on the factual circumstances"); *Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at \*4 (N.D. Ill. Feb. 27, 2018) ("Even if defendants' statements were couched in uncertain terms such as we believe and we think ... those statements ... would not have been understood … as uncertain.").

Moreover, even if "opinions," Defendants' statements were actionable for each of the three reasons that, as the Supreme Court holds, opinion statements can mislead: they (i) were not sincerely held, (ii) did not "fairly align[] with the information in the issuer's possession," and (iii) omitted facts that "conflict with what a reasonable investor would take from the statement." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct. 1318, 1321, 1328-29, 1332 (2015).

**C.      The Complaint Pleads A Strong Inference Of Scienter**

A complaint adequately pleads scienter by alleging facts indicating "that [a defendant] either knew [a] statement was false or was reckless in disregarding a substantial risk that it was false." *Tellabs III*, 513 F.3d at 704. The inquiry "constantly assum[es] the plaintiff's allegations to be true" and asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322-23, 326-27 (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. Any tie between culpable and non-culpable inferences favors the plaintiff because "the choice between competing reasonable inferences is not one that the court can make at the pleading stage of th[e] case." *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 979 (S.D. Ind. 2007).

Here, the Complaint contains numerous highly detailed allegations raising a strong inference of Defendants' scienter. *E.g.*, ¶¶144-58. The most prominent of such facts are discussed here below.

First, UTP was AOS's most important customer in the entire world. As Defendants admitted shortly after the Class Period, UTP was involved in "approximately *70%*" of the Company's China sales. ¶¶36 n.2, 145-46. Moreover, UTP was responsible for up to *26%* of the Company's total worldwide sales, *double* the largest of the Company's other distributors. ¶¶34, 36, 146. UTP and AOS also shared deep business and financial entanglements, including that (i) UTP was the master distributor for AOS's two largest markets in China and at least four additional markets; (ii) the

companies were joint venture partners for AOS China's online sales; and (iii) AOS supported UTP with loans and guarantees because UTP was essentially insolvent and on the verge of collapse. *E.g.*, ¶¶76-77. Given the critical importance of UTP to the Company's overall financial condition, and these deep, longstanding entanglements, Defendants obviously knew UTP was AOS's largest customer worldwide and channel stuffed hundreds of millions of dollars in contingent sales.[14]

Second, AOS's China business was critical to the Company's overall performance, accounting for up to 35% of AOS's overall revenues and more than 90% of AOS's revenue growth. ¶¶29, 36 n.2, 145. The channel stuffing scheme regarded AOS's lynchpin customer in its most important growth market, and Defendants clearly knew about it. *See Jones*, 701 F. Supp. 2d at 1028 ("[O]fficers of a company can be assumed to know of facts 'critical to a business's core operations ….'"); *Selbst*, 2005 WL 2319936, at *20 (scienter inference where the issue "affects a significant source of income or a core operation"). As the Seventh Circuit has stated, when the false statements relate to critical business issues, the only competing inference – that Defendants were simply unaware of the false and misleading nature of their statements – is "exceedingly unlikely." *Tellabs III*, 513 F.3d at 709-11.

Third, Defendants have effectively admitted that they were fully apprised of AOS's dealings with UTP. Defendants repeatedly emphasized their focus on AOS's China business, including their close monitoring of AOS's Chinese channel inventory levels, sales trends, distributor solvency, and overall risk exposure. ¶¶149-55. The Individual Defendants even went so far as to highlight their "day-to-day management" of China inventory levels, asserting that they utilized "a variety of

---

[14] *See In re Interlink Elecs., Inc., Sec. Litig.*, 2008 WL 4531967, at *4 (C.D. Cal. Oct. 6, 2008) (in channel-stuffing case, it is "hard to believe that [the CEO and CFO] would be unaware that their company allowed its customers a right to return its products"); *Schleicher*, 529 F. Supp. 2d at 979 (scienter alleged by the "combination of the nature, duration, scope, and financial magnitude of the alleged misstatements and omissions"); *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (where allegations concern "operations," rejecting "Defendants[' argument] that scienter cannot be presumed from a defendant's executive position").

24

inventory measures, by customer, by product category, by percentage increase, off-line to online" to assess inventories and sales trends. ¶¶150, 152. The Individual Defendants further assured investors that they "hire[d] outside experts" to provide advice on AOS's China operations and risk exposures, and described their frequent onsite visits in China, including one in which they were accompanied by AOS's entire Board of Directors. ¶¶149, 155; *see Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 607 (E.D. Va. 2015) (executives' repeated statements that they were "personally involved in [defendant's] Chinese operations" contributes to inference of scienter); *Ross*, 2012 WL 5363431, at *10 (inference that the CEO "made it his business to look into" the issue).

Fourth, as demand in China continued to diminish during the Class Period and channel overstock began to rise further, Defendants tried to cover it up. *See Interlink*, 2008 WL 4531967, at *3 (cover-up efforts support an inference of scienter). For example, in 2018, as continually deteriorating market conditions in China caused AOS to exert mounting "pressure" to "stuff[]" channels … to hide the sales decline" (¶¶48, 65), Defendants falsely attributed "high channel inventory levels in China" not to their own channel stuffing, but instead to a "series of things" outside AOS, such as consumer confidence, currency fluctuations, and a "slowdown [that] has to be hitting everybody." ¶¶125-27. Defendants further covered up by severely understating the extent of excess inventories, stating that inventories were just "a little bit heavy." *Id.* In Spring 2019, as the slowdown in China sales and channel stuffing wore into yet another year, and AOS customers were so overstocked that they canceled contracts with AOS, AOS was finally forced to reveal shocking declines in sales, earnings, and margins in China. Yet, Defendants *still* covered up the true extent of declines by understating excess inventory by nearly *six times*. ¶¶68-69, 138.

Fifth, Item 101 *required* Defendants to disclose the existence of UTP. ¶¶37-41 (citing 17 C.F.R. §229.101(c)(1)(vii)). The SEC has repeatedly emphasized the importance of Item 101 and

AOS itself has recognized the importance of disclosing major customers. *Id.* That Defendants never disclosed the *existence* of UTP until *after* J Capital exposed AOS's relationship with UTP – even as Defendants disclosed smaller U.S. customers pursuant to Item 101 (¶¶36-37, 40, 146) – is powerful scienter proof. *Next Level*, 1999 WL 387446, at *8-11 ("deceptive" financial reporting that allegedly violated Item 101 contributed to inference of scienter); *Jones*, 701 F. Supp. 2d at 1022 (undisclosed special purpose entities used to hide distressed real estate "betokens an intent to deceive").

GAAP similarly required Defendants to disclose that AOS was guaranteeing UTP's loans to AOS's downstream distributors in China and had substantial inventory repurchase agreements. ¶¶83-89. Like Item 101, the subject GAAP provisions are clear requirements that did not require any meaningful exercise of accounting judgment. They simply required AOS to disclose straightforward facts regarding AOS's contingent sales through UTP. *Id.* The fact that Defendants only began reporting such admittedly material facts to investors after the Class Period – *i.e.*, just days *after* they were exposed by J Capital – again shows Defendants' intent to conceal as long as possible.[15]

Sixth, the consistent accounts of multiple on-the-ground sources in China further support scienter. While witness statements are not required (*see Hughes v. Huron Consulting Grp., Inc.*, 733 F. Supp. 2d 943, 949 (N.D. Ill. 2010) (CW statements were "icing on the cake")), here numerous undisputed and cross-corroborating eyewitnesses – including UTP executives and staff, over a dozen AOS distributors in China, AOS competitors in China, and AOS personnel in China – all confirm the core facts of AOS's channel stuffing scheme by telling "essentially the same story." ¶¶47-48, 61-

---

[15] *See In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1023 (N.D. Ill. 2004) (GAAP violations, "when combined with other circumstances suggesting fraudulent intent … may support a strong inference of scienter"); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637-38 (E.D. Va. 2000) (because GAAP rules on contingencies are "relatively simple," it was "likely" that Defendants violated them with scienter); *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 834 n.6 (S.D.N.Y. 2017) (temporal proximity between Defendants' corrective disclosures and prior false statements or omissions supported scienter). Defendants' SOX certifications also add to the scienter inference. *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 819 (N.D. Ill. 2017).

69, 77-78, 95-98; *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (anonymous sources at "different levels of the Company" support scienter).  As one distributor reported, AOS adopted "a sales strategy that would make AOS sales look like they were rising but … AOS stuffed channels, pushing UTP and, in turn, distributors, to take on more inventory than they needed, to hide the sales decline."  ¶65.  Distributors were so overstocked that they could not keep up with the "contracted orders enforced by AOS" and were forced to break contracts "because the inventory pressure [was] so great."  ¶¶44-48; *see Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *17 (N.D. Ill. Feb. 3, 2013) (courts rely on anonymous witnesses if plaintiffs provide "job title, duration of employment ..., and a description of employee responsibilities" for witnesses).  Defendants' attempted criticisms of the on-the-ground sources fail.[16]

Seventh, while motive allegations are not necessary to allege scienter, here the Individual Defendants' large and suspicious insider stock sales add to the strong scienter inference.  *See Tellabs II*, 551 U.S. at 325 (no motive required); *Allstate*, 2018 WL 1071442, at *5 ("suspicious insider selling" contributed to inference of scienter).  Indeed, Defendants Rajendra, Kita, and Wheeler collectively reaped over $12 million in insider trading proceeds during the Class Period.  *See In re Qwest Commc'ns. Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1196 (D. Colo. 2004) (noting that even

---

[16] Defendants contend that CW accounts must be categorically discounted, citing *Higginbotham*.  Br. at 23.  *Higginbotham* was limited by *Tellabs III*, which made clear that courts may rely on anonymous sources if they are sufficiently detailed and the sources' positions provide them with a basis for their asserted knowledge.  *Tellabs III*, 513 F.3d at 711-12 (*Higginbotham* was "very different" case involving a subsidiary concealing facts from its corporate parent); *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 934 (N.D. Ill. 2015) ("There is no categorical discount of [CW] allegations where ... Plaintiff has described the witnesses with enough detail that this Court can determine that the [CWs] have a foundation for their allegations.").  Moreover, such sources need not have management positions or direct contacts with the Individual Defendants, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1139 (9th Cir. 2017) (crediting accounts of "five lower-level [company] employees"), or even have worked at the defendant company during the Class Period.  *See United Union Roofers, Waterproofers & Allied Workers Local Union No. 8 v. Great Lakes Dredge & Dock Corp.*, 2014 WL 12780549, at *2 (N.D. Ill. Oct. 21, 2014).

27

"$410,000 is a substantial sum, and reasonably can be seen as a significant gain from the alleged deception").  Moreover, the Individual Defendants' massive insider selling occurred at elevated prices (often just shy of AOS's Class Period high), were far out of line with their prior trading, and were not made pursuant to any preexisting 10b5-1 trading plan.  ¶157.  Defendants' assertion that their sales were neither usual nor suspicious given the "unusually long" Class Period (Br. at 25) is belied by the fact that Rajendra sold *twice* as many shares during the Class Period as he did in the preceding 27-month Control Period, and that Wheeler had *no* sales during the Control Period.  ¶157.  Defendants' argument that their sales did not occur shortly before the J Capital reports (Br. at 26) is irrelevant, as "there was no preordained date" when the channel stuffing scheme would be uncovered.[17]

Finally, Defendants fail to provide any non-culpable inference.  *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *10 & n.3 (E.D.N.Y. Dec. 5, 2013) (complaint sustained as "Defendants do not identify any … more compelling, competing inference").  Indeed, Defendants' only attempt at proposing a non-culpable inference is to assert that they "repeatedly alerted investors" to elevated inventory "and how it could impact AOS's performance."  Br. at 23.  This is just another half-truth, as it critically omits that these updates grossly and intentionally *misstated* both the extent of the problems and their cause.  ¶¶102(c), 102(d), 116, 120, 125-40; *see Jones*, 701 F. Supp. 2d at 1025 (despite disclosing "certain … difficulties," a company's "statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested").  Indeed, analysts specifically exposed certain of AOS's knowing falsehoods.  ¶¶68-69, 75, 78.

Defendants do not even attempt to contend that they were somehow unaware that as much as

---

[17] *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1185-86 (C.D. Cal. 2007).  Defendants' assertions regarding their stock holdings at the *end* of the Class Period are grounded in erroneous tables, raise fact issues that are outside the pleadings, and do not undercut the scienter inference.  *See* Lead Plaintiff's Opposition to Defendants' Motion to Consider Documents, submitted concurrently herewith (ECF No. 31); *Allstate*, 2018 WL 1071442, at *5.

75% of AOS's China business depended on a single, essentially insolvent distributor whose financial condition required management to park the vast majority of AOS's cash in China to backstop massive channel-stuffing loans. *See In re Comput. Scis. Corp. Sec. Litig.*, 890 F. Supp. 2d 650, 669 (E.D. Va. 2012) (scienter supported where contract was one of the company's largest and CEO watched it closely). Even if Defendants buried their heads in the sand, scienter is still manifest because "failure to have such knowledge equate[s] to reckless disregard." *Lindelow*, 2001 WL 830956, at *8.

Instead of proposing any non-culpable inference, Defendants suggest that Lead Plaintiff was required to plead direct evidence of Defendants' knowledge, such as internal documents. Defendants are incorrect. No "smoking-gun" is required. *Tellabs II*, 551 U.S. at 324; *see In re NeoPharm, Inc. Sec. Litig.*, 705 F. Supp. 2d 946, 969 (N.D. Ill. 2010) ("circumstantial evidence can be more than sufficient to establish scienter"). Indeed, "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Tellabs I*, 437 F.3d at 603. Here, Defendants not only had access to facts undercutting their misstatements, but also professed to be carefully monitoring AOS's China business, distributors, and inventory levels.

### D. The Complaint Adequately Pleads Loss Causation

The Complaint easily satisfies the Rule 8 notice pleading standard for loss causation. *Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 742-43 (N.D. Ill. 2006) (Rule 8 governs). Lead Plaintiff and the Class purchased AOS stock during the Class Period at prices that Defendants' misstatements had artificially inflated. ¶¶159-68. Each corrective disclosure removed artificial inflation, causing investor losses. *Id.* Observers specifically noted the clear causal connections. *Id.*

On April 30, 2019, AOS reported disastrous financial results that it specifically attributed to "channel inventory build" in China, and the stock price dropped significantly as a result. ¶¶58-60, 161-63. These facts allege loss causation. *See Allstate*, 2018 WL 1071442, at *6 (earnings release

alleges loss causation); *Silverman*, 2008 WL 4360648, at *15 (same). Defendants wrongly contend that the April 30 release did nothing more than confirm AOS's forecast. Br. at 29. After the disclosure, securities analysts stated the opposite – that AOS's China business was suddenly "in free fall" amid "***worse*** than … expected earnings," and that Defendants had lost credibility. ¶¶162-63. Moreover, Defendants' "truth-on-the-market" defense is inappropriate at this stage. *Asher*, 377 F.3d at 734.

Loss causation is also clearly alleged based on the J Capital research reports, each of which resulted in large and immediate drops in AOS's stock price. ¶¶61-70, 75-79, 164-68. Courts routinely hold that such analyst reports that reveal new information, just like any other source of material news, are sufficient to plead loss causation. *See McIntire*, 927 F. Supp. 2d at 124 (collecting cases holding that short seller reports adequately allege loss causation and noting that courts have "repeatedly rejected" the contention that short seller reports are "biased"). Defendants' contentions that the J Capital reports did nothing more than dress up "publicly available information" with "sensationalized … opinion" (Br. at 29-30) are doubly wrong, as the reports recounted extensive proprietary research that detailed Defendants' channel stuffing scheme and material misstatements and omissions, sending AOS's share price plummeting. ¶¶61-70; *see Asher*, 377 F.3d at 734 ("[I]t is hard to understand the sharp drop in the price of [the company's] stock [if] the full truth had reached the market."). Defendants' case citations are inapt.[18]

## IV. CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety.[19]

---

[18] For example, the short sellers in *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), and *Central States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013), merely provided their opinions based on purely public information. In *Meyer*, the opinion concerned a "potential future action," 710 F.3d at 1200, and in *Central States* the share price had already declined 40% before the short seller's report. 543 F. App'x at 575.

[19] Because the Complaint adequately alleges Section 10(b) violations, the Section 20(a) claim should be sustained. *United Union Roofers*, 2014 WL 12780549, at *4.

Dated: April 3, 2020

Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ David R. Kaplan*

David R. Kaplan (admitted *pro hac vice*)
Brandon Marsh (admitted *pro hac vice*)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Tel: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
bmarsh@saxenawhite.com

Steven B. Singer (*pro hac vice* forthcoming)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
Brandon T. Grzandziel) (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
brandon@saxenawhite.com

*Lead Counsel for the Class*

31

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 3, 2020, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

/s/ *David R. Kaplan*

32