# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CITY OF BIRMINGHAM RETIREMENT
AND RELIEF SYSTEM, individually and
on behalf of all others similarly situated,
       Plaintiff,

      v.                              Case No. 19-C-1198

A.O. SMITH CORPORATION, et al.,
       Defendants.

---

## DECISION AND ORDER

The plaintiff is an institutional investor serving as the lead plaintiff in a proposed class action under the Private Securities Litigation Reform Act ("PSLRA") against A.O. Smith Corporation ("AOS") and some of its officers and directors. The complaint alleges that AOS and the other defendants committed securities fraud in three respects: by concealing what the plaintiff describes as a "classic channel stuffing scheme," Compl. ¶ 3, by failing to disclose a material customer, and by failing to disclose in its financial statements an agreement to repurchase certain inventory from its distributors in China. Before me now is the defendants' motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).[1]

---

[1] Also before me is the defendants' motion to consider certain documents that are not attached to the complaint in connection with the motion to dismiss. The plaintiff agrees that I may consider the documents identified as Exhibits 1–36 in ECF No. 25 without converting the motion to dismiss into a motion for summary judgment. However, the plaintiff contends that I may not consider the other documents identified in the defendants' motion. Because I have found it unnecessary to consult the disputed documents, I will grant the motion insofar as it is undisputed and deny the remainder without prejudice.

## I. BACKGROUND

AOS is a publicly traded company that manufactures and sells water heaters, boilers, water treatment products, and air purifiers. Most of its sales are to customers in the United States and China. The plaintiff's allegations arise out of AOS's business in China. Between 2014 and 2016, AOS's Chinese sales rose rapidly and became an important part of the company's financial success. The plaintiff alleges that, in February 2017, AOS's growth in China began to decline. The decline culminated in poor financial results that the Company began disclosing after the close of the first quarter of 2019 but allegedly did not fully disclose until June 2019. The plaintiff alleges that, between February 17, 2017 and May 28, 2019 (the class period), the price of AOS's stock was inflated due to the defendants' fraudulent activity. The alleged fraud consisted of a channel-stuffing scheme and AOS's failure to disclose certain matters about how it conducted business in China.

In general, "channel stuffing" refers to the practice of a company's shipping more of its products to its distributors than it thinks the distributors will be able to sell. *See Makor Issues & Rights, Ltd. v. Telllabs, Inc.* (Makor III), 513 F.3d 702, 709 (7th Cir. 2008). The practice is not inherently fraudulent or nefarious, for "a seller might have a realistic hope that stuffing the channel of distribution would incite his distributors to more vigorous efforts to sell the stuff lest it pile up in inventory." *Id.* Channel stuffing becomes a fraud only when it is used "to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Id.* This is a fraud because accounting rules do not permit a company to recognize revenue under these circumstances—such sales are "in effect

2

sales on consignment." *Id.* A recent case from the Fifth Circuit describes a classic channel-stuffing fraudulent scheme:

> "Channel stuffing" is a fraudulent scheme companies sometimes attempt, in an effort to smooth out uneven earnings—typically to meet Wall Street earnings expectations. Specifically, a company that anticipates missing its earnings goals will agree to sell products to a coconspirator. The company will book those sales as revenue for the current quarter, increasing reported earnings. In the following quarter, the coconspirator returns the products, decreasing the company's reported earnings in that quarter. Effectively, the company fraudulently "borrows" earnings from the future quarter to meet earnings expectations in the present. Thus, in the second quarter, the company must have enough genuine revenue to make up for the "borrowed" earnings and to meet that quarter's earnings expectations. If the company does not meet expectations in the second quarter, it might "borrow" ever-larger amounts of money from future quarters, until the amounts become so large that they can no longer be hidden and the fraud is revealed.

> ArthroCare carried out exactly this fraud, with DiscoCare playing the role of coconspirator. Over several years, ArthroCare fraudulently "borrowed" around $26 million from DiscoCare. This "borrowing" occurred by directing DiscoCare to buy products from ArthroCare on credit, with the agreement that ArthroCare would be paid only when DiscoCare could sell those products. Although this can be a legitimate sales strategy, it was fraudulent here because DiscoCare purchased medical devices that it knew it could not sell reasonably soon for the sole purpose of propping up ArthroCare's quarterly earnings.

*United States v. Gluk*, 831 F.3d 608, 611 (5th Cir. 2016).

In the present case, the plaintiff contends that AOS carried out a supposedly similar fraud using a Chinese company as a coconspirator. The company, Jiangsu Huiyuan Supply Chain Management Co., Ltd.—which the parties refer to as "UTP"—is alleged to have been AOS's customer and "logistics provider." Compl. ¶ 31. According to the complaint, AOS "used UTP to report China sales volumes in line with or above the Company's targets, and to hide deteriorating sales and margins in the region amid flagging demand from customers." *Id.* ¶ 33. But here the plaintiff's allegations depart from

3

the classic channel-stuffing fact pattern. The plaintiff does not allege that AOS shipped inventory to UTP at the end of a quarter that it knew UTP could not sell, immediately booked the shipment as a sale, and then accepted returns of the same inventory from UTP in future quarters. Instead, the plaintiff alleges that UTP served as an "undisclosed middleman" who made loans to AOS's downstream distributors in China that enabled the distributors to finance their purchases of AOS's products. *Id.* The plaintiff alleges that AOS "guaranteed" these loans. *Id.* This allegation is based on an SEC filing AOS made just after the close of the class period, in which AOS stated that UTP has "collateralized lending facilities in place with multiple Chinese banks under which [AOS] has agreed to repurchase inventory if both requested by the bank and certain defined conditions are met, primarily related to the aging of the distributors' notes." AOS Form 8-K at 2 (June 3, 2019); ECF No. 25-36; *see also* Compl. ¶¶ 80–82 (alleging that AOS admitted to financing UTP's channel-stuffing loans in the Form 8-K). Notably, the plaintiff does not allege that AOS's Chinese distributors had a right to return products or that the distributors could demand that AOS repurchase their inventory. Nor does the plaintiff allege that AOS ever repurchased inventory from a Chinese distributor. AOS, in its Form 8-K, represented that no Chinese bank had ever requested that it repurchase inventory under the credit facilities. *See* Form 8-K at 2.

The plaintiff alleges that, by guaranteeing UTP's loans to Chinese distributors, AOS enabled the distributors to purchase more inventory from AOS than they could reasonably be expected to sell. The plaintiff also alleges that, because AOS guaranteed the loans, the sales to the distributors were like consignment sales and thus could not legitimately be booked as revenue. The plaintiff further alleges that UTP facilitated this

4

alleged channel-stuffing scheme by agreeing to "take" and not return inventory if AOS requested that it do so. Compl. ¶ 33. Here, the plaintiff describes UTP as a "stockpiler." *Id.* The plaintiff seems to suggest that AOS improperly recognized revenue on inventory that UTP agreed to store in its warehouses. However, the plaintiff never expressly alleges that AOS improperly treated inventory in UTP's warehouses as sales.

The plaintiff alleges that AOS's dealings with UTP involved two additional frauds that related to the supposed channel-stuffing scheme. First, the plaintiff alleges that, "[g]iven UTP's role as a loan conduit and stockpiler of inventory, UTP was by far [AOS]'s largest customer in China during the Class Period." Compl. ¶ 34. The plaintiff alleges that UTP "account[ed] for between 14% and 26% of [AOS]'s total sales throughout the Class Period." *Id.* ¶ 36. The plaintiff alleges that, under SEC Regulation S-K, Item 101, *see* 17 C.F.R. § 229.101, AOS should have disclosed its relationship with UTP in its SEC filings. Compl. ¶¶ 37–41. The plaintiff alleges that AOS's failure to make this disclosure was fraudulent. *Id.* ¶ 100. Second, the plaintiff alleges that AOS violated Generally Accepted Accounting Principles ("GAAP") by failing to disclose in its financial statements its agreement with Chinese banks to repurchase inventory under the UTP credit facilities. *Id.* ¶¶ 84–89, 101.

The plaintiff alleges that these three schemes enabled AOS to report growing sales in China throughout much of the class period. According to the complaint, the truth began to be revealed in April 2019, when AOS reported poor financial results for the first quarter of 2019 due to declining revenue in China. Compl. ¶ 58. The plaintiff alleges that AOS had no choice but to disclose poor financial results for that quarter because its "Chinese

5

customers could no longer absorb [its] excess inventories." *Id.* After AOS disclosed its first-quarter results, its stock price dropped by nearly 6%.

The next step in the unveiling of the alleged fraud took place on May 16, 2019, when a short seller, J Capital Research ("JCap"), published a report in which it argued that AOS's stock was overvalued. *See* JCap Report, ECF No. 25-33. JCap gave many reasons for shorting the stock, one of which was AOS's relationship with UTP. At the time JCap published the report, AOS's relationship with UTP was "public knowledge in China," *see id.* at 2, but AOS had not formally disclosed it in an SEC filing or other public statement. JCap claimed that UTP was involved "in almost every aspect of [AOS]'s China business," including "'accepting' inventory and financing AOS distributors." *Id.* JCap estimated that UTP may have been "responsible" for as much as 75% of AOS's China sales. *Id.* According to JCap, "[t]he UTP partnership has allowed AOS to inflate gross margins and mask the actual China revenue slowdown through distributer-financed channel stuffing." *Id.* JCap based its belief that AOS had been channel stuffing on a survey of AOS distributors in China that it claimed to have conducted. According JCap, distributors reported that, in the first quarter of 2019, they were "carrying around two months of more inventory on average than normal." *Id.* at 22. JCap also reported that it interviewed one distributor in China who said that AOS was pushing distributors to "take on more inventory than they needed" by "providing higher rebates on sales volumes" and requiring UTP to lower the interest rate it charged to distributors for "working-capital loans." *Id.* at 27. After JCap published its report, the price of AOS's stock declined by 10%. Compl. ¶ 70.

6

The day after JCap published its report, AOS issued a press release in which it described JCap's allegations as "inaccurate, unfounded and misleading." Press Release of May 17, 2019; ECF No. 25-34. In the report, AOS acknowledged its relationship with UTP and claimed that it was appropriate. AOS described UTP as "supply chain partner" that purchased product from AOS to subsequently distribute to other distributors and end users. *Id.* AOS claimed that "[a]ll revenue associated with UTP and others was appropriately recognized in accordance with U.S. GAAP in [its] financial statements." *Id.*

On May 29, 2019, JCap published a second report about AOS. *See* Compl. ¶ 75; JCap Supp. Report; ECF No. 25-35. In this report, JCap claims to have conducted a "flash survey" of AOS's Chinese distributors that indicated inventories were still high and were continuing to grow. JCap Supp. Report at 1, 5–6. Some distributors told JCap that they did not intend to buy additional inventory from AOS and that they "heard" that some distributors were breaking contracts with AOS so that they could avoid purchasing additional inventory. *Id.* at 6. JCap also speculated that UTP "must have at least half of AOS's China business" and that therefore AOS should have disclosed UTP as a material customer under Item 101 of Regulation S-K. *Id.* at 4. On the day JCap released its second report, AOS's stock price declined by 4%.

In the wake of the JCap reports, analysts and investors asked AOS to provide additional information about its relationship with UTP. Compl. ¶ 80. In response to these requests, AOS filed a Form 8-K with the SEC on June 3, 2019. *Id.* & ECF No. 25-36. There, AOS stated that "[i]n its capacity as supply-chain service provider to the Company, UTP provides order-entry, warehousing and logistics support in connection with approximately 70% of the Company's sales in China." Form 8-K at 2. AOS also disclosed

7

UTP's collateralized lending facilities with Chinese banks, which I described above. In the 10-Q and 10-K disclosures that AOS has made since June 2019, it has continued to disclose the financing arrangement with UTP and the Chinese banks.

## II. DISCUSSION

Section 10(b) of the Securities Exchange Act forbids the use or employment of any deceptive device in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b). Rule 10b–5 forbids the making of any "untrue statement of a material fact" or the omission of any material fact needed to make the statements not misleading. 17 C.F.R. § 240.10b–5. To plead a violation of Section 10(b) and Rule 10b–5, a plaintiff must allege non-conclusory factual matter that, when accepted as true, gives rise to a reasonable inference that (1) the defendants made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) the false statement or omission proximately caused the plaintiff's damages. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* (Makor I), 437 F.3d 588, 595 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007).

The PSLRA creates a heightened pleading standard for securities fraud claims. Under the PSLRA, to plead a false statement of material fact, a plaintiff must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief." *Makor I*, 437 F.3d at 595 (citing 15 U.S.C. § 78u–4(b)(1)). The facts alleged must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* (internal quotation marks omitted).

8

Scienter involves a "mental state embracing an intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12 (1976). Misstatements or omissions made with reckless disregard of a substantial risk of falsity are also made with scienter. *Makor III*, 513 F.3d at 704. Under the PSLRA, to plead scienter, a complaint must "state with particularity the facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. § 78u–4(b)(2). In determining whether the plaintiff's allegations are adequate to give rise to a strong inference of scienter, I accept those allegations as true and consider the complaint in its entirety as well as other sources that I would ordinarily review, such as documents attached to the complaint or those subject to judicial notice. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). I then ask whether the allegations taken collectively establish a "strong inference of scienter." *Id.* at 323. In doing so, I weigh plausible nonculpable inferences against inferences favoring the plaintiffs' claim. *Id.* at 323–24. The inference favoring the plaintiff's claim "need not be irrefutable, . . . of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324. Rather, the plaintiff's complaint survives if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.*

To evaluate the sufficiency of the plaintiff's complaint, I divide my analysis into three parts. First, I examine whether the plaintiff has adequately pleaded that the defendants engaged in a fraudulent channel-stuffing scheme. Second, I examine whether the plaintiff has adequately pleaded that the defendants committed fraud by failing to disclose UTP in its class-period SEC filings. Finally, I examine whether the plaintiff has

9

adequately pleaded that the defendants committed fraud by failing to disclose AOS's repurchase obligation to Chinese banks in its class-period financial statements.

## A. Channel Stuffing

As I indicated in the background section, having high channel inventory is not inherently fraudulent. For this reason, even if AOS had high channel inventory during parts of the class period—that is, even if the distribution channels were completely "stuffed"—it would not follow that AOS committed fraud. Channel stuffing is fraudulent only when the company recognizes revenue on products shipped to its distributors that it expects the distributors to return in future reporting periods. *See, e.g., Makor III*, 513 F.3d at 709. Here, the plaintiff alleges that AOS had high channel inventory during 2018 and 2019, but it does not allege facts suggesting that, to meet quarterly targets, AOS sold inventory to distributors during one quarter and then accepted returns in subsequent quarters. To the contrary, the plaintiff repeatedly alleges that AOS's Chinese distributors could not return inventory. *See* Compl. ¶¶ 33, 46, 64–65.

Moreover, beginning in 2017, AOS began informing investors that its channel inventory was high and that it expected this to negatively affect future sales numbers. On its earnings call for the fourth quarter of 2017, AOS disclosed that its sales in China had exceeded its expectations for the quarter because customers accelerated their purchases to qualify for "volume incentives" and to build inventory for the holiday shopping season. ECF No. 25-14 at 8. AOS stated that it believed this fourth-quarter "outperformance" would "negatively impact [its] first quarter and full year 2018 China sales." *Id.* During nearly every remaining earnings call in the class period, AOS continued to disclose high channel inventory. On its earnings call for the second quarter of 2018, AOS stated that

10

"[s]ales are expected to be negatively impacted in the second half of the year by high channel inventory levels, which we believe to be the result of recently significant declines in the growth rate housing sales in China." ECF No. 25-20 at 6. AOS management then responded to several questions from investors about the higher inventory levels. *Id.* at 8–9, 11, 16, 20. On the third quarter conference call, AOS stated that it expected China sales growth to be lower "as inventory levels remain elevated into next year with slower housing growth." ECF No. 25-22 at 6. Again, AOS responded to analyst questions about the higher inventory and repeatedly stated that its channel inventory remained elevated. *Id.* at 8, 9. After the fourth quarter, AOS management continued to disclose high channel inventory, *see* ECF 25-25 at 6–7, and told analysts that they could not represent that the excess inventory would soon be "flushe[d] out," *id.* at 8. During the final earnings call for the class period (for the first quarter of 2019), AOS again disclosed high channel inventory, stating that "China sales were down 18% in local currency primarily related to channel inventory build, which occurred in the first quarter of 2018 and did not repeat in 2019." ECF No. 25-29 at 5. When an analyst asked management whether "the inventory channel correction in China" would be complete by the end of the second quarter, management said that "when we look at forward on the year our assumption is that [channel inventory] would be flat to down, but we don't see a lot of decrease in that in our forecast for the rest of the year." *Id.* at 9.

As the Fifth Circuit discussed, perpetrators of a channel-stuffing scheme generally try to hide the fact that sales in a quarter are "borrowed" from future quarters. *See Gluk*, 831 F.3d at 611. Thus, a company engaged in such a scheme likely would not tell investors that high sales in one quarter were caused by customers making unusually large

purchases to qualify for volume discounts, which would negatively impact sales in future quarters, as AOS did here.

Because the plaintiff does not allege that AOS accepted returns of channel inventory, and because AOS repeatedly disclosed its high channel inventory, the plaintiff has not pleaded that AOS engaged in a classic channel-stuffing scheme. The plaintiff, however, offers additional reasons for thinking that AOS committed fraud with respect to its channel inventory. First, the plaintiff cites AOS's admitted agreement with UTP and Chinese banks to repurchase inventory from distributors under certain circumstances. The plaintiff alleges that this agreement turned the sales of inventory to distributors into consignment sales, which AOS fraudulently booked as revenue. *See Makor III*, 531 F.3d at 709. Essentially, the plaintiff argues that the repurchase obligation was functionally equivalent to accepting returns of excess channel inventory. But the plaintiff's allegations do not support this argument. The plaintiff does not allege that, under the loans from UTP, a distributor could demand that AOS repurchase inventory that it could not sell. Instead, the plaintiff's allegations show only that a Chinese bank could initiate a repurchase under certain circumstances. *See, e.g.,* Compl. ¶ 6 (alleging that AOS's agreement to repurchase inventory was with Chinese banks) & ¶ 87 (incorporating AOS disclosure stating that AOS agreed to repurchase inventory "if both requested by the banks and certain defined conditions are met"). Unless the bank made such a request to AOS, the distributor would be required to keep the inventory and repay the loan. Moreover, the loans that UTP made to distributors appeared to result in sales having real economic substance because, as far as the complaint reveals, a Chinese bank never requested that AOS repurchase inventory from a distributor, *see id.* ¶ 80 (adopting Form 8-K, which

12

states on page 2 that AOS "has not been requested to repurchase any inventory under" the UTP credit facilities). Thus, while AOS incurred a risk of having to repurchase some of its inventory, the existence of the repurchase obligation does not give rise to a reasonable inference that any sales associated with the obligation were phony and improperly booked as revenue as part of a channel-stuffing scheme.

Second, the plaintiff alleges that UTP was AOS's "stockpiler" that "soak[ed] up excess inventory." Compl. ¶ 33. The plaintiff seems to suggest that whenever AOS was at risk of failing to meet sales expectations in China, it sold inventory to UTP that UTP then stored in a warehouse. However, the plaintiff does not plead any concrete facts that support this suggestion. As discussed below in connection with Item 101, the plaintiff does not plead that AOS recognized revenue on all products shipped to UTP. Instead, the plaintiff's allegations are consistent with UTP's merely warehousing inventory in China until a distributor placed an order, at which point AOS would recognize revenue. Thus, the plaintiff has not pleaded that AOS generated phony sales by shipping unsold products to UTP and dressing them up as sales to customers.

Third, the plaintiff relies on JCap's speculation that AOS must have been hiding declining sales by stuffing distributors with inventory. *See* Compl. ¶¶ 61-79 (summarizing contents of JCap reports). However, for the most part, the JCap reports only purport to demonstrate that AOS had high channel inventory in China, which, as I've explained, is not inherently nefarious. The reports do not supply evidence showing that channel inventories were high because AOS had been perpetuating a fraudulent channel-stuffing scheme. To the contrary, the reports suggest that, if the distribution channel was stuffed, it became stuffed as a result of legitimate business practices. JCap repeatedly references

13

interviews it claims to have conducted with AOS's distributors. The distributors complained to JCap that AOS pressured them to buy more inventory and hit high sales targets. *See, e.g.,* JCap Report at 27–28. If AOS had been illegally channel stuffing, the distributors would not have complained about sales pressure, for their inventory purchases would have lacked economic substance and they would have known that AOS would accept returns in future quarters or would repurchase inventory they could not sell.

To be sure, JCap stated that at least one distributor viewed AOS's sales pressure as an attempt to hide declining sales. *See* JCap Report at 27 (reporting that a distributor told JCap that "AOS adopted a sales strategy that would make AOS sales look like they were rising but would be bad for distributors . . . to hide the sales decline"). But this seems to have been just JCap's gloss on what the distributor said, and the plaintiff does not purport to have conducted its own interview of the distributor to confirm that the distributor thought AOS was trying to hide declining sales. In any event, what the distributor supposedly describes is simply AOS pressuring it to buy more product, which is legitimate. The fact that the distributor viewed the pressure as an attempt to hide declining sales does not suggest that AOS actually engaged in illegal channel stuffing to hide declining sales. Perhaps AOS thought the distributor could do more to increase sales and thus was trying to incite the distributor "to more vigorous efforts to sell the stuff." *Makor III*, 513 F.3d at 709.

JCap also stated that its interviews "indicate[d]" that AOS had stuffed channels by "providing higher rebates on sales volumes" and causing UTP to reduce the interest rate it charges distributors for working capital loans. JCap Report at 27. Offering volume discounts and other incentives to customers can be part of a channel-stuffing scheme.

*See In re Sunbeam Corp.*, S.E.C. Release No. 7976, Admin. File No. 3–10481, 2001 WL 616627, at \*1 n.4 (May 15, 2001). But such practices are also legitimate and used by most companies. *See In re Spectrum Brands, Inc. Sec. Litig.*, 461 F. Supp. 2d 1297, 1310 (N.D. Ga. 2006). The practice is illegitimate only when a company uses incentives to pull forward revenues from future fiscal periods and then touts the higher revenues as reflecting increased demand. *See In re Sunbeam Corp.*, 2001 WL 616627, at \*1 n.4. Here, the plaintiff does not plead facts giving rise to a reasonable inference that AOS's incentives were part of a channel-stuffing scheme. The plaintiff does not point to any single quarter's results and allege that AOS inflated them by offering incentives to distributors to accelerate purchases that they would not have made until future quarters. Instead, the plaintiff contends that AOS used incentives to inflate its sales for the entire 27-month class period, during which time, according to the plaintiff, AOS's sales were constantly declining. But to pull this off, AOS would have had to have continually increased its sales incentives each quarter to encourage distributors to keep buying inventory that they could neither sell nor return. *See Gluk*, 831 F.3d at 611 (explaining that, to meet targets over multiple quarters, a channel stuffer must continually "borrow" ever-larger amounts of money from future quarters); *In re Sunbeam*, 2001 WL 616627, at \*4 n.11 (explaining that once a company begins the process of discounting to accelerate revenue recognition, the company enters a "doom loop" in which it must continually do so or experience a major earnings shortfall). The distributors quoted in the JCap report do not describe such a massive discounting scheme. They do not claim that, quarter after quarter, AOS kept increasing rebates and lowering interest rates on loans to induce distributors to continually buy inventory they didn't need and couldn't return.

15

Likewise, the few distributors that the plaintiff interviewed do not claim that AOS induced them to purchase inventory they didn't need by repeatedly increasing rebates or making loans more attractive. *See* Compl. ¶¶ 95–98. These distributors do not claim to have ever been offered a rebate, and although two of them describe receiving loans from UTP, they do not claim that UTP repeatedly lowered interest rates to induce them to buy products they didn't need or would not have purchased until future fiscal periods. Moreover, it must be remembered that AOS disclosed to investors that, in 2017 and 2018, channel inventory was high in part because some distributors accelerated their purchases to qualify for "volume incentives." ECF No. 25-14 at 8. AOS warned investors that this revenue "pull-in" would "negatively affect our first quarter and full year 2018 China sales." *Id.* As I mentioned above, this is not the kind of disclosure a company engaged in a channel-stuffing scheme would make. For these reasons, the complaint does not plead facts giving rise to a reasonable inference that AOS used sales incentives to inflate quarterly results and deceive investors into thinking that Chinese sales were rising when they were actually declining.

In its supplemental report, JCap quotes a distributor who claims to have "heard" that distributors are "breaking contracts" because "the inventory pressure is so great." JCap Supp. Report at 6. The plaintiff cites this part of the report and contends that it supports the allegation of channel stuffing. Compl. ¶¶ 10, 47. In fact, this allegation is inconsistent with a channel-stuffing scheme. As discussed above, in a channel-stuffing scheme, a company books revenue based on sales that do not have economic substance because the customer may return inventory it cannot sell. A distributor's having to break

16

a contract to avoid purchasing additional inventory suggests that any purchases the customer makes would have economic substance.

Finally, the plaintiff contends that even if AOS did not perpetrate a channel-stuffing scheme, it made statements that "grossly understated the extent of the inventory build." Br. in Opp. at 13. The plaintiff does not develop this argument in its brief by describing the statements at issue and then pointing to alleged facts showing that the statements were false. Instead, it cites a dozen paragraphs of the complaint and leaves it to me to pick out the allegedly false statements. *See id.* As best I can tell, the plaintiff primarily relies on a portion of the JCap report in which JCap states that its distributor survey showed that AOS was "still carrying around two months of more inventory on average than normal," which, according to JCap, "translates to about $140 [million] in excess inventory in the system." JCap Report at 22. The plaintiff alleges that, during its first-quarter 2019 earnings call, AOS represented that it had only $25 million in excess inventory in the system. Compl. ¶ 69; *see also id.* ¶¶ 138–40. However, no such representation appears in the transcript of the earnings call. At one point, an AOS manager answers an analyst's question about "year-on-year decline" by referring to channel inventory and then stating that the second quarter would be "down" by "roughly half" as much as the first quarter's "roughly $50 million." ECF No. 25-29 at 10. This statement is somewhat vague, in that it is not entirely clear what these numbers refer to. However, the plaintiff interprets the statement as meaning that "inventory build would affect Q2 2019 performance by only $25 million." Compl. ¶ 140. I will assume that the plaintiff's interpretation is correct. Even so, it does not show that AOS represented that its excess channel inventory at the beginning of the quarter was $25 million. A company's

17

predicting that, due to channel inventory levels, one quarter's performance would be $25 million worse than the same quarter a year earlier is not the same as saying that, at the beginning of the quarter, the company had only $25 million in excess channel inventory in the system. (Or, if it is, the plaintiff hasn't adequately explained why.) Notably, JCap did not predict that, because its distributor survey showed that AOS had $140 million of excess channel inventory in the system, AOS's second-quarter sales would be down by at least $140 million compared to the same quarter in 2018. And the plaintiff alleges that the actual reduction in second-quarter sales from 2018 to 2019 was less than $60 million, *see* Compl. ¶ 140, meaning that any such prediction would have been incorrect. Although the $60 million loss may show that AOS's $25 million projection was also incorrect, "a projection is not rendered false when the world turns out otherwise." *Gallagher v. Abbott Labs.*, 269 F.3d 806, 810 (7th Cir. 2002). Thus, the plaintiff has not adequately alleged that AOS represented that it had only $25 million of excess channel inventory at a time when it actually had $140 million.

For these reasons, I conclude that the complaint does not adequately allege that AOS or its managers made false or misleading statements or omissions concerning AOS's channel inventory during the class period.

## B.    Failure to Disclose UTP

The plaintiff alleges that AOS made misleading omissions by failing to disclose the existence of its relationship with UTP during the class period. An omission is not misleading absent a duty to disclose. *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *Higginbotham v. Baxter Int'l., Inc.*, 495 F.3d 753, 760 (7th Cir. 2007); *Gallagher*, 269 F.3d at 808. To show that AOS had a duty to disclose UTP, the plaintiff

18

points to SEC Regulation S-K, which identifies information that a public company must disclose in its periodic SEC filings, including in its Form 10-K. *See* 17 C.F.R. §§ 229.10–229.915. A part of Regulation S-K known as Item 101 requires a company to disclose the extent to which its business is dependent "upon a single customer, or a few customers, the loss of any one or more of which would have a material adverse effect on" the business. *Id.* § 229.101(c)(vii). Specifically, Item 101 states that the company must disclose "[t]he name of any customer and its relationship, if any, with the registrant or its subsidiaries" if "sales to the customer by one or more segments are made in an aggregate amount equal to 10 percent or more of the registrant's consolidated revenues and the loss of such customer would have a material adverse effect on the registrant and its subsidiaries taken as a whole." *Id.*

In its complaint, the plaintiff alleges that UTP "accounted for" or "was responsible for" more than 10% of AOS's consolidated revenues, that the loss of UTP would have had a material adverse effect on the company, and that therefore AOS had a duty to disclose its relationship with UTP in its Form 10-K. *See, e.g.,* Compl. ¶¶ 34, 41, 104, 121. However, the plaintiff never directly alleges that AOS's *sales to UTP* amounted to 10% or more of the company's consolidated revenues. By using vague language such as "accounted for" and "responsible for," the plaintiff appears to be alleging that, because UTP provided services in connection with most of AOS's sales in China, AOS had a duty to disclose UTP in its Form 10-K. But Item 101 does not require a company to disclose a service provider that assists with sales to customers, even if the provider assists with a great many sales. Instead, Item 101 requires a company to disclose a "customer" when,

19

among other things, "sales to the customer" equal or exceed 10% of the company's consolidated revenues. 17 C.F.R. § 229.101(c)(vii).

The plaintiff relies almost exclusively on JCap's reports as support for its belief that UTP was "responsible for" more than 10% of AOS's consolidated revenues. *See* Compl. ¶¶ 7, 34, 36, 62, 76. But in its original report, JCap did not accuse AOS of having violated Item 101. To the contrary, JCap stated that UTP could have been classified as a "service partner simply warehousing inventory for the distributors," rather than as a "material customer." JCap Report at 10. Only after AOS described UTP as a "customer" in its press release did JCap begin to speculate that AOS might have violated Item 101. *See* JCap Supp. Report at 3–4. But JCap's supplemental report does not supply adequate reasons for believing that AOS's sales to UTP equaled or exceeded 10% of its consolidated revenues. The report first notes that UTP served as AOS's distributor for several regions in China, including Shanghai and Shenzhen. But neither JCap nor the plaintiff alleges that AOS's sales to UTP in its capacity as distributor for those regions equaled or exceeded 10% of AOS's consolidated revenues. The supplemental report next notes that UTP owned 10% of a joint venture that "manage[d]" AOS China's online sales. *Id.* at 4. But managing sales is not the same thing as being the customer in a sale, and in any event neither JCap nor the plaintiff makes the case that sales to a joint venture in which UTP held a minority stake qualified as sales to UTP for purposes of applying Item 101. Finally, JCap notes that "65% of the independent distributors [JCap] interviewed purchase from UTP." *Id.* at 4. But a distributor's placing an order through UTP does not imply that UTP purchased the distributor's inventory from AOS. Instead, a distributor's placing an order with UTP is consistent with AOS's representation that UTP was not a material customer

20

but a "supply-chain service provider" that provided "order-entry, warehousing and logistics support in connection with approximately 70% of the Company's sales in China." Form 8-K at 2. In any event, JCap does not identify the number of independent distributors it interviewed or explain how it arrived at the conclusion that AOS's associated sales to UTP were large enough to make UTP a material customer. The plaintiff has not filled this gap in the JCap report with information that it learned through its own investigation. None of the confidential witnesses that the plaintiff interviewed provides information about the quantity of sales AOS made to UTP. *See* Compl. ¶¶ 95–98.

Other than the JCap reports, the plaintiff cites only AOS's Form 8-K as evidence that Item 101 required UTP's disclosure. *See* Br. in Opp. at 11. The plaintiff contends that because AOS disclosed UTP in the 8-K after the class period, AOS must be deemed to have admitted that its relationship with UTP was material and should have been disclosed during the class period. There are two problems with this argument. First, AOS's choosing to disclose its relationship with UTP after investors made inquiries about it does not imply that SEC regulations required AOS to make the disclosure earlier. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993) ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact"). Second, the Form 8-K does not identify UTP as a material customer. Instead, as discussed, it describes UTP as a "supply-chain service provider" in China who also provided "asset-backed financing to certain of the Company's distributors in China." Form 8-K at 2. Nothing in the 8-K suggests that AOS's sales to UTP amounted to 10% or more of the company's consolidated revenues.

21

In sum, because the complaint does not plead facts suggesting that AOS had a duty to disclose UTP under Item 101, it does not adequately allege that AOS's failure to disclose UTP was misleading.

## C.    Failure to Disclose Repurchase Obligations in Financial Statements

The plaintiff's final argument is that AOS violated GAAP by failing to disclose its repurchase obligations to Chinese banks in connection with the UTP credit facilities. The plaintiff contends that this violation rendered all the Forms 10-K and 10-Q that AOS filed during the class period misleading. However, in its brief, the plaintiff does not identify the GAAP provision it contends AOS violated or explain why that provision required AOS to disclose the repurchase obligation. *See* Br. in Opp. at 17–18. Instead, it cites eight paragraphs in its complaint and assumes that the alleged GAAP violation is adequately explained there. It is not, as I explain below.

The complaint alleges that AOS violated FASB Accounting Standards Codification ("ASC") 450, which applies to contingencies. *See* Compl. ¶ 84. The standard governs both recognizing and disclosing a loss contingency. I understand the plaintiff to be focusing on disclosure rather than recognition because it alleges that AOS should have disclosed the repurchase obligation in the notes to its financial statements. *See* Compl. ¶ 88. Under ASC 450-20-50-3, a loss contingency must be disclosed only if there is a "reasonable possibility" that a loss may have been incurred. The complaint does not allege that, at any time during the class period, AOS's accountants should have determined that there was at least a reasonable possibility that AOS may have incurred a loss in connection with its repurchase obligations to Chinese banks under the UTP credit facilities. Indeed, the plaintiff does not even allege that any Chinese distributors

22

defaulted on their obligations to UTP during the class period. In the absence of a default by a distributor, it is hard to see how AOS could be charged with knowledge of a reasonable possibility that it may have incurred a loss under its repurchase obligations to Chinese banks.

In passing, the complaint cites a different GAAP provision, ASC 460, which governs guarantees. Compl. ¶ 84. However, the plaintiff does not explain, either in its brief or its complaint, why ASC 460 required AOS to either record a liability or make a disclosure in connection with its repurchase obligations in its financial statements. Thus, I am unable to conclude that the complaint pleads facts from which it may reasonably be inferred that AOS violated ASC 460 in connection with the repurchase obligations.

The plaintiff also contends that because, after the class period, AOS began disclosing the repurchase obligations in its SEC filings, AOS must be deemed to have admitted that its failure to disclose them earlier violated GAAP. However, adding a disclosure "does not show that earlier ones were recognized as deficient." *Higginbotham*, 495 F.3d at 760. And even if it did, under Federal Rule of Evidence 407, a subsequent remedial measure may not be used as evidence of liability. *Id.*

Finally, even if the complaint had adequately alleged that AOS's class-period financial statements violated GAAP and were misleading due to their failure to disclose the repurchase obligations, this claim would fail because the complaint does not plead that any GAAP violation was committed with scienter. Not a single fact alleged in the complaint suggests that AOS's management knew or was reckless in disregarding a substantial risk that GAAP required the company to disclose its repurchase obligations in its financial statements. To be sure, the complaint alleges that AOS management knew

23

that the repurchase obligations existed, *see* Compl. ¶ 147, but such knowledge does not imply that AOS management also knew that, under any reasonable application of GAAP, the repurchase obligations had to be disclosed. Thus, the complaint does not plead a strong inference of scienter in connection with the alleged GAAP violations.

### III. CONCLUSION

Because the complaint does not adequately plead that AOS made statements or omissions that were false or misleading or adequately plead that any such statements or omissions were made with scienter, I will grant the defendants' motion to dismiss the complaint. However, because a district court generally must consider granting a plaintiff at least one opportunity to amend a deficient complaint, I will allow the plaintiff to move for leave to file an amended complaint under Federal Rule of Civil Procedure 15 and Civil Local Rule 15. In its motion, the plaintiff must explain how the proposed amended complaint cures the problems identified above. Under Civil Local Rule 7(b)–(c), the defendants will have an opportunity to file a response to any such motion, and then the plaintiff may file a reply. If I determine that the proposed amended complaint does not state a claim, then I will deny leave to amend on the ground that granting such leave would be futile. If the plaintiff chooses not to seek leave to amend, then I will enter judgment for the defendants.

Accordingly, **IT IS ORDERED** that the defendants' motion to dismiss (ECF No. 22) is **GRANTED**. However, the plaintiff may file a motion for leave to amend on or before **July 31, 2020**.

24

**IT IS FURTHER ORDERED** that the defendants' motion to consider documents not attached to the complaint (ECF No. 26) is **GRANTED** insofar as it relates to Exhibits 1–37 of ECF No. 25. In all other respects, the motion is **DENIED WITHOUT PREJUDICE**.

Dated at Milwaukee, Wisconsin, this 24th day of June, 2020.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge